487 F.2d 700
 19 A.L.R.Fed. 343, 159 U.S.App.D.C. 58
 Richard M. NIXON, President of the United States, Petitioner
v.
The Honorable John J. SIRICA, United States District Judge,
Respondent and Archibald Cox, Special Prosecutor,
Watergate Special Prosecution Force,
Party in Interest.
UNITED STATES of America, Petitioner
v.
The Honorable John J. SIRICA, Chief Judge, United States
District Court for the District of Columbia,
Respondent and Richard M. Nixon,
President of the United
States, Party in Interest.
In re GRAND JURY PROCEEDINGS.
 Nos. 73-1962, 73-1967 and 73-1989.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 11, 1973.
Decided Oct. 12, 1973.
As amended Oct. 12 and Oct. 25, 1973.
 
 Charles Alan Wright, Austin, Tex., with whom Douglas M. Parker, and Robert T. Andrews, Washington, D. C., were on the brief, for petitioner in No. 73-1962.
 Archibald Cox, Washington, D. C., with whom Philip A. Lacovara and Peter M. Kreindler, Washington, D. C., were on the brief, for petitioner in Nos. 73-1967 and 73-1989.
 Anthony C. Morella, and George D. Horning, Jr., Washington, D. C., for respondent.
 Sherman Cohn, Eugene Gressman, Jerome A. Barron, Samuel Dash, Chief Counsel, Rufus Edmisten, Deputy Counsel, James Hamilton, Asst. Chief Counsel, and Ronald D. Rotunda, Asst. Counsel, were on the brief as amicus curiae.
 Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, LEVENTHAL, ROBINSON, MacKINNON and WILKEY, Circuit Judges, sitting en banc.
 PER CURIAM:
 
 
 1
 This controversy concerns an order of the District Court for the District of Columbia entered on August 29, 1973, by Chief Judge John J. Sirica as a means of enforcing a grand jury subpoena duces tecum issued to and served on President Richard M. Nixon. The order commands the President, or any subordinate official, to produce certain items identified in the subpoena so that the Court can determine, by in camera inspection, whether the items are exempted from disclosure by evidentiary privilege.[1]
 
 
 2
 Both the President and Special Prosecutor Archibald Cox, acting on behalf of the grand jury empanelled by the District Court in June, 1972,[2] challenge the legality of this order. All members of this Court agree that the District Court had, and this Court has, jurisdiction to consider the President's claim of privilege.[3] The majority of the Court approves the District Court's order, as clarified and modified in part, and otherwise denies the relief requested.
 
 I.
 
 3
 We deem it essential to emphasize the narrow contours of the problem that compels the Court to address the issues raised by this case. The central question before us is, in essence, whether the President may, in his sole discretion, withhold from a grand jury evidence in his possession that is relevant to the grand jury's investigations. It is our duty to respond to this question, but we limit our decision strictly to that required by the precise and entirely unique circumstances of the case.
 
 
 4
 On July 23 of this year, Special Prosecutor Cox caused to be issued a subpoena duces tecum directed to the President.[4] The subpoena called upon the President to produce before the grand jury certain documents and objects in his possession-specifically, tape recordings of certain identified meetings and telephone conversations that had taken place between the President and his advisers in the period from June 20, 1972 to April 15, 1973.[5] In a letter dated July 25, 1973, addressed to the Chief Judge of the District Court, the President declined to produce the subpoenaed recordings. The President informed the Court that he had concluded "that it would be inconsistent with the public interest and with the Constitutional position of the Presidency to make available recordings of meetings and telephone conversations in which [he] was a participant. . . ."[6]
 
 
 5
 On July 26, at the instruction of the grand jury, the Special Prosecutor applied to the District Court for an order requiring production of the evidence. Having determined by poll in open court the grand jury's desire for the evidence, the District Judge ordered the President, or any appropriate subordinate official, to show cause "why the documents and objects described in [the subpoena] should not be produced . . .." On August 7, in answer to the order, the President filed a Special Appearance and Brief in Opposition, stating that the letter of July 25 constituted a "valid and formal claim of executive privilege" and that, therefore, the District Court "lack[ed] jurisdiction to enter an enforceable order compelling compliance with the subpoena. . ."[7]
 
 
 6
 The District Court then allowed the Special Prosecutor to submit a memorandum in response to that of the President and in support of the Court's order. This memorandum contains a particularized showing of the grand jury's need for each of the several subpoenaed tapes[8]-a need that the District Court subsequently and, we think, correctly termed "well-documented and imposing."[9]
 
 
 7
 The strength and particularity of this showing were made possible by a unique intermeshing of events unlikely soon, if ever, to recur. The President had previously declared his intention to decline to assert any privilege with respect to testimony by his present and former aides, whether before the grand jury or the Select Committee of the Senate on Presidential Campaign Activities, concerning what has come to be known as the "Watergate" affair.[10] As a result, detailed testimony by these aides before the Senate Committee enabled the Special Prosecutor to show a significant likelihood that there existed conspiracies among persons other than those already convicted of the Watergate break-in and wiretapping, not only to commit those offenses, but to conceal the identities of the persons involved. Moreover, the Special Prosecutor was able to show from the public testimony that important evidence relevant to the existence and scope of the purported conspiracy was contained in statements made by the President's advisers during certain conversations that took place in his office. Most importantly, perhaps, significant inconsistencies in the sworn testimony of these advisers relating to the content of the conversations raised a distinct possibility that perjury had been committed before the Committee and, perhaps, before the grand jury itself.
 
 
 8
 Thus, the Special Prosecutor was able to show that the tape recordings of the disputed conversations-conversations specifically identified as to time, place, and content-were each directly relevant to the grand jury's task. Indeed, the Memorandum demonstrates, particularly with respect to the possible perjury offenses, that the subpoenaed recordings contain evidence critical to the grand jury's decisions as to whether and whom to indict.
 
 
 9
 On August 29th, the Chief Judge of the District Court entered the order at issue in this case. In the accompanying opinion, 360 F.Supp. 1, he rejected the President's challenge to the Court's jurisdiction and to its authority to enter orders necessary to the enforcement of the subpoena. The President, petitioner in No. 73-1962, asks this Court for a writ of mandamus commanding the District Court to vacate its August 29th order. In No. 73-1967, the United States, through the Special Prosecutor and on behalf of the grand jury, petitions for a writ commanding the District Court to order full and immediate disclosure of the tapes to the grand jury and, in the alternative, for instructions to govern any in camera inspection that takes place. The United States has, in addition, filed an appeal from the order below.[11]
 
 
 10
 Because of the public interest in their prompt resolution, we consolidated the cases and ordered briefing on an expedited schedule. For the reasons stated herein, we decline to command the District Court to vacate its order, and dismiss both the petition and appeal of the United States. We direct, however, that the District Court modify its order in certain respects, and that it conduct further proceedings in this case in a manner consistent with the criteria and procedures defined in this opinion.
 
 II.
 
 11
 In their petitions for relief, both the President and the Special Prosecutor invoke this court's statutory authority to issue "all writs necessary or appropriate in aid of" its jurisdiction.[12] As the Supreme Court has noted, the peremptory writ of mandamus, one of the group authorized by the All Writs Act, "has traditionally been used in the federal courts only 'to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so."'[13] And although jurisdiction, for purposes of the writ, need not be defined in its narrow, technical sense, "it is clear that only exceptional circumstances amounting to a judicial 'usurpation of power' will justify the invocation of this extraordinary remedy."[14] Beyond these considerations, the writ may not be used as a substitute for an appeal, nor to subvert the general congressional policy against appeals from interlocutory orders,[15] a policy that is particularly strong in criminal cases.[16]
 
 
 12
 With these general parameters in mind, we turn first to the President's petition, which seeks to accommodate a well settled limitation on direct appeals challenging subpoenas. As recently restated by the Supreme Court, ordinarily "one to whom a subpoena is directed may not appeal the denial of a motion to quash that subpoena but must either obey its commands or refuse to do so and contest the validity of the subpoena if he is subsequently cited for contempt on account of his failure to obey."[17] Contrary to the argument of the respondent Chief Judge, we see no basis for broadly differentiating an order to produce evidence for an in camera inspection to determine whether it is privileged from disclosure to a grand jury.
 
 
 13
 From the viewpoint of mandamus, however, the central question that the President raises-whether the District Court exceeded its authority in ordering an in camera inspection of the tapes-is essentially jurisdictional.[18] It is, too, a jurisdictional problem of "first impression" involving a "basic, undecided question."[19] And if indeed the only avenue of direct appellate review open to the President requires that he first disobey the court's order, appeal seems to be "a clearly inadequate remedy."[20] These circumstances, we think, warrant the exercise, at the instance of the President, of our review power under the All Writs Act,[21] particularly in light of the great public interest in prompt resolution of the issues that his petition presents.[22]
 
 
 14
 We find the Special Prosecutor's petition much more problematic.[23] The Supreme Court "has never approved the use of the writ to review"-at the instance of the Government-"an interlocutory procedural order in a criminal case which did not have the effect of a dismissal."[24] And while the Court has not decided "under what circumstances, if any, such a use of mandamus would be appropriate,"[25] we have grave doubt that it would be appropriate in this case. It is by no means clear that a writ directing the District Court to dispense with in camera inspection and order immediate production to the grand jury could fairly be characterized as aiding this court's jurisdiction, however nontechnically jurisdiction might be defined.
 
 
 15
 Moreover, any resolution of the President's petition necessitates consideration of the validity of the projected in camera inspection-the object of the Special Prosecutor's sole objection-and of the need for instructions governing any such inspection-the subject of his sole request in the alternative. In Schlagenhauf v. Holder,[26] the Supreme Court sustained the inherent power of the courts of appeals in special circumstances to review by mandamus a "basic, undecided question,"[27] and "to settle new and important problems."[28] Although one of the problems raised in that case would not normally have justified an exercise of mandamus authority, the Court recognized the propriety of avoiding piecemeal litigation by resolving all issues arising out of the same set of operative facts.[29] Surely the extraordinary importance of the issues that the Special Prosecutor tenders demands no less.
 
 
 16
 Mandamus is generally withheld when relief is available in another manner.[30] Our review of the President's contentions will necessarily subsume the Special Prosecutor's present concerns. Since we do not consider the question of jurisdiction of his petition essential to a full disposition of this consolidated proceeding, we exercise our discretion[31] to dismiss the petition without deciding it.
 
 III.
 
 17
 We turn, then, to the merits of the President's petition. Counsel for the President contend on two grounds that Judge Sirica lacked jurisdiction to order submission of the tapes for inspection. Counsel argue, first, that, so long as he remains in office, the President is absolutely immune from the compulsory process of a court; and, second, that Executive privilege is absolute with respect to presidential communications, so that disclosure is at the sole discretion of the President. This immunity and this absolute privilege are said to arise from the doctrine of separation of powers and by implication from the Constitution itself. It is conceded that neither the immunity nor the privilege is express in the Constitution.
 
 A.
 
 18
 It is clear that the want of physical power to enforce its judgments does not prevent a court from deciding an otherwise justiciable case.[32] Nevertheless, if it is true that the President is legally immune from court process, this case is at an end. The judiciary will not, indeed cannot, indulge in rendering an opinion to which the President has no legal duty to conform. We must, therefore, determine whether the President is legally bound to comply with an order enforcing a subpoena.[33]
 
 
 19
 We note first that courts have assumed that they have the power to enter mandatory orders to Executive officials to compel production of evidence.[34] While a claim of an absolute Executive immunity may not have been raised directly before these courts, there is no indication that they entertained any doubts of their power. Only last term in Environmental Protection Agency v. Mink,[35] the Supreme Court stated that a District Court "may order" in camera inspections of certain materials to determine whether they must be disclosed to the public pursuant to the Freedom of Information Act.[36]
 
 
 20
 The courts' assumption of legal power to compel production of evidence within the possession of the Executive surely stands on firm footing. Youngstown Sheet & Tube Co. v. Sawyer,[37] in which an injunction running against the Secretary of Commerce was affirmed, is only the most celebrated instance of the issuance of compulsory process against Executive officials. See, e. g., United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (affirming an order requiring the Government to make full disclosure of illegally wiretapped conversations); Kendall v. United States ex rel. Stokes, 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1828) (issuing a mandamus to Postmaster General, commanding him fully to comply with an act of Congress); State Highway Commission v. Volpe, 479 F.2d 1099 (8th Cir. 1973) (enjoining the Secretary of Transportation).
 
 
 21
 It is true that, because the President has taken personal custody of the tapes and is thus himself a party to the present action, these cases can be formally distinguished. As Judge Sirica noted, however, to rule that this case turns on such a distinction would be to exalt the form of Youngstown Sheet & Tube over its substance, Justice Black, writing for the Youngstown majority, made it clear that the Court understood its affirmance effectively to restrain the President. There is not the slightest hint in any of the Youngstown opinions that the case would have been viewed differently if President Truman rather than Secretary Sawyer had been the named party.[38] If Youngstown still stands, it must stand for the case where the President has himself taken possession and control of the property unconstitutionally seized, and the injunction would be framed accordingly. The practice of judicial review would be rendered capricious-and very likely impotent-if jurisdiction vanished whenever the President personally denoted an Executive action or omission as his own. This is not to say that the President should lightly be named as a party defendant. As a matter of comity, courts should normally direct legal process to a lower Executive official even though the effect of the process is to restrain or compel the President. Here, unfortunately, the court's order must run directly to the President, because he has taken the unusual step of assuming personal custody of the Government property sought by the subpoena.
 
 
 22
 The President also attempts to distinguish United States v. Burr,[39] in which Chief Justice Marshall squarely ruled that a subpoena may be directed to the President. It is true that Burr recognized a distinction between the issuance of a subpoena and the ordering of compliance with that subpoena, but the distinction did not concern judicial power or jurisdiction. A subpoena duces tecum is an order to produce documents or to show cause why they need not be produced. An order to comply does not make the subpoena more compulsory; it simply maintains its original force. The Chief Justice's words merit close attention. His statement:
 
 
 23
 Whatever difference may exist with respect to the power to compel the same obedience to the process, as if it had been directed to a private citizen, there exists no difference with respect to the right to obtain it[,]
 
 
 24
 is immediately followed by the statement:
 
 
 25
 The guard, furnished to this high officer, to protect him from being harassed by vexatious and unnecessary subpoenas, is to be looked for in the conduct of a court after those subpoenas have issued; not in any circumstance which is to precede their being issued.[40]
 
 
 26
 The clear implication is that the President's special interests may warrant a careful judicial screening of subpoenas after the President interposes an objection, but that some subpoenas will nevertheless be properly sustained by judicial orders of compliance. This implication is borne out by a later opinion by the great Chief Justice in the same case. When President Jefferson did not fully respond to the subpoena issued to him, Colonel Burr inquired why the President should not comply. The Chief Justice's answer should put to rest any argument that he felt the President absolutely immune from orders of compliance:
 
 
 27
 The president, although subject to the general rules which apply to others, may have sufficient motives for declining to produce a particular paper, and those motives may be such as to restrain the court from enforcing its production. * * * I can readily conceive that the president might receive a letter which it would be improper to exhibit in public * * *. The occasion for demanding it ought, in such a case, to be very strong, and to be fully shown to the court before its production could be insisted on. * * * Such a letter, though it be a private one, seems to partake of the character of an official paper, and to be such as ought not on light ground to be forced into public view.[41]
 
 
 28
 A compliance order was, for Marshall, distinct from an order to show cause simply because compliance was not to be ordered before weighing the President's particular reasons for wishing the subpoenaed documents to remain secret. The court was to show respect for the President in weighing those reasons, but the ultimate decision remained with the court.[42]
 
 
 29
 Thus, to find the President immune from judicial process, we must read out of Burr and Youngstown the underlying principles that the eminent jurists in each case thought they were establishing. The Constitution makes no mention of special presidential immunities. Indeed, the Executive Branch generally is afforded none. This silence cannot be ascribed to oversight. James Madison raised the question of Executive privileges during the Constitutional Convention,[43] and Senators and Representatives enjoy an express, if limited, immunity from arrest, and an express privilege from inquiry concerning "Speech and Debate" on the floors of Congress.[44] Lacking textual support, counsel for the President nonetheless would have us infer immunity from the President's political mandate, or from his vulnerability to impeachment, or from his broad discretionary powers. These are invitations to refashion the Constitution, and we reject them.
 
 
 30
 Though the President is elected by nationwide ballot, and is often said to represent all the people,[45] he does not embody the nation's sovereignty.[46] He is not above the law's commands: "With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law . . .."[47] Sovereignty remains at all times with the people, and they do not forfeit through elections the right to have the law construed against and applied to every citizen.
 
 
 31
 Nor does the Impeachment Clause imply immunity from routine court process.[48] While the President argues that the Clause means that impeachability precludes criminal prosecution of an incumbent, we see no need to explore this question except to note its irrelevance to the case before us. The order entered below, and approved here in modified form, is not a form of criminal process. Nor does it compete with the impeachment device by working a constructive removal of the President from office. The subpoena names in the alternate "any subordinate officer," and the tasks of compliance may obviously be delegated in whole or in part so as not to interfere with the President's official responsibilities.[49] By contemplating the possibility of post-impeachment trials for violations of law committed in office, the Impeachment Clause itself reveals that incumbency does not relieve the President of the routine legal obligations that confine all citizens. That the Impeachment Clause may qualify the court's power to sanction non-compliance with judicial orders is immaterial. Whatever the qualifications, they were equally present in Youngstown: Commerce Secretary Sawyer, the defendant there, was an impeachable "civil officer,"[50] but the injunction against him was nonetheless affirmed. The legality of judicial orders should not be confused with the legal consequences of their breach; for the courts in this country always assume that their orders will be obeyed, especially when addressed to responsible government officials. Indeed, the President has, in this case, expressly abjured the course of setting himself above the law.
 
 
 32
 Finally, the President reminds us that the landmark decisions recognizing judicial power to mandamus Executive compliance with "ministerial" duties also acknowledged that the Executive Branch enjoys an unreviewable discretion in many areas of "political" or "executive" administration.[51] While true, this is irrelevant to the issue of presidential immunity from judicial process. The discretionary-ministerial distinction concerns the nature of the act or omission under review, not the official title of the defendant.[52] No case holds that an act is discretionary merely because the President is the actor.[53] If the Constitution or the laws of evidence confer upon the President the absolute discretion to withhold material subpoenaed by a grand jury, then of course we would vacate, rather than approve with modification, the order entered below. However, this would be because the order touched upon matters within the President's sole discretion, not because the President is immune from process generally. We thus turn to an examination of the President's claim of an absolute discretion to withhold evidence from a grand jury.
 
 B.
 
 33
 There is, as the Supreme Court has said, a "longstanding principle" that the grand jury "has a right to every man's evidence" except that "protected by a constitutional, common law, or statutory privilege."[54] The President concedes the validity of this principle. He concedes that he, like every other citizen, is under a legal duty to produce relevant, non-privileged evidence when called upon to do so.[55] The President contends, however, that whenever, in response to a grand jury subpoena, he interposes a formal claim of privilege, that claim without more disables the courts from inquiring by any means into whether the privilege is applicable to the subpoenaed evidence. The President agrees that, in theory, the privilege attached to his office has limits; for example, he explicitly states that it "cannot be claimed to shield executive officers from prosecution for crime."[56] Nonetheless, he argues that it is his responsibility, and his alone, to determine whether particular information falls beyond the scope of the privilege. In effect, then, the President claims that, at least with respect to conversations with his advisers, the privilege is absolute, since he, rather than the courts, has final authority to decide whether it applies in the circumstances.
 
 
 34
 We of course acknowledge the longstanding judicial recognition of Executive privilege. Courts have appreciated that the public interest in maintaining the secrecy of military and diplomatic plans may override private interests in litigation.[57] They have further responded to Executive pleas to protect from the light of litigation "intra-governmental documents reflecting * * * deliberations comprising part of a process by which governmental decisions and policies are formulated."[58] In so doing, the Judiciary has been sensitive to the considerations upon which the President seems to rest his claim of absolute privilege: the candor of Executive aides and functionaries would be impaired if they were persistently worried that their advice and deliberations were later to be made public.[59] However, counsel for the President can point to no case in which a court has accepted the Executive's mere assertion of privilege as sufficient to overcome the need of the party subpoenaing the documents. To the contrary, the courts have repeatedly asserted that the applicability of the privilege is in the end for them and not the Executive to decide.[60] They have, moreover, frequently ordered in camera inspection of documents for which a privilege was asserted in order to determine the privilege's applicability.[61]
 
 
 35
 It is true, as counsel for the President stress, that Presidents and Attorneys General have often said that the President's final and absolute assertion of Executive privilege is conclusive on the courts.[62] The Supreme Court in United States v. Reynolds, however, went a long way toward putting this view to rest. The Reynolds Court, considering a claim based on military secrets, strongly asserted: "The court itself must determine whether the circumstances are appropriate for the claim of privilege;"[63] "judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers."[64] It is true that, somewhat inconsistently with this sweeping language, the Court formally reserved decision on the Government's claim that the Executive has an absolute discretion constitutionally founded in separation of powers to withhold documents.[65] However, last term in Committee for Nuclear Responsibility, Inc. v. Seaborg,[66] we confronted directly a claim of absolute privilege and rejected it: "Any claim to executive absolutism cannot override the duty of the court to assure that an official has not exceeded his charter or flouted the legislative will."[67]
 
 
 36
 We adhere to the Seaborg decision. To do otherwise would be effectively to ignore the clear words of Marbury v. Madison,[68] that "[i]t is emphatically the province and duty of the judicial department to say what the law is."[69]
 
 
 37
 Seaborg is not only consistent with, but dictated by, separation of powers doctrine. Whenever a privilege is asserted, even one expressed in the Constitution, such as the Speech and Debate privilege, it is the courts that determine the validity of the assertion and the scope of the privilege.[70] That the privilege is being asserted by the President against a grand jury subpoena does not make the task of resolving the conflicting claims any less judicial in nature. Throughout our history, there have frequently been conflicts between independent organs of the federal government, as well as between the state and federal governments. When such conflicts arise in justiciable cases, our constitutional system provides a means for resolving them-one Supreme Court. To leave the proper scope and application of Executive privilege to the President's sole discretion would represent a mixing, rather than a separation, of Executive and Judicial functions. A breach in the separation of powers must be explicitly authorized by the Constitution,[71] or be shown necessary to the harmonious operation of "workable government."[72] Neither condition is met here. The Constitution mentions no Executive privileges, much less any absolute Executive privileges. Nor is an absolute privilege required for workable government. We acknowledge that wholesale public access to Executive deliberations and documents would cripple the Executive as a co-equal branch. But this is an argument for recognizing Executive privilege and for according it great weight, not for making the Executive the judge of its own privilege.
 
 
 38
 If the claim of absolute privilege was recognized, its mere invocation by the President or his surrogates could deny access to all documents in all the Executive departments to all citizens and their representatives, including Congress, the courts as well as grand juries, state governments, state officials and all state subdivisions. The Freedom of Information Act could become nothing more than a legislative statement of unenforceable rights. Support for this kind of mischief simply cannot be spun from incantation of the doctrine of separation of powers.[73]
 
 
 39
 Any contention of the President that records of his personal conversations are not covered by the Seaborg holding must be rejected. As our prior discussion of United States v. Burr makes clear, Chief Justice Marshall's position supports this proposition. At issue in Burr was a subpoena to President Jefferson to produce private letters sent to him-communications whose status must be considered equal to that of private oral conversations. We follow the Chief Justice and hold today that, although the views of the Chief Executive on whether his Executive privilege should obtain are properly given the greatest weight and deference, they cannot be conclusive.
 
 IV.
 
 40
 The President's privilege cannot, therefore, be deemed absolute. We think the Burr case makes clear that application of Executive privilege depends on a weighing of the public interest protected by the privilege against the public interests that would be served by disclosure in a particular case.[74] We direct our attention, however, solely to the circumstances here. With the possible exception of material on one tape, the President does not assert that the subpoenaed items involve military or state secrets;[75] nor is the asserted privilege directed to the particular kinds of information that the tapes contain. Instead, the President asserts that the tapes should be deemed privileged because of the great public interest in maintaining the confidentiality of conversations that take place in the President's performance of his official duties. This privilege, intended to protect the effectiveness of the executive decision-making process, is analogous to that between a congressman and his aides under the Speech and Debate Clause; to that among judges, and between judges and their law clerks;[76] and similar to that contained in the fifth exemption to the Freedom of Information Act.[77]
 
 
 41
 We recognize this great public interest, and agree with the District Court that such conversations are presumptively privileged.[78] But we think that this presumption of privilege premised on the public interest in confidentiality must fail in the face of the uniquely powerful showing made by the Special Prosecutor in this case. The function of the grand jury, mandated by the Fifth Amendment for the institution of federal criminal prosecutions for capital or other serious crimes, is not only to indict persons when there is probable cause to believe they have committed crime, but also to protect persons from prosecution when probable cause does not exist.[79] As we have noted, the Special Prosecutor has made a strong showing that the subpoenaed tapes contain evidence peculiarly necessary to the carrying out of this vital function-evidence for which no effective substitute is available. The grand jury here is not engaged in a general fishing expedition, nor does it seek in any way to investigate the wisdom of the President's discharge of his discretionary duties. On the contrary, the grand jury seeks evidence that may well be conclusive to its decisions in on-going investigations that are entirely within the proper scope of its authority. In these circumstances, what we said in Committee for Nuclear Responsibility v. Seaborg becomes, we think, particularly appropriate:
 
 
 42
 But no executive official or agency can be given absolute authority to determine what documents in his possession may be considered by the court in its task. Otherwise the head of an executive department would have the power on his own say so to cover up all evidence of fraud and corruption when a federal court or grand jury was investigating malfeasance in office, and this is not the law.[80]
 
 
 43
 Our conclusion that the general confidentiality privilege must recede before the grand jury's showing of need, is established by the unique circumstances that made this showing possible. In his public statement of May 22, 1973, the President said: "Executive privilege will not be invoked as to any testimony concerning possible criminal conduct or discussions of possible criminal conduct, in the matters presently under investigation, including the Watergate affair and the alleged cover-up."[81] We think that this statement and its consequences may properly be considered as at least one factor in striking the balance in this case. Indeed, it affects the weight we give to factors on both sides of the scale. On the one hand, the President's action presumably reflects a judgment by him that the interest in the confidentiality of White House discussions in general is outweighed by such matters as the public interest, stressed by the Special Prosecutor, in the integrity of the level of the Executive Branch closest to the President, and the public interest in the integrity of the electoral process-an interest stressed in such cases as Civil Service Commission v. National Association of Letter Carriers[82] and United States v. United Automobile Workers.[83] Although this judgment in no way controls our decision, we think it supports our estimation of the great public interest that attaches to the effective functioning of the present grand jury. As Burr makes clear, the courts approach their function by considering the President's reasons and determinations concerning confidentiality.
 
 
 44
 At the same time, the public testimony given consequent to the President's decision substantially diminishes the interest in maintaining the confidentiality of conversations pertinent to Watergate. The simple fact is that the conversations are no longer confidential. Where it is proper to testify about oral conversations, taped recordings of those conversations are admissible as probative and corroborative of the truth concerning the testimony.[84] There is no "constitutional right to rely on possible flaws in the [witness's] memory. * * * [N]o other argument can justify excluding an accurate version of a conversation that the [witness] could testify to from memory."[85] In short, we see no justification, on confidentiality grounds, for depriving the grand jury of the best evidence of the conversations available.[86]
 
 
 45
 The District Court stated that, in determining the applicability of privilege, it was not controlled by the President's assurance that the conversations in question occurred pursuant to an exercise of his constitutional duty to "take care that the laws be faithfully executed." The District Court further stated that while the President's claim would not be rejected on any but the strongest possible evidence, the Court was unable to decide the question of privilege without inspecting the tapes.[87] This passage of the District Court's opinion is not entirely clear. If, however, the District Judge meant that rejection of the claim of privilege requires a finding that the President was not engaged in the performance of his constitutional duty, we cannot agree. We emphasize that the grand jury's showing of need in no sense relied on any evidence that the President was involved in, or even aware of, any alleged criminal activity. We freely assume, for purposes of this opinion, that the President was engaged in performance of his constitutional duty. Nonetheless, we hold that the District Court may order disclosure of all portions of the tapes relevant to matters within the proper scope of the grand jury's investigations, unless the Court judges that the public interest served by nondisclosure of particular statements or information outweighs the need for that information demonstrated by the grand jury.
 
 V.
 
 46
 The question remains whether, in the circumstances of this case, the District Court was correct in ordering the tapes produced for in camera inspection, so that it could determine whether and to what extent the privilege was properly claimed. Since the question of privilege must be resolved by the Court, there must be devised some procedure or series of procedures that will, at once, allow resolution of the question and, at the same time, not harm the interests that the privilege is intended to protect.
 
 
 47
 Two days after oral argument, this Court issued a Memorandum calling on the parties and counsel to hold conversations toward the objective of avoiding a needless constitutional adjudication. Counsel reported that their sincere efforts had not been fruitful.[88] It is our hope that our action in providing what has become an unavoidable constitutional ruling, and in approving, as modified, the order of the District Court, will be followed by maximum cooperation among the parties. Perhaps the President will find it possible to reach some agreement with the Special Prosecutor as to what portions of the subpoenaed evidence are necessary to the grand jury's task.
 
 
 48
 Should our hope prove unavailing, we think that in camera inspection is a necessary and appropriate method of protecting the grand jury's interest in securing relevant evidence. The exception that we have delineated to the President's confidentiality privilege depends entirely on the grand jury's showing that the evidence is directly relevant to its decisions. The residual problem of this case derives from the possibility that there are elements of the subpoenaed recordings that do not lie within the range of the exception that we have defined.
 
 
 49
 This may be due, in part, to the fact that parts of the tape recordings do not relate to Watergate matters at all. What is apparently more stressed by the President's counsel is that there are items in the tape recordings that should be held confidential yet are inextricably interspersed with the portions that relate to Watergate. They say, concerning the President's decision to permit testimony about possible criminal conduct or discussions thereof, that
 
 
 50
 testimony can be confined to the relevant portions of the conversations and can be limited to matters that do not endanger national security. Recordings cannot be so confined and limited, and thus the President has concluded that to produce the recordings would do serious damage to Presidential privacy and to the ability of that office to function.[89]
 
 
 51
 The argument is not confined to matters of national security, for the underlying importance of preserving candor of discussion and Presidential privacy pertains to all conversations that involve discussion or making of policy, ordinary domestic policies as well as matters of national security, and even to personal discussion with friends and advisers on seemingly trivial matters.[90] Concerning the inextricability problem, the President's counsel say:
 
 
 52
 Recordings are the raw material of life. By their very nature they contain spontaneous, informal, tentative and frequently pungent comments on a variety of subjects inextricably intertwined into one conversation. * * * The nature of informal, private conversations is such that it is not practical to separate what is arguably relevant from what is clearly irrelevant.[91]
 
 
 53
 The "inextricable intermingling" issue may be potentially significant. The District Court correctly discerned that in camera inspection is permissible, even though it involved what the President's counsel agree is a "limited infraction" of confidentiality, in order to determine whether there is inextricable intermingling. In EPA v. Mink, the Supreme Court declared that in camera inspection was an appropriate means of determining whether and to what extent documents sought in litigation were disclosable as factual information even though the Government argued that the documents "submitted directly to the President by top-level Government officials" were, by their very nature, a blending of factual presentation and policy recommendations that are necessarily "inextricably intertwined with policymaking processes."[92] The Supreme Court stated that it had no reason to believe that the District Judge directed to make in camera inspection "would go beyond the limits of the remand and in any way compromise the confidentiality of deliberative information." The Court acknowledged that "the encouragement of open expression of opinion as to governmental policy is somewhat impaired by a requirement to submit the evidence even [in camera]." Yet the Court stated: "Plainly, in some situations, in camera inspection will be necessary and appropriate."[93] It further noted: "A representative document of those sought may be selected for in camera inspection." And it suggested that the agency may disclose portions of the contested documents and attempt to show, by circumstances, "that the excised portions constitute the barebones of protected matter."[94]
 
 
 54
 In this case, the line of permissible disclosure is different from that in Mink, since even policy and decisional discussions are disclosable if they relate to Watergate and the alleged coverup. But Mink confirms that courts appropriately examine a disputed item in camera, even though this necessarily involves a limited intrusion upon what ultimately may be held confidential, where it appears with reasonable clarity that some access is appropriate, and in camera inspection is needed to determine what should and what should not be revealed.[95]
 
 
 55
 Mink noted that the case might proceed by the Government's disclosing portions of the contested documents,[96] and also noted an instance in which the "United States offered to file 'an abstract of factual information' contained in the contested documents (FBI reports)."[97] We think that the District Judge and counsel can illuminate the key issue of what is "inextricable" by cultivating the partial excision and "factual abstract" approaches noted in Mink.
 
 
 56
 The District Court contemplated that "privileged portions may be excised so that only unprivileged matter goes before the grand jury." Even in a case of such intermingling as, for example, comment on Watergate matters that is "pungent," once counsel, or the District Judge, has listened to the tape recording of a conversation, he has an ability to present only its relevant portions, much like a bystander who heard the conversation and is called to testify. He may give the grand jury portions relevant to Watergate, by using excerpts in part and summaries in part, in such a way as not to divulge aspects that reflect the pungency of candor or are otherwise entitled to confidential treatment. It is not so long ago that appellate courts routinely decided cases without an exact transcript, but on an order of the trial judge settling what was given as evidence.
 
 VI.
 
 57
 We contemplate a procedure in the District Court, following the issuance of our mandate, that follows the path delineated in Reynolds, Mink, and by this Court in Vaughn v. Rosen.[98] With the rejection of his all-embracing claim of prerogative, the President will have an opportunity to present more particular claims of privilege, if accompanied by an analysis in manageable segments.
 
 
 58
 Without compromising the confidentiality of the information, the analysis should contain descriptions specific enough to identify the basis of the particular claim or claims.
 
 
 59
 1. In so far as the President makes a claim that certain material may not be disclosed because the subject matter relates to national defense or foreign relations, he may decline to transmit that portion of the material and ask the District Court to reconsider whether in camera inspection of the material is necessary. The Special Prosecutor is entitled to inspect the claim and showing and may be heard thereon, in chambers. If the judge sustains the privilege, the text of the government's statement will be preserved in the Court's record under seal.
 
 
 60
 2. The President will present to the District Court all other items covered by the order, with specification of which segments he believes may be disclosed and which not. This can be accomplished by itemizing and indexing the material, and correlating indexed items with particular claims of privilege.[99] On request of either counsel, the District Court shall hold a hearing in chambers on the claims. Thereafter the Court shall itself inspect the disputed items.
 
 
 61
 Given the nature of the inquiry that this inspection involves, the District Court may give the Special Prosecutor access to the material for the limited purpose of aiding the Court in determining the relevance of the material to the grand jury's investigations. Counsels' arguments directed to the specifics of the portions of material in dispute may help the District Court immeasurably in making its difficult and necessarily detailed decisions. Moreover, the preliminary indexing will have eliminated any danger of disclosing peculiarly sensitive national security matters. And, here, any concern over confidentiality is minimized by the Attorney General's designation of a distinguished and reflective counsel as Special Prosecutor. If, however, the Court decides to allow access to the Special Prosecutor, it should, upon request, stay its action in order to allow sufficient time for application for a stay to this Court.
 
 
 62
 Following the in camera hearing and inspection, the District Court may determine as to any items (a) to allow the particular claim of privilege in full; (b) to order disclosure to the grand jury of all or a segment of the item or items; or, when segmentation is impossible, (c) to fashion a complete statement for the grand jury of those portions of an item that bear on possible criminality. The District Court shall provide a reasonable stay to allow the President an opportunity to appeal.[100] In case of an appeal to this Court of an order either allowing or refusing disclosure, this Court will provide for sealed records and confidentiality in presentation.VII.
 
 
 63
 We end, as we began, by emphasizing the extraordinary nature of this case. We have attempted to decide no more than the problem before us-a problem that takes its unique shape from the grand jury's compelling showing of need.[101] The procedures we have provided require thorough deliberation by the District Court before even this need may be satisfied. Opportunity for appeal, on a sealed record, is assured.
 
 
 64
 We cannot, therefore, agree with the assertion of the President that the District Court's order threatens "the continued existence of the Presidency as a functioning institution."[102] As we view the case, the order represents an unusual and limited requirement that the President produce material evidence. We think this required by law, and by the rule that even the Chief Executive is subject to the mandate of the law when he has no valid claim of privilege.
 
 
 65
 The petition and appeal of the United States are dismissed. The President's petition is denied, except in so far as we direct the District Court to modify its order and to conduct further proceedings in a manner not inconsistent with this opinion.
 
 
 66
 The issuance of our mandate is stayed for five days to permit the seeking of Supreme Court review of the issues with which we have dealt in making our decision.
 
 So ordered.APPENDIX I
 MEMORANDUM AND REPLIES
 UNITED STATES COURT OF APPEALS
 FOR THE DISTRICT OF COLUMBIA CIRCUIT
 September Term, 1973
 
 67
 [Filed Sep. 13, 1973, United States Court of Appeals for the
 
 
 68
 District of Columbia Circuit, Hugh E. Kline, Clerk]
 
 No. 73-1962
 
 69
 RICHARD M. NIXON, President of the United States,
 
 Petitioner
 
 70
 v.
 
 
 71
 The Honorable JOHN J. SIRICA,
 
 United States District Judge, Respondent
 
 72
 and
 
 
 73
 ARCHIBALD COX, Special Prosecutor, Watergate Special
 
 Prosecution Force, Party in Interest
 No. 73-1967
 UNITED STATES OF AMERICA, Petitioner
 
 74
 v.
 
 
 75
 The Honorable JOHN J. SIRICA, Chief Judge, United States
 
 
 76
 District Court for the District of Columbia, Respondent
 
 
 77
 and
 
 
 78
 RICHARD M. NIXON, President of the United States,
 
 Party in Interest
 
 79
 Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, LEVENTHAL, ROBINSON, MacKINNON, and WILKEY, Circuit Judges.
 
 MEMORANDUM
 
 80
 PER CURIAM.
 
 
 81
 From the able exposition by counsel in the unusually full oral argument allowed by the Court in this case, it appeared to the Court that the issues dividing the parties might be susceptible of resolution by procedures other than those set forth in either District Judge Sirica's opinion or the briefs of the parties. The Court has been, and is, conscious of the public importance of this matter and the public interest in the earliest possible resolution of it.
 
 
 82
 The doctrine under which courts seek resolution of a controversy without a constitutional ruling is particularly applicable here. The possibility of a resolution of this controversy without the need for a constitutional ruling is enhanced by the stature and character of the two counsel charged with representation of each side in this cause, and by the circumstance that each was selected for his position, directly or indirectly, by the Chief Executive himself.
 
 
 83
 Whereas Judge Sirica contemplated an in camera examination of the subpoenaed tapes, which would have necessitated the presence of the Judiciary, we contemplate an examination of the tapes by the Chief Executive or his delegate, assisted by both his own counsel, Professor Wright, and the Special Prosecutor, Professor Cox.
 
 
 84
 We say this without intimating a decision on any question of jurisdiction or privilege advanced by any party. Apart from noting that the likelihood of successful settlement along the lines indicated contemplates a voluntary submission of such portions of the tapes to the two counsel as satisfies them, we do not presume to prescribe the details of how the Chief Executive will work with the two counsel.
 
 
 85
 This procedure may permit the different approaches of the parties to converge. The President has maintained that he alone should decide what is necessarily privileged and should not be furnished the grand jury. The Special Prosecutor has maintained that he should have the opportunity of examining the material and asserting its relevance and importance to the grand jury investigation. If the President and the Special Prosecutor agree as to the material needed for the grand jury's functioning, the national interest will be served. At the same time, neither the President nor the Special Prosecutor would in any way have surrendered or subverted the principles for which they have contended.
 
 
 86
 If, after the most diligent efforts of all three concerned, there appear to be matters the President deems privileged and the Special Prosecutor believes necessary and not privileged, then this Court will discharge its duty of determining the controversy with the knowledge that it has not hesitated to explore the possibility of avoiding constitutional adjudication. Even if this were to occur, the issues remaining for resolution might be substantially narrowed and clarified.
 
 
 87
 We have issued this Memorandum without interrupting the schedule for post-argument memoranda by the parties. The overriding public interest in this case demands our best and most expeditious efforts in the meantime. The Court asks that it be advised, by both counsel, no later than September 20, 1973, whether the approach indicated in this memorandum has been fruitful.
 
 
 88
 The Clerk is directed to transmit this Memorandum to all parties to the instant proceedings and to file it in the record.THE WHITE HOUSE
 
 WASHINGTON
 20 September 1973
 
 89
 [Filed Sep. 20, 1973, United States Court of Appeals
 
 
 90
 for the District of Columbia Circuit
 
 
 91
 Hugh E. Kline, Clerk]
 
 Mr. Hugh E. Kline
 Clerk
 United States Court of Appeals
 Washington, D. C. 20001
 
 92
 In re Grand Jury Subpoena, Nos. 73-1962, 73-1967
 
 Dear Mr. Kline:
 
 93
 This is to advise you that counsel in the above-entitled matter have had lengthy meetings, pursuant to the suggestion in the Court's memorandum of September 13th. Mr. Cox and Mr. Buzhardt met on September 17th and 18th and today Mr. Cox and Mr. Lacovara of his office met with Mr. Buzhardt, Mr. Garment, and myself. I regret to advise the Court that these sincere efforts were not fruitful.
 
 
 94
 All participants in these conversations have agreed that we shall say nothing about them except to make this report to the Court.
 
 
 95
 I understand that Mr. Cox will similarly advise you of these meetings and of their unsuccessful outcome.
 
 
 96
 Respectfully,
 
 
 97
 /s/ Charles Alan Wright
 
 CHARLES ALAN WRIGHT
 An Attorney for the President
 
 98
 cc: Honorable Archibald CoxWATERGATE SPECIAL PROSECUTION FORCE
 
 United States Department of Justice
 
 99
 1425 K Street, N.W.
 
 Washington, D. C. 20005
 September 20, 1973
 
 100
 [Filed Sep. 20, 1973, United States Court of Appeals
 
 
 101
 for the District of Columbia Circuit
 
 
 102
 Hugh E. Kline, Clerk]
 
 Hon. Hugh E. Kline
 Clerk, United States Court of
 Appeals for the District of
 Columbia Circuit
 
 103
 Washington, D. C.
 
 
 104
 Re: Nixon v. Sirica et al. (Nos. 73-1962, 73-1967)
 
 Dear Mr. Kline:
 
 105
 This is to advise you that counsel in the above entitled matter have had lengthy meetings pursuant to the suggestion in the Court's memorandum of September 13. Mr. Buzhardt and I met on September 17 and 18 and today Mr. Lacovara of my office and I met with Messrs. Wright, Buzhardt, and Garment. I regret to advise the Court that these sincere efforts were not fruitful.
 
 
 106
 All participants in these conversations have agreed that we shall say nothing about them except to make this report to the Court.
 
 
 107
 I understand that Mr. Wright will similarly advise you of these meetings and of their unsuccessful outcome.
 
 
 108
 Sincerely,
 
 
 109
 /s/ Archibald Cox
 
 ARCHIBALD COX
 Special Prosecutor
 
 110
 cc: Hon. John J. Sirica
 
 
 111
 Charles Alan Wright, Esq.
 
 APPENDIX II
 
 112
 In a "Memorandum in Support of an Order to Produce Documents or Objects in Response to the Subpoena" (pp. 5-10), filed with the court below on August 13, 1973, the Special Prosecutor provided the following description of the nine communications, tapes of which are sought by the grand jury. (The transcript references throughout are to the transcript of the hearings of the Senate Select Committee on Presidential Campaign Activities.)
 
 
 113
 1. Meeting of June 20, 1972. Respondent met with John D. Ehrlichman and H. R. Haldeman in his Old Executive Office Building (OEOB) office on June 20, 1972, from 10:30 a. m. until approximately 12:45 p. m. There is every reason to infer that the meeting included discussion of the Watergate incident. The break-in had occurred on June 17-just three days earlier. Dean did not return to Washington until June 18 (S. Tr. 2166). Mitchell, Haldeman and LaRue had also been out of town and did not return until late on June 19 (S. Tr. 3305, 3307, 6195). Early on the morning of June 20, Haldeman, Ehrlichman, Mitchell, Dean and Attorney General Kleindienst met in the White House. This was their first opportunity for full discussion of how to handle the Watergate incident, and Ehrlichman has testified that Watergate was indeed the primary subject of the meeting (S. Tr. 5923-5924). From there, Ehrlichman and then Haldeman went to see the President. The inference that they reported on Watergate and may well have received instructions, is almost irresistible. The inference is confirmed by Ehrlichman's public testimony that the discussion with respondent included both Watergate and government wiretapping (S. Tr. 5924-25). The contemporary evidence of that meeting should show the extent of the knowledge of the illegal activity by the participants or any effort to conceal the truth from the respondent.
 
 
 114
 2. Telephone call of June 20, 1972. Respondent and John Mitchell, the director of respondent's campaign for re-election, spoke by telephone from 6:08 to 6:12 p. m. on June 20, 1972. Mitchell has testified that the sole subject was the Watergate break-in and investigation (S. Tr. 3407-08). This apparently was the first direct contact after the break-in between respondent and Mitchell, so that what Mitchell reported may be highly material. Indeed, although Mitchell already may have been briefed at this time by Robert C. Mardian and LaRue about Liddy's involvement in the break-in (S. Tr. 3629-32, 4590, 4595), Mitchell maintains that he told the President that only the five arrested at Watergate-not including Liddy-were involved. (S. Tr. 3407-08, 3632). Evidence of this conversation with a man who had no public office at the time and was concerned solely with respondent's political interests will either tend to confirm Mitchell's version or show a more candid report to respondent.
 
 
 115
 3. Meeting of June 30, 1972. Respondent met with Mitchell and Haldeman for an hour and 15 minutes in his EOB office, apparently the first meeting between respondent and Mitchell since June 17, 1972. The topic of conversation, according to Mitchell, was his impending resignation as Chairman of the Committee for the Re-Election of the President (S. Tr. 3442-43), which in fact was announced the next day. This is a meeting most of which almost surely did not involve any official duties of the President. It also strains credulity to suppose that Watergate and how Watergate affected Mitchell and the campaign were not topics of conversation. The records of the meeting are clearly the most direct evidence of the knowledge and intentions of the participants as of a date shortly after the grand jury began its investigation.
 
 
 116
 4. Meeting of September 15, 1972. On September 15, 1972, the grand jury returned an indictment charging seven individuals with conspiracy and other offenses relating to the break-in. Respondent met the same day with Dean and Haldeman in his Oval Office from 5:27 to 6:17 p. m. Both Dean and Haldeman have given lengthy but contradictory accounts of what was said (S. Tr. 2229-33, 6090-93).
 
 
 117
 According to Dean, the purpose of the meeting was to brief respondent on the status of the investigation and related matters. Dean said that respondent then congratulated him on the "good job" he had done and was pleased that the case had "stopped with Liddy." Dean said that he then told respondent that all he had been able to do was "contain" the case and "assist in keeping it out of the White House." (S. Tr. 2230.) If this testimony is corroborated, it will tend to establish that a conspiracy to obstruct justice reached the highest level of government.
 
 
 118
 Haldeman, after reviewing a tape recording of the meeting, has agreed that there was discussion of the Watergate indictments, of the civil cases arising out of the break-in, of the possibility of a continuing grand jury investigation, of internal policies at the Committee for the Re-Election of the President, and of other matters. He denies, however, that respondent congratulated Dean on Dean's efforts to thwart the investigation. (S. Tr. 6090-93, 6456.)
 
 
 119
 If Haldeman's innocuous version of the meeting can be sustained, it is because the meeting only involved an innocent discussion of political interests. The question of Dean's perjury would then arise. Resolution of this conflict between two of the three persons present and an accurate knowledge of plans or admissions made on this occasion would be of obvious aid to the grand jury's investigation.
 
 
 120
 5. Meeting of March 13, 1973. Respondent again met with Dean and Haldeman on March 13, 1973, from 12:42 to 2:00 p. m. Dean testified at length about the meeting. (S. Tr. 2323-2325.) Haldeman gave evidence that he has no independent recollection of what was said (S. Tr. 6100).*
 
 
 121
 The White House briefing for the Senate Committee suggests that the meeting related primarily to Watergate and that respondent asked Dean for a report on the involvement of Haldeman and others.** Dean, on the other hand, testified that respondent told Dean that respondent had approved executive clemency for defendant Hunt and that there would be no problem about raising $1 million to buy all defendants' silence (S. Tr. 2324). Unquestionably, confirmation of Dean's testimony would aid the grand jury in determining the existence, membership, and scope of a cover-up conspiracy. Conclusive disproof, on the other hand, would raise a question of perjury by Dean before the Senate Committee, a matter directly within the grand jury's jurisdiction.
 
 
 122
 6, 7. Meetings of March 21, 1973. On March 21, 1973, respondent met with Dean and Haldeman from 10:12 to 11:55 a. m. and with Dean, Haldeman, Ehrlichman and Ronald Ziegler from 5:20 to 6:01 p. m. (Not all parties were present all of the time.)
 
 
 123
 Both Dean and Haldeman (who reviewed the recording of the morning meeting) have testified extensively about that meeting (S. Tr. 2329-34, 6112-15, 6273-95, 6394-6400), and it is also discussed in the White House briefing for the Senate Committee. All accounts confirm that the sole subject was the Watergate break-in and wiretapping and the subsequent cover-up. All agree that Dean talked about a "cancer" affecting the Presidency and revealed a theory of the cover-up and the possible liability of White House and Committee officials, including Magruder, Mitchell, Strachan, Colson, Ehrlichman, Haldeman, and himself. (S. Tr. 2330-31, 6112-15, 6286-94, 6640-41.) All agree that there was discussion of Hunt's threat to expose his "seamy" work for the White House unless he received a considerable sum of money. Haldeman testified that it was at this meeting that respondent indicated that $1 million easily could be raised; according to Haldeman however, respondent went on to say that it would not be right to pay the money. This discrepancy, which can be resolved by a contemporary recording, is manifestly significant.
 
 
 124
 Haldeman, Ehrlichman and Dean each have testified about the afternoon meeting as well, and the White House briefing gives a separate account. Again, the sole topic of conversation was Watergate. The participants discussed the possibility of present and former White House officials, as well as employees of the Committee, testifying before the grand jury. (S. Tr. 2334-35, 5650, 5710, 6118.) Dean has testified that it was clear to him after this meeting that the cover-up would continue (S. Tr. 2335). Evidence of this meeting is pertinent to determining the existence of a cover-up, its thrust, and its membership.
 
 
 125
 8. Meeting of March 22, 1973. Respondent met with Dean, Ehrlichman, Haldeman and Mitchell from 2:00 p. m. to 3:43 p. m. on March 22, 1973. (Mitchell, of course, was a private citizen at this time.) Dean, Mitchell, Ehrlichman, and Haldeman each have testified that the meeting centered in general on Watergate and in particular on the problems that would be presented by the upcoming Senate Select Committee hearings (S. Tr. 2337-40, 3413-15, 5720, 5128, 6119-22). This meeting was apparently concerned, at least in major part, with political assessments and operations, not exclusively with establishing "government" policy, and is likely to reveal the knowledge and motives of the participants.
 
 
 126
 9. Meeting of April 15, 1973. Respondent met with Dean from 9:17 to 10:12 p. m. on April 15, 1973. Dean has testified in detail about the substance of this hour-long conversation, allegedly telling respondent of his meetings with the United States Attorney's Office. Dean also testified that respondent said that he had been "joking" when respondent approved raising $1 million for the Watergate defendants and acknowledged that he had been "foolish" to discuss executive clemency with Charles Colson. (S. Tr. 2371-75.) If true and accurate, this testimony would indicate an important dimension to the cover-up conspiracy. If false and misleading, a perjurious injustice has been done for which the grand jury can return an indictment.
 
 
 127
 MacKINNON, Circuit Judge, concurring in part and dissenting in part:
 
 
 128
 I concur in the decision on the jurisdiction of this court as expressed in part II of the Per Curiam opinion, but I respectfully dissent from its conclusion on the principal issue. I also concur in the result reached by Judge Wilkey's dissent and concur generally in his reasoning. However, I rely on some points not discussed by Judge Wilkey and as to points that are common to our two dissenting opinions there are at times differences in emphasis.
 
 I. INTRODUCTION
 
 129
 This case presents for consideration an important constitutional question which has not confronted the courts in the 186 years since the Constitution was written. While the issues involved have arisen many times in the relations between the Congress and the President, there are no controlling judicial precedents. The immediate issue involves the requested disclosure of confidential discussions between the President and his close advisers, but the ultimate issue is the effect that our decision will have upon the constitutional independence of the Presidency for all time.
 
 
 130
 Justice Frankfurter prefaced his concurring opinion in Youngstown Sheet & Tube Co.[1] with the following admonition, which is peculiarly appropriate to the present case:
 
 
 131
 Rigorous adherence to the narrow scope of the judicial function is especially demanded in controversies that arouse appeals to the Constitution. The attitude with which this Court must approach its duty when confronted with such issues is precisely the opposite of that normally manifested by the general public. Socalled constitutional questions seem to exercise a mesmeric influence over the popular mind. This eagerness to settle-preferably forever-a specific problem on the basis of the broadest possible constitutional pronouncements may not unfairly be called one of our minor national traits. An English observer of our scene has acutely described it: "At the first sound of a new argument over the United States Constitution and its interpretation the hearts of Americans leap with a fearful joy. The blood stirs powerfully in their veins and a new lustre brightens their eyes. Like King Harry's men before Harfleur, they stand like greyhounds in the slips, straining upon the start." The Economist, May 10, 1952, p. 370.
 
 
 132
 ******
 
 
 133
 * * *
 
 
 134
 [W]ith the utmost unwillingness, with every desire to avoid judicial inquiry into the powers and duties of the other two branches of the government, I cannot escape consideration of the legality of [the President's order.[2]
 
 
 135
 Like Justice Frankfurter in Youngstown, it is my view that a constitutional decision in this case is unavoidable.
 
 
 136
 It is my opinion that the preservation of the confidentiality of the Presidential decision-making process is of overwhelming importance to the effective functioning of our three branches of government. Therefore, I would recognize an absolute privilege for confidential Presidential communications. The privilege is grounded upon an historically consistent interpretation of the constitutional structure of our government, and derives support from common law principles of evidentiary privileges. Since the privilege is designed to enhance a President's ability to perform the duties of his office, it only protects presidential communications related to the performance of Article II duties. It is unnecessary to define the parameters of the privilege beyond the precise facts of this case, but at the least the privilege must protect the recordings subpoenaed here. To compel disclosure of these tape recordings, which contain communications between a President and his most intimate advisers, would endanger seriously the continued efficacy of the presidential decision-making process.
 
 II. THE HISTORICAL PERSPECTIVE
 
 137
 The established usage and custom between the executive, legislative and judicial branches warrant the most respectful consideration, especially in view of its consistency over such an extended period of time. Usage and custom are a source of law in all governments[3] and have particular force where, as is the case here, the applicable written law is ambiguous or unclear. "Even constitutional power, when the text is doubtful, may be established by usage."[4] Early in our nation's history, the Supreme Court relied upon usage and custom to establish firmly its own constitutional authority to review decisions of the highest appellate courts of a state.[5] More recently, the Supreme Court explained the importance of custom and usage as follows:
 
 
 138
 It may be argued that while these facts and rulings prove a usage they do not establish its validity. But government is a practical affair intended for practical men. Both officers, lawmakers and citizens naturally adjust themselves to any long-continued action of the Executive Department-on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle but the basis of a wise and quieting rule that in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself-even when the validity of the practice is the subject of investigation.[6]
 
 
 139
 A. Presidential Refusals to Comply with Congressional
 
 Subpoenas
 
 140
 Throughout our nation's history, the greatest number of the important instances where information has been requested or demanded of the executive department by Congress have involved the President himself. The precedents created by these confrontations are vital here, because Congress and the courts have similar subpoena powers.[7] These precedents gain additional vitality from the fact that they involved highly critical issues, issues that caused Congress to demand, and the President to resist, disclosure based on the strongest national interest grounds. As Professor Corwin wrote with respect to these instances:
 
 
 141
 The point at issue, however, has generally been not justice to the official involved but the right of the Executive Department to keep its own secrets.
 
 
 142
 Corwin, The President-Office and Powers 1787-1957, 111 (1957). Mindful of the tremendous forces that shaped these precedents, we turn to a few of the most important.
 
 
 143
 In 1948, following an abortive attempt by a Republican-controlled Congress to obtain certain information and papers from the executive department, a bill was prepared which, if enacted, would have required every President to produce confidential information even though he considered that compliance would be contrary to the public interest. President Truman thought that such a law would be unconstitutional and in preparation for the 1948 presidential election campaign he had a lengthy memorandum prepared[8] (hereinafter referred to as the "Truman Memorandum"). The Truman Memorandum recites all the principal instances, beginning in 1796, where Presidents have refused to furnish information or papers to Congress. A resume of the refusals by seventeen of our Presidents and their heads of departments, as set out in the Truman Memorandum, is printed in the margin.[9] We can profit from these examples of presidential refusals and the precedents they created.
 
 
 144
 The March 1792 resolution of the House of Representatives empowering the committee investigating the military expedition under Major General St. Clair to call for "such persons, papers, and records, as may be necessary to assist their inquiries"[10] was the first such request ever made by Congress. It met with the rebuke by President Washington, after consulting his cabinet, that the "House was an inquest" and "might call for papers generally," but that the Executive should "exercise a discretion . . . to communicate such papers as the public good will would permit."[11] Washington also refused the request of the House for confidential papers which related to the negotiation of the Jay Treaty with Great Britain, notwithstanding a threat by the House that it would not appropriate the required funds unless its request for information and papers was satisfied.[12] The extortive demand by Congress was not successful.
 
 
 145
 President Jefferson asserted a similar position in refusing to expose the names of those involved in the alleged Burr conspiracy, except that of the principal actor.[13] This apparently is the first instance where a President refused to divulge confidential information involving an alleged substantial criminal offense. President Jackson followed suit in 1835 when he refused to comply with a Senate resolution requesting information in aid of its investigation of frauds in the sale of public lands.[14] In refusing to produce papers to the House, which was investigating the integrity and efficiency of the executive departments in 1837, President Jackson stated in part:
 
 
 146
 I shall repel all such attempts as an invasion of the principles of justice, as well as of the Constitution, and I shall esteem it my sacred duty to the people of the United States to resist them as I would the establishment of a Spanish Inquisition.[15]
 
 
 147
 President Tyler's refusal in 1842 to furnish to the House certain requested information established the principle that papers and documents relating to applications for office are of a confidential nature. President Tyler vigorously asserted that the House of Representatives could not exercise a right to call upon the Executive for information, even though it related to a subject under deliberation by the House if, by so doing, it attempted to interfere with the discretion of the Executive.[16] He further stated:
 
 
 148
 It is certainly no new doctrine in the halls of judicature or of legislation that certain communications and papers are privileged, and that the general authority to compel testimony must give way in certain cases to the paramount rights of individuals or of the Government. Thus, no man can be compelled to accuse himself, to answer any question that tends to render him infamous, or to produce his own private papers on any occasion. The communication of a client to his counsel and the admissions made at the confessional in the course of religious discipline are privileged communications. In the courts of that country from which we derive our great principles of individual liberty and the rules of evidence, it is well settled, and the doctrine has been fully recognized in this country, that a minister of the Crown or the head of a department can not be compelled to produce any papers, or to disclose any transactions relating to the executive functions of the Government which he declares are confidential, or such as the public interest requires should not be divulged; and the persons who have been the channels of communication to officers of the State are in like manner protected from the disclosure of their names. Other instances of privileged communications might be enumerated, if it were deemed necessary. These principles are as applicable to evidence sought by a legislature as to that required by a court.[17]
 
 
 149
 Presidents Polk and Buchanan subscribed to similar positions in opposition to congressional demands for information. Polk refused to turn over information that his predecessor as President had considered to be confidential and ought not to be made public.[18] Buchanan refused to comply with a request for information as to whether "money, patronage or other improper means" had been used to influence Congress.[19] Again, this information related to a possible crime.
 
 
 150
 The request made of President Grant, which he refused, is too political and trivial to discuss,[20] but not so in Grover Cleveland's administration. There, the "Relations between the Senate and the Executive Departments" amounted to a major confrontation and the issues were debated in the Senate for almost two weeks. They dealt with the removal of substantial numbers of office holders by the incoming President; Congress requested the papers and reasons related to the dismissals. Such requests were refused for the usual reasons and one result was the passage of a separate resolution condemning the Attorney General's refusal.[21] President Cleveland pointed out that the Senate was assuming "the right . . . to sit in judgment upon the exercise of my exclusive discretion and Executive function, for which I am solely responsible to the people from whom I have so lately received the sacred trust of office."[22]
 
 
 151
 On January 4, 1909, the Senate passed a resolution directing the Attorney General to inform the Senate whether legal proceedings had been instituted by him against the United States Steel Corporation because of a certain merger, and if not, they required him to state the reasons. President Theodore Roosevelt took up the cudgel and delivered a special message to the Senate, stating that there were insufficient grounds for legal proceedings against the company. He additionally instructed the Attorney General not to state reasons for his nonaction.[23] Thereafter, when the Senate attempted to get certain papers on this subject from the Commissioner of Corporations, the papers were turned over to the President upon the advice of the Attorney General, and the Senate then introduced a strong resolution:
 
 
 152
 Resolved by the Senate, That any and every public document, paper, or record, or copy thereof, on the files of any department of the Government relating to any subject whatever over which Congress has any grant of power, jurisdiction, or control, under the Constitution, and any information relative thereto within the possession of the officers of the department, is subject to the call or inspection of the Senate for its use in the exercise of its constitutional powers and jurisdiction.
 
 
 153
 43 Cong.Rec. 839 (1909). This resolution is remindful of the bill introduced to compel President Truman to turn over papers and of some of the statements being currently made in connection with this general controversy. The resolution was debated extensively but never came to a final vote.
 
 
 154
 In 1924, during the administration of President Coolidge, information relating to his Secretary of the Treasury was sought in a Senate resolution strongly supported by Senator Couzens. President Coolidge termed it an "unwarranted intrusion" and asserted it was the duty of the Executive to resist it. Other Senators then stated that they never sought "confidential records" and thereafter the committee operated with voluntary witnesses and through departmental courtesy.[24]
 
 
 155
 Next came President Hoover's refusal in 1930 to furnish the Senate Foreign Relations Committee with confidential telegrams, letters and other papers leading up to the London Conference and the London Treaty.[25]
 
 
 156
 And President Franklin D. Roosevelt received the same treatment at the hands of Congress in 1941 some months prior to Pearl Harbor, when the House requested the FBI to furnish detailed reports and correspondence in connection with investigations arising out of strikes, subversive activities in connection with labor disputes and labor disturbances in industrial establishments with Naval contracts. Attorney General Jackson replied:
 
 
 157
 It is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to "take care that the laws be faithfully executed," and that congressional or public access to them would not be in the public interest.[26]
 
 
 158
 The Attorney General further pointed out inter alia that:
 
 
 159
 . . . disclosure would seriously prejudice the future usefulness of the Federal Bureau of Investigation, for keeping faith with confidential informants was an indispensable condition of future efficiency. . . .[27]
 
 
 160
 Later during the same administration, FBI Director Hoover refused to disclose to a House committee the directive he had received from President Roosevelt in 1944 directing him not to testify as to any correspondence relating to internal security.[28] There were other similar requests during the Roosevelt administration, some of which related to national security, while others were resisted merely because they were "confidential."[29]
 
 
 161
 President Truman refused to surrender to Congress information and papers relating to loyalty investigations of Government employees, personnel files and FBI files.[30] Subsequently, on the advice of Attorney General Brownell, President Eisenhower made his famous decision refusing to turn over certain information requested in the McCarthy-Stevens investigation.[31]
 
 
 162
 In each of these instances the Congress sought information from the President or the executive branch in order to enable it to legislate upon subjects within its constitutional power, and in each instance cited the request was refused by the President, who determined that to furnish the information would be an unconstitutional intrusion into the functioning of the executive branch and contrary to the public interest. The numerous confrontations between Congress and prior Presidents over the confidentiality of presidential information firmly establish a custom and usage that a President need not produce information which he considers would be contrary to the public interest.
 
 
 163
 B. The Similarity Between Congressional and Judicial
 
 Subpoenas
 
 164
 The Special Prosecutor contends that custom and usage between the executive and legislative branches are not controlling because the subpoena in this case was not issued by Congress, but by a federal court pursuant to a grand jury investigation. However, a congressional subpoena issued for the purpose of obtaining facts upon which to legislate carries at least as much weight as a judicial subpoena issued for the purpose of obtaining evidence of criminal offenses. The only differences between these two types of subpoenas occur in the subject matter to which the subpoena power may be directed. Congressional subpoenas seek information in aid of the power to legislate for the entire nation while judicial subpoenas seek information in aid of the power to adjudicate controversies between individual litigants in a single civil or criminal case. A grand jury subpoena seeks facts to determine whether there is probable cause that a criminal law has been violated by a few people in a particular instance. A congressional subpoena seeks facts which become the basis for legislation that directly affects over 200 million people. Thus, both congressional and judicial subpoenas serve vital interests, and one interest is no more vital than the other.
 
 
 165
 Furthermore, both congressional and judicial subpoenas are compulsory documents enforceable with criminal sanctions. Congress always has possessed the inherent power to punish witnesses who refuse to disclose information. And since the enactment in 1857 of a statute making it a misdemeanor to refuse to answer or to produce papers before Congress,[32] the power of the courts has been an additional sanction available to enforce a congressional request or subpoena.[33] In Kilbourn v. Thompson,[34] the Court remarked that Congress has "the right to compel the attendance of witnesses and their answers to proper questions, in the same manner and by the use of the same means, that courts of justice can in like cases."[35] Congress and the courts stand equal in their power to issue subpoenas and equal in their power to enforce them with criminal sanctions.
 
 
 166
 *****
 
 
 167
 * * *
 
 
 168
 For these reasons, a judicial subpoena cannot be exalted over a congressional subpoena, and the historic precedents involving congressional requests to the executive department are persuasive authority in the present dispute over a judicial subpoena to a President. However, it is unnecessary to rely entirely on instances of presidential assertions of privilege. The other branches of government have been no less disposed to recognize an absolute privilege on their own behalf.
 
 C. Congressional Privilege
 
 169
 Congress has asserted a privilege with respect to subpoenas addressed to members of Congress for documents in its possession and for the testimony of its employees. The practice which has been consistently followed is that no documents can be taken from the possession of either House except by the express consent of such House.
 
 
 170
 In 1876 a Representative from Indiana was subpoenaed to appear before the grand jury of the District of Columbia. Congress asserted the "well settled" privilege which protects a member who is subpoenaed to testify before a grand jury or in court:
 
 
 171
 Inasmuch as it seemed to be well settled that the privilege of the Member was the privilege of the House and that privilege could not be waived except with the consent of the House, they had thought it their duty to submit the matter to the House.[36]
 
 
 172
 Whereupon a resolution was offered and the member was "authorized to appear and testify under the said summons."[37]
 
 
 173
 Upon service of a subpoena duces tecum by a court-martial, Congress asserted with respect to the documents:
 
 
 174
 They belong to the House, and are under its absolute and unqualified control. It can at any time take them from the custody of the Clerk, refuse to allow them to be inspected by anyone, order them to be destroyed, or dismiss the Clerk for permitting any of them to be removed from the files without its expressed consent.[38]
 
 
 175
 Whereupon the resolution asserted the House privilege and consented to the parties to a general court-martial making copies of documents in the possession of the House.[39]
 
 
 176
 Usually, when personal attendance or documents are requested of members of Congress, Congress permits compliance with such request, but not always. In 1876 the House refused to permit its committee investigating William W. Belknap, late Secretary of War, who had been impeached by the House, to produce before the Supreme Court of the District of Columbia in response to process certain documents relating to the acceptance of bribes.[40] In 1926, Mr. Fiorello LaGuardia of New York rose to a question of personal privilege in the House of Representatives, reported he had been subpoenaed before a federal grand jury in Indianapolis, that he could "not obey that subpoena without the permission of the House" and that if any member of the House introduced a resolution granting him "permission to go [he would] not resist it. No resolution was offered and no further record appears."[41]
 
 
 177
 Essentially the same practice exists in Congress at this time. On October 13, 1970, in a case which subsequently came before this court entitled United States Servicemen's Fund (USSF) v. Eastland,[42] the Senate subpoenaed certain documents in aid of its power of investigation for legislative purposes. The subject (the USSF) of the documents intervened and in aid of a deposition had a subpoena issued to the Chief Counsel of the Internal Security Subcommittee of the Committee on the Judiciary calling for his personal "testimony regarding activities of the Subcommittee, and calling also for production of certain records and other papers in the Subcommittee."[43] The Senate thereupon passed the usual resolution with respect to its documents and the requested appearance of the Chief Counsel. It provided, inter alia:
 
 
 178
 Resolved, That the Chief Counsel, Jullen [sic] G. Sourwine, of the Senate Internal Security Subcommittee of the Committee on the Judiciary, is authorized to comply with an appropriate notice of deposition in the case aforesaid, but shall not testify respecting matters of which he obtained knowledge by virtue of his position or activities as Chief Counsel of the Subcommittee, which are not matters of public record and shall not without further action by the Senate surrender any papers or documents on file in his office or under his control or in his possession as Chief Counsel of the Senate Internal Security Subcommittee of the Committee on the Judiciary.[44]
 
 
 179
 Later, when the Chief Counsel appeared for the deposition, he refused to give evidence in violation of the "Senate's mandate"[45] as to matters "which were not at a public hearing."[46]
 
 
 180
 The common thread throughout these proceedings is that the House or the Senate itself judges and controls the extent to which its members and documents should be produced in courts and before grand juries in response to subpoenas. Congress since 1787 has claimed that it has the absolute privilege to decide itself whether its members or employees should respond to subpoenas and to determine the extent of their response. As far as I have been able to discover, that practice has never been successfully challenged.
 
 D. Judicial Privilege
 
 181
 The judicial branch of our government claims a similar privilege, grounded on an assertion of independence from the other branches. Express authorities sustaining this position are minimal, undoubtedly because its existence and validity has been so universally recognized. Its source is rooted in history and gains added force from the constitutional separation of powers of the three departments of government. Chief Justice Burger has asserted that this privilege is grounded in the courts' "inherent power" to protect the confidentiality of their internal proceedings:
 
 
 182
 With respect to the question of inherent power of the Executive to classify papers, records, and documents as secret, or otherwise unavailable for public exposure, and to secure aid of the courts for enforcement, there may be an analogy with respect to this Court. No statute gives this Court express power to establish and enforce the utmost security measures for the secrecy of our deliberations and records. Yet I have little doubt as to the inherent power of the Court to protect the confidentiality of its internal operations by whatever judicial measures may be required.[47]
 
 
 183
 In his concurring opinion in Soucie v. David, involving the exemptions from disclosure of certain information in the executive department under the Freedom of Information Act,[48] Judge Wilkey based the privilege upon the common law and the Constitution:
 
 
 184
 To put this question in perspective, it must be understood that the privilege against disclosure of the decision-making process is a tripartite privilege, because precisely the same privilege in conducting certain aspects of public business exists for the legislative and judicial branches as well as for the executive. It arises from two sources, one common law and the other constitutional.[49]
 
 
 185
 Counsel for the President in their brief cites additional support for the judicial claim of confidentiality:
 
 
 186
 It has always been recognized that judges must be able to confer with their colleagues, and with their law clerks, in circumstances of absolute confidentiality. Justice Brennan has written that Supreme Court conferences are held in "absolute secrecy" for "obvious reasons." Brennan, Working at Justice, in An Autobiography of the Supreme Court 300 (Westin ed. 1963). Justice Frankfurter has said that the "secrecy that envelops the Court's work" is "essential to the effective functioning of the Court." Frankfurter, Mr. Justice Roberts, 105 U.Pa.L.Rev. 311, 313 (1955).
 
 
 187
 ******
 
 
 188
 * * *
 
 
 189
 The Judiciary works in conditions of confidentiality and it claims a privilege against giving testimony about the official conduct of judges. Statement of the Judges, 14 F.R.D. 335 (N.D.Cal.1953). See also the letter of Justice Tom C. Clark, refusing to respond to a subpoena to appear before the House Un-American Activities Committee, on the ground that the "complete independence of the judiciary is necessary to the proper administration of justice." N. Y. Times, Nov. 14, 1953, p. 9.[50]
 
 
 190
 The Statement of the Judges,[51] to which counsel for petitioner refers, asserted that the separation of powers prohibits any branch of government from unlawfully interfering with the others, to the extent that Congress had no authority to summon a United States District Judge to appear before a House subcommittee investigating the Department of Justice. The Statement went on to say:
 
 
 191
 [W]e know of no instance, in our history where a committee such as yours, has summoned a member of the Federal judiciary.[52]
 
 
 192
 Thus, the judicial branch asserts the same immunity from being compelled to respond to congressional subpoenas that past Presidents have asserted.
 
 
 193
 Further assertions of judicial independence surfaced in the aftermath of Justice Fortas' resignation.[53] At that time a special story by Max Frankel reported the reaction among some of the other Justices of the Supreme Court to their suggestion that they should compose a code of conduct to assure their objectivity and probity:
 
 
 194
 [I]f drawn, they are not likely to diminish the absolute independence traditionally asserted by the high court for itself and by each of its nine members as individuals.
 
 
 195
 In fact, the Justices are said to be determined to resist any effort by Congress or other outside authority to impose ethical standards or enforcement methods upon them. Above all, they remain committed to the principle that each Justice must be free to work beyond the control or censure even of his colleagues, and they were careful to protect that principle while concerning themselves with the Fortas case over the last two weeks.
 
 
 196
 ******
 
 
 197
 * * *
 
 
 198
 [T]he Justices are believed to have turned their thoughts to the ways in which they could create a body of standards without compromising the great tradition of professional independents.
 
 
 199
 ******
 
 
 200
 * * *
 
 
 201
 It will be a long exercise, in any case, the Justices expect, and the "standards" that emerge may be no more than each Justice's interpretation of the informal discussions that began around the Court with the Fortas revelations.
 
 
 202
 ******
 
 
 203
 * * *
 
 
 204
 Some members of Congress now believe that they have a duty to impose some standards on the entire Federal judiciary, including the Supreme Court, and after the Fortas affair some Justices appear to understand this impulse.
 
 
 205
 But since they refuse to yield to the control of their own Chief Justice or their colleagues, the Justices will plainly resent and resist Congressional supervision if they possibly can.
 
 
 206
 ******
 
 
 207
 * * *
 
 
 208
 It is the conclusion of most Justices, therefore, that they must observe the very highest standards but that they must be their own final judges. Whether they can combine these two doctrines into a reassuring public body of Supreme Court ethics will not be evident for some time.[54]
 
 
 209
 The above excerpts express the judiciary's conception of its own privileges as it so far has been made public.
 
 
 210
 A recent example of the exercise of the judiciary's privilege to protect the confidentiality of its internal decisionmaking process occurred in this court in February of this year. It arose in the very important case involving the validity of the right of way and permits granted by the Department of the Interior for the construction of the 789-mile Alaska Pipeline. The estimated cost of this pipeline was upwards of $3 1/2 billion. Following the argument of the case on appeal and while the case was under advisement by the judges of this court, a United States Senator wired the Chief Judge of this court as follows:
 
 
 211
 I have been told one or more judges have disqualified themselves in the trans-Alaska pipeline case currently under advisement. Kindly advise me of their identities and reasons if this is the case. I would appreciate a reply in writing as soon as possible. Thank you very much.
 
 
 212
 In the reply for the court by Chief Judge Bazelon, this court exercised its privilege to protect the confidentiality of its deliberations, stating:
 
 
 213
 In re your telegram of February 5, 1973 inquiring as to whether 1 or more judges have disqualified themselves in the trans Atlantic [sic] pipeline cases currently under advisement and in which you request their identities and reasons if this is the case. The opinion, when issued, will reveal the names of the judges who have participated therein. With great respect, we believe that further reply to your inquiry would not be appropriate with cordial wishes.
 
 
 214
 It thus appears that the judiciary, as well as the Congress and past Presidents, believes that a protected independence is vital to the proper performance of its specified constitutional duties. It is my conclusion that the deliberative functions of the President's office should be afforded the same essential protection that has been recognized for, and asserted and enjoyed by, the legislative and judicial branches of our government since 1787.
 
 
 215
 III. THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE
 
 
 216
 The Per Curiam opinion recognizes the "great public interest" in maintaining the confidentiality of the presidential decision-making process, but concludes that the national interest in presidential confidentiality may be subordinated in particular situations to a strong countervailing need for disclosure.[55] Thus, the majority recognizes only a qualified privilege for presidential communications.
 
 
 217
 The focus of my disagreement with this conclusion is that in my opinion an absolute privilege exists for presidential communications. At least where a President discusses matters of official concern with his most intimate advisers, strict confidentiality is so essential to the deliberative process that it should not be jeopardized by any possibility of disclosure.
 
 A. The Importance of Confidentiality
 
 218
 By recognizing an absolute privilege, my opinion places the presidential communications privilege on an equal footing with that recognized for military or state secrets in United States v. Reynolds.[56] Military or state secrets are never subject to disclosure regardless of the weight of countervailing interests.[57] Once the court is satisfied that military or state secrets are at stake, its inquiry is at an end. The court cannot balance the importance of secrecy in a particular case against the necessity demonstrated by the party seeking disclosure.[58]
 
 
 219
 The rationale underlying the absolute privilege for military or state secrets is the policy judgment that the nation's interest in keeping this information secret always outweighs any particularized need for disclosure. A similar policy judgment supports an absolute privilege for communications between a President and his advisers on matters of official concern.
 
 
 220
 The interest supporting an absolute privilege for presidential communications is the confidentiality essential to insure thorough and unfettered discussion between a President and his advisers. This widely recognized necessity for confidentiality in any decision-making process[59] is especially important in the office of the Presidency. Confidentiality is indispensable to encourage frankness and to allow a President's advisers to advance possibly unpopular arguments without fear of public criticism. Working at the highest level of government, a President and his advisers must be free to explore all aspects of an issue so that final decisions are based upon completely thorough analysis. Their discussions must be informal, candid and blunt. If there is a danger that the words spoken at these discussions will be disclosed to the public, the participants inevitably will speak more guardedly, they will hesitate to suggest possibly unpopular opinions, and the discussions will lose their spontaneity. This loss of spontaneity and freedom would severely restrict a President's ability to conduct thorough and frank discussions on issues of national and world-wide importance.
 
 
 221
 An essential attribute of the presidential communications privilege is that the President must have absolute discretion in its exercise. To the majority's fear that it would be dangerous to vest absolute discretion in the President because of possible abuse in the future,[60] we need only refer to Justice Story's telling refutation of that argument in Martin v. Hunter's Lessee:
 
 
 222
 It is always a doubtful course to argue against the use or existence of a power, from the possibility of its abuse. It is still more difficult, by such an argument, to ingraft upon a general power a restriction which is not to be found in the terms in which it is given. From the very nature of things, the absolute right of decision, in the last resort, must rest somewhere-wherever it may be vested it is susceptible of abuse.[61]
 
 
 223
 To allow the courts to breach presidential confidentiality whenever one of 400 federal trial judges considers that the circumstances of the moment demonstrate a compelling need for disclosure would frustrate the privilege's underlying policy of encouraging frank and candid presidential deliberations. If it is possible to convince a court to compel the disclosure of presidential conversations, then a President cannot guarantee confidentiality to his advisers and they must operate always under the hazard that their conversations might be publicly exposed at the behest of some trial court in the future.
 
 
 224
 By enacting the Presidential Libraries Act of 1955,[62] Congress recognized the importance of maintaining presidential confidentiality. The Act bestows an absolute privilege upon papers and sound recordings[63] deposited with the Government-administered presidential libraries by providing that presidential papers and recordings may be accepted "subject to restrictions agreeable to the administrator [of General Services] as to their use."[64] The presidential papers of Presidents Eisenhower, Kennedy and Johnson are subject to the restriction that "materials containing statements made by or to" the President are to be kept in confidence and held under seal and not revealed to anyone except the donors or archival personnel until "the passage of time or the circumstances no longer require such materials being kept under restriction." Restrictions imposed by letters from President Eisenhower and from President Johnson additionally prohibit disclosure to "public officials" on the ground that "the President of the United States is the recipient of many confidences from others, and . . . the inviolability of such confidence is essential to the office of the presidency . . . ."[65] Thus Congress by statute has recognized the confidential nature of presidential papers and recordings, and has subjected them to restrictions against disclosure. It would be incongruous to accord a greater confidence to the materials of a deceased President than to the materials of a living, incumbent President.
 
 
 225
 The Special Prosecutor contends that in view of the unique circumstances in the present case, disclosure would not infringe seriously upon the confidentiality of the presidential deliberative process. However, the ultimate decision in this case will have repercussions far beyond the narrow factual confines of the present events. The decision here will be the first definitive judicial statement on the issue of presidential privilege. To recognize only a qualified privilege is to invite every litigant, both civil and criminal, to demonstrate his or her own particularized need for evidence contained in presidential deliberations. Already several claims of this nature are pending.[66] The lessons of legal history teach that it will be impossible to contain this breach of presidential confidentiality if numerous federal judges may rummage through presidential papers to determine whether a President's or a litigant's contentions should prevail in a particular case. Furthermore, the decision in this case inevitably will be precedent for assaults on the presently asserted absolute privileges of Congress and the Judiciary.[67]
 
 B. The Executive Privilege Cases
 
 226
 The majority relies on a line of cases which recognize a qualified "executive privilege" where a civil litigant seeks disclosure of relevant government documents.[68] In formulating this qualified privilege, the courts concluded that the interest in confidentiality to insure a free deliberative process is weaker than that recognized as necessary to protect military or state secrets.[69] Consequently, the courts have recognized only a qualified, not an absolute, privilege where the government has resisted disclosure solely on the ground of protecting the confidentiality of the deliberative process.
 
 
 227
 However, none of the "executive privilege" cases involved personal communications between a President and his closest advisers. There is a great distinction between the office of the President and the myriad other agencies and departments that comprise the executive branch.[70] Virtually every decision emanating from a President's office has a direct and immediate effect on the entire, or a substantial part of, the nation. Lesser executive departments and agencies do not hold such awesome responsibility and power. Each has responsibility for and operates upon only a small segment of the nation. As important as the lesser executive departments and agencies are, their decisions do not have the sweeping and immediate impact which characterizes the decisions and policies of a President.
 
 
 228
 The national interest in maintaining presidential confidentiality to insure that a President's deliberative process remains completely unfettered is at least as strong as the national interest in protecting military or state secrets. As explained earlier, secrecy is not the ultimate goal of the presidential communications privilege. The ultimate goal is to guarantee that Presidents will remain comprehensively informed throughout their decision-making processes. The importance of the military or state secrets privilege is most apparent when, for example, it prevents disclosure of emergency defense or invasion plans, foreign espionage programs or summit meeting strategy. But if a President is unable to conduct thorough and unfettered deliberations with his advisers, these plans, programs and strategies may never be formulated. Furthermore, whereas the confidentiality of military or state secrets is important primarily with respect to this country's international relations, the presidential privilege promotes informed decisions in both the international and domestic spheres. In view of the immediate national and world-wide impact which accompanies presidential decisions, the need to protect the presidential deliberative process is at least as great as the need to protect military and state secrets. If military and state secrets are absolutely privileged based on the need for confidentiality, then conferences between a President and his close advisers should enjoy a similar absolute privilege based on the need for confidentiality.
 
 
 229
 C. Presidential Privilege Against a Grand Jury
 
 
 230
 The foregoing discussion demonstrates that the courts should afford presidential communications the same absolute privilege which protects military and state secrets. However, the Reynolds decision, as well as the "executive privilege" cases, arose from civil litigation and did not discuss the assertion of privilege against a grand jury subpoena. The final issue which must be resolved before recognizing an absolute presidential communications privilege in this case is whether the policy supporting the privilege prevails over the competing interests which arise from a court order to produce information for a grand jury investigation.
 
 
 231
 Common law evidentiary privileges based on encouraging frank and candid communication apply equally in criminal and civil cases. For example, the husband-wife and attorney-client privileges may be invoked by a witness for either the prosecution or defense in a criminal trial, regardless of the claimed necessity for disclosing the evidence.
 
 
 232
 Nevertheless, an interest which supports the existence of a privilege in a civil context might be outweighed by stronger countervailing interests which arise in the administration of criminal justice. In Gravel v. United States[71] the court of appeals had fashioned a nonconstitutional testimonial privilege which protected a Congressman's aide from questioning by a grand jury regarding allegedly criminal activity committed in the course of his duties.[72] The court analogized the privilege to that which protects executive officials from civil liability. Since government officers are immune from civil liability, the court of appeals reasoned, a similar doctrine should immunize government officers from criminal prosecution. Carrying this reasoning one step further, the court concluded that a grand jury could not question government officers about crimes for which they could not be prosecuted. The Supreme Court disagreed, explaining:
 
 
 233
 But we cannot carry a judicially fashioned privilege so far as to immunize criminal conduct proscribed by an Act of Congress or to frustrate the grand jury's inquiry into whether publication of these classified documents violated a federal criminal statute. The so-called executive privilege has never been applied to shield executive officers from prosecution for crime.[73]
 
 
 234
 It is important to recognize that the "executive privilege" referred to in Gravel is the doctrine also known as official immunity.[74] It is not the evidentiary "executive privilege" upon which the majority in this case relies.[75] The express purpose of the official immunity doctrine is to shield executive officers from civil suits so they will not be deterred in the performance of their duties.[76] The quoted language from the Gravel decision recognizes that the underlying purpose of official immunity, while supporting immunity from civil liability, does not support total immunity from criminal prosecution.
 
 
 235
 The only relevance of the Gravel dictum to the present case is to suggest that the interest in protecting the confidentiality of the deliberative process may not support absolute immunity from criminal prosecution for executive officers. But the presidential communications privilege, as here outlined, does not immunize executive officers from criminal prosecution. This evidentiary privilege, which protects the presidential deliberative process by preventing disclosure of the exact details of that process, is not premised on any notions of immunity from civil or criminal liability. It is unnecessary in this case to decide the issue touched upon by Gravel, which is whether the interest in confidentiality that supports the evidentiary privilege would also preclude the indictment of participants in the deliberative process.
 
 
 236
 The possibility that an occasional criminal prosecution may be hampered by the privilege does not justify abandoning the compelling long-range necessity for presidential confidentiality. The inability of a prosecutor or grand jury to obtain specific privileged information will seldom prevent a successful criminal prosecution. Understandably, a prosecutor desires to obtain all evidence relevant to a case. But particular evidence frequently is unavailable because of commonly recognized privileges, such as the husband-wife, attorney-client or self-incrimination privileges. In such instances, non-privileged information remains available and convictions routinely are obtained despite various claims of privilege by witnesses.
 
 
 237
 The 1807 decision in United States v. Burr,[77] upon which the majority relies,[78] does not preclude recognition of an absolute privilege in the present case. In that case, the accused sought to obtain allegedly exculpatory evidence contained in a letter which had been written to President Jefferson by General Wilkinson, an essential witness against the accused.[79] Chief Justice Marshall, sitting alone as the trial judge in the case, issued a subpoena to the President for production of the letter, but the President, through his attorney, refused to disclose certain passages. The Chief Justice appreciated the weight which attaches to a presidential assertion of privilege:
 
 
 238
 The president, although subject to the general rules which apply to others, may have sufficient motives for declining to produce a particular paper, and those motives may be such as to restrain the court from enforcing its production.
 
 
 239
 ******
 
 
 240
 * * *
 
 
 241
 Had the president, when he transmitted it, subjected it to certain restrictions, and stated that in his judgment the public interest required certain parts of it to be kept secret, and had accordingly made a reservation of them, all proper respect would have been paid to it. . . .[80]
 
 
 242
 However, since the President had relied upon his attorney's discretion and had not communicated directly with the court,[81] the Chief Justice allowed the attorney time to consult with the President. Several days later, the Chief Justice accepted "a certificate from the President, annexed to a copy of General Wilkinson's letter, excepting such parts as he deemed he ought not to permit to be made public."[82] From all that appears these excisions were not contested.[83]
 
 
 243
 The Burr case involved a subpoena by a defendant in a criminal trial, and the defendant's demand for the letter was an exercise of his sixth amendment right "to have compulsory process for obtaining witnesses in his favor."[84] Although Chief Justice Marshall was never called upon to enforce the subpoena against the President,[85] and therefore never was required to resolve the ultimate conflict between the President's privilege and the sixth amendment right to compulsory process, he took the opportunity in dicta to discuss whether a President's claim of privilege should be upheld in the face of a criminal defendant's demand for possible exculpatory evidence. Recognizing that he could not "precisely lay down any general rule for such a case,"[86] the Chief Justice suggested that "perhaps" a presidential claim of privilege could be overridden in a criminal trial where the defendant demonstrates a particularly compelling need for the evidence.[87] Quite clearly, this suggestion was not a final disposition of the issue, nor even a holding of the case.
 
 
 244
 The case before this court involves a grand jury proceeding, not a criminal trial of an accused. A grand jury, of course, is an accuser, not an accused, and has no sixth amendment right to compulsory process for obtaining witnesses. Thus, the express guarantee of the sixth amendment which was present in Burr is not applicable to the present case. Moreover, although the grand jury's authority to subpoena witnesses is essential to its task, grand juries always have operated under the constraints of evidentiary privileges.[88] Any conflict between the presidential communications privilege and the sixth amendment rights of a criminal defendant is better resolved in the future when a court has before it an indicted defendant who is able to demonstrate the materiality of the evidence to his particular defense.[89]
 
 
 245
 D. Constitutional Dimensions of the Privilege
 
 
 246
 The foregoing discussion has demonstrated the soundness of an absolute, evidentiary privilege for conversations and deliberations of a President with his close advisers. But the privilege also has constitutional dimensions which derive both from the separation of powers doctrine and from the logical principle that inherent in any constitutional right are the means requisite to its effective discharge.
 
 
 247
 The effective discharge of the presidential duty faithfully to execute the laws requires a privilege that preserves the integrity of the deliberative processes of the executive office. It would be meaningless to commit to the President a constitutional duty and then fail to protect and preserve that which is essential to its effective discharge. Thus the term "effective" is the sine qua non that imbues the presidential decisional process with a constitutional shield. The genius of our Constitution lies, perhaps as much as anywhere, in the generality of its principles which makes it susceptible to adaptation to the changing times and the needs of the country. But this much is explicit: "[The President] shall take Care that the Laws be faithfully executed. . . ." U.S.Const. art. II, Sec. 3. Is it plausible that the Framers should have charged the President with so basic a responsibility, one upon which every ordered society is premised, and yet left him without the ability effectively to satisfy that high charge? Emphatically, the answer must be, "No." The duty and the means of its discharge coalesce and each, the one explicit and the other implicit, finds its source in the Constitution.
 
 
 248
 The constitutional nature of the presidential communications privilege is reenforced by the doctrine of separation of powers. It is clear, of course, that our constitutional system of checks and balances makes each branch dependent upon the other branches in some instances. The trial court and the majority of this court rely in part on this interdependency to decide that the courts have both the power to compel a President to comply with the subpoena and the right to obtain recordings of conversations that were part of the presidential decisionmaking process. The flaw in their analysis becomes apparent upon closer examination of the nature of both separation of powers and checks and balances. James Wilson[90] in his "Lectures on the Law" accurately stated both concepts:
 
 
 249
 [E]ach of the great powers of government should be independent as well as distinct. When we say this; it is necessary-since the subject is of primary consequence in the science of government-that our meaning be fully understood, and accurately defined. For this position, like every other, has its limitations; and it is important to ascertain them.
 
 
 250
 The independence of each power consists in this, that its proceedings, and the motives, views, and principles, which produce those proceedings, should be free from the remotest influence, direct or indirect, of either of the other two powers. But further than this, the independency of each power ought not to extend. Its proceedings should be formed without restraint, but when they are once formed, they should be subject to control.
 
 
 251
 We are now led to discover, that between these three great powers of government, there ought to be a mutual dependency, as well as a mutual independency. We have described their independency: let us now describe their dependency. It consists in this, that the proceedings of each, when they come forth into action and are ready to affect the whole, are liable to be examined and controlled by one or both of the others. (Emphasis added).
 
 
 252
 2 Wilson, Works 409-10 (1804).
 
 
 253
 Thus the system of checks and balances begins to operate only at the point "when [the proceedings of any branch] come forth into action and are ready to affect the whole." It is only necessary to cite several examples. The Executive may veto acts of Congress and Congress may override such a veto.[91] The Executive nominates, and the Senate confirms, ambassadors, justices of the Supreme Court and all other officers of the United States.[92] The courts may declare acts of Congress unconstitutional,[93] or constitutional and the Executive faithfully executes the laws in conformance with such decisions. That these principles establish the mutual dependency of the three branches is obvious, but it is equally obvious that each of the above instances involves a restraint by one branch on a final action of a coordinate branch.[94]
 
 
 254
 The doctrine of separation of powers, by contrast, requires that each branch's "proceedings, and the motives, views, and principles, which produce those proceedings, should be free from the remotest influence, direct or indirect, of either of the other two powers." Id. This doctrine, then, prohibits intrusion in any form by one branch into the decisional processes of an equal and coordinate branch. And it is clear, of course, that "[t]he grand jury is an arm of the court and its in camera proceedings constitute 'a judicial inquiry."'[95] Thus, recordings of presidential deliberations cannot be the subject of a judicial subpoena if it would even remotely influence the conduct of such deliberations or their final outcome. Enforcement of the subpoena demonstrably would have just such an effect in this case. The conversations that are the subject of the subpoena presumptively occurred as part of the ongoing decisional process involved in the President's constitutional duty faithfully to execute the laws.[96] The end product of this process would be the decision whether crimes had been committed and whether to prosecute such crimes, and whether to discharge or retain certain government employees. These decisions would be the "final action" comparable to the seizure of the steel mills in Youngstown Sheet & Tube Co.[97] The conversations themselves, however, were an integral part of the deliberative process and thus not subject to judicial intrusion by means of enforcement of the subpoena. Moreover, it appears insignificant that such a judicial intrusion into that process is for the purpose of laying open those presidential conferences before the grand jury. To hold otherwise would, to paraphrase the district court, exalt the form of the intrusion over its substance,[98] since the pervasively adverse effect on the candor of the deliberations and the soundness of the decisions reached there flows from the breach of confidentiality itself, whatever the purpose of the intrusion.
 
 
 255
 But the greatest vice of the decision sought by the Special Prosecutor is that it would establish a precedent that would subject every presidential conference to the hazard of eventually being publicly exposed at the behest of some trial judge trying a civil or criminal case. It is this precedential effect which transforms this case from one solely related to the recordings sought here, to one which decides whether this President, and all future Presidents, shall continue to enjoy the independency of executive action contemplated by the Constitution and fully exercised by all their predecessors.
 
 IV. THE PRIVILEGE IN THIS CASE
 A. The Privilege Was Properly Invoked
 
 256
 For the foregoing reasons, my opinion recognizes an absolute privilege for presidential communications. To be privileged, the communications must occur under an aura of confidentiality, and, because the privilege is designed to protect a President's ability to perform his duties, the communications must relate to the performance of Article II duties.
 
 
 257
 The presidential communications privilege was properly invoked by the President under the circumstances of this case. In Reynolds v. United States[99] the Supreme Court discussed the procedures and formalities necessary for a proper invocation of the absolute privilege for military or state secrets.[100] Since the presidential communications privilege resembles the military or state secrets privilege, the Reynolds procedures are instructive in the present case.[101]
 
 
 258
 Initially, there must be "a formal claim of privilege lodged by the head of the department which has control over the matter, after actual personal consideration by that officer."[102] Although an earlier statement by the President indicated that he did not intend to invoke executive privilege with regard to the investigation,[103] the President's letter in response to the subpoena from the District Court expressed a clear intent to claim his constitutional privilege to withhold recordings of conversations with his advisers.[104]
 
 
 259
 After the President has claimed the privilege, the court must satisfy itself that "the circumstances are appropriate for the claim of privilege."[105] In determining whether the privilege is appropriate in a particular case, the only inquiry is whether there is a "reasonable danger" that disclosure of the evidence would expose matters which the privilege is designed to protect.[106] Since the presidential communications privilege is an absolute rather than a qualified privilege, there is no occasion to balance the particularized need for the evidence against the governmental interest in confidentiality. The balance between these competing interests was examined and resolved when the absolute presidential communications privilege was formulated.[107] Having concluded that the privilege is available, the only inquiry is whether the President's invocation of the privilege promotes the policy which the privilege was designed to protect. Regarding the absolute privilege for military or state secrets, the Reynolds Court stated:
 
 
 260
 Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the Court is ultimately satisfied that military secrets are at stake.[108]
 
 
 261
 The presidential communications privilege protects the confidentiality of communications between the President and his close advisers which are related to his Article II duties. Since the subpoena covers recordings of confidential communications between the President and his closest advisers, the privilege is appropriate in this case if the recorded conversations related to the President's Article II duties. My starting point is the presumption, in the absence of clear evidence to the contrary, that as a government official the President was discharging his constitutional duties.[109] The nature of the Presidency often makes it difficult to distinguish private from official concerns of the President. Because of his position in the nation, actions which might be commonplace if performed by a private individual assume national importance when performed by the President. As Chief Justice Marshall stated in the Burr decision: "Letters to the president in his private character, are often written to him in consequence of his public character, and may relate to public concerns."[110]
 
 
 262
 From the circumstances already in the public record, it is reasonable to conclude that the conversations at issue related to the President's Article II duty to "take Care that the Laws be faithfully executed."[111] The break-in at the Democratic Party headquarters soon became a pervasive topic of conversation throughout the country. There occurred constant and widespread speculation concerning the possible involvement of high public officials, and some suspected that the Justice Department was not investigating the matter thoroughly. There is evidence that the President, like other citizens, was concerned that the laws were not being fully enforced. Especially in view of allegations linking the burglary to the White House staff, it was appropriate for the President, as the nation's chief law enforcement officer, to discuss these matters with his advisers.[112] Thus, it is reasonable to conclude that the discussions covered by the subpoena related to the President's Article II duty to execute the laws. The possibility that the President also may have been concerned about the political effect of the offenses on the Republican Party is not inconsistent with the performance of his Article II duties.
 
 
 263
 Since the subpoenaed tapes are recordings of the President's confidential conversations and there is a reasonable probability that the discussions related to the President's Article II duties, there exists at least a "reasonable danger" that disclosing the tapes would jeopardize the very interest which the presidential communications privilege is designed to protect. Just as the Reynolds Court found only a "reasonable danger" that disclosure would jeopardize protected interests,[113] it is not necessary in this case to conclude with absolute certainty that disclosure would violate presidential confidentiality in matters of official concern. Reynolds only requires a "reasonable danger," and that standard is satisfied here.
 
 
 264
 Since there exists a reasonable danger that disclosing the recordings would infringe upon protected presidential confidentiality, an examination of the tapes by a judge even in chambers would be improper. Once a President asserts his privilege, a court's only function is to determine whether the circumstances are appropriate for the claim of privilege.[114] Yet the court must make this determination without forcing disclosure of the very communication which the privilege protects.[115] Thus an in camera inspection is proper only if the court cannot otherwise satisfy itself that the privilege should be sustained. In the present case, I am satisfied that appropriate circumstances do exist and, therefore, would hold that even in camera inspection is improper.
 
 
 265
 B. Privilege Not Destroyed by Possibility of Criminal
 
 Conspiracy by Advisers
 
 266
 The Special Prosecutor also argues that the privilege disappears upon a prima facie showing that the conversations occurred as part of a criminal conspiracy by certain of the President's advisers.[116] He strenuously argues that abuse of the privileged relationship vitiates any otherwise valid privilege possessed by the President. The argument is fatally defective, however, since the President alone holds the privilege which is designed to ensure the integrity of his decisional processes. The possibility that those close to him may have perverted the relationship cannot destroy the privilege held in the public interest exclusively by the President.
 
 
 267
 The Special Prosecutor relies heavily upon Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933), to sustain his position, but that case is not to the contrary. Clark involved a prospective juror who on voir dire concealed facts and falsely swore in order to be accepted as a juror. Whatever privilege she might have possessed as a juror could "not apply where the relation giving birth to it was fraudulently begun or fraudulently continued." Id. at 14, 53 S.Ct. at 469. It is questionable, of course, whether the privilege of a jury is at all comparable to the presidential communications privilege. In any event, the privilege discussed in Clark is designed to protect the deliberations of the entire jury and thus belongs to the jury as an entity. A single juror cannot waive the privilege for all other jurors and make public against their wishes the discussions that occurred in the secrecy of the jury room. A corollary of this principle is that, although a nonculpable juror properly may invoke the privilege, a juror who has abused the privileged relationship cannot assert the privilege to shield himself from criminal sanction if the remaining jurors wish to testify. There is not the slightest indication in Clark that the nonculpable jurors attempted to interpose their privilege to keep the jury deliberations secret. Thus Clark only decided that a juror who abuses the relationship which creates the privilege loses any privilege he otherwise might have possessed; such a juror may not validly interpose a privilege retained by nonculpable jurors who are willing to testify.
 
 
 268
 Indeed, the analogy of the attorney-client privilege referred to in Clark[117] supports the view that an innocent holder of a privilege does not lose it because of misconduct by another. The client, not the attorney, is the holder of that privilege and thus, as Clark states, "the loss of the privilege [does not] depend upon the showing of a conspiracy, upon proof that client and attorney are involved in equal guilt. The attorney may be innocent, and still the guilty client must let the truth come out." Id. at 15, 53 S.Ct. at 469. By contrast, where the client is innocent, his privilege does not fail because of any misconduct by his attorney. The client cannot control the use to which his attorney puts information confided to him during the course of their relationship, but relies simply upon the attorney's sense of professional integrity. It would be manifestly unjust to penalize the ordinary client by exposing to public scrutiny the intimate details of his personal and financial life upon a prima facie showing that his attorney had utilized such information in an illegal enterprise. Similarly, possible abuse of the privileged relationship by advisers to the President cannot vitiate the privilege held by him alone to protect the integrity of the presidential deliberative process.
 
 
 269
 C. The Impeachment Clause and the Possibility of
 
 Presidential Misconduct
 
 270
 Thus the Special Prosecutor's case finally rests upon a showing of probable cause to believe that the President himself was guilty of misconduct. However, the Special Prosecutor has never strongly urged the point, preferring to rest his case upon the showing of criminal involvement by those close to the President. Although I would be reluctant to consider a contention never directly pressed, my greater reluctance is premised more fundamentally upon the ground that such a determination at this stage of the proceedings is constitutionally inhibited. I state here not a firm conclusion, but one of sufficient merit to circumscribe judicial inquiry. The constitutional inhibition essentially derives from implications inherent in the Impeachment Clause:
 
 
 271
 Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.
 
 
 272
 U.S.Const. art. I, Sec. 3 p 7. And, of course, a President may be removed from office only upon impeachment. Id., art. II, Sec. 4.
 
 
 273
 My starting point is the proposition that a President is subject to the criminal laws, but only after he has been impeached by the House and convicted by the Senate and thus removed from office. The contemporaneous views of the Framers clearly supports the view that all aspects of criminal prosecution of a President must follow impeachment. For example, Gouverneur Morris stated during the debates on impeachment that:
 
 
 274
 A conclusive reason for making the Senate instead of the Supreme Court the Judge of impeachments, was that the latter was to try the President after the trial of the impeachment.
 
 
 275
 2 Farrand, Records of the Federal Convention 500 (rev. ed. 1966) (emphasis added). And Alexander Hamilton in the Federalist Papers twice reiterated the proposition that removal from office must precede any form of criminal process against an incumbent President:
 
 
 276
 The punishment which may be the consequence of conviction upon impeachment, is not to terminate the chastisement of the offender. After having been sentenced to a perpetual ostracism from the esteem and confidence, and honors and emoluments of his country, he will still be liable to prosecution and punishment in the ordinary course of law.
 
 
 277
 The Federalist No. 65, at 426 (Modern Library ed. 1937).
 
 
 278
 The President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would afterwards be liable to prosecution and punishment in the ordinary course of law.
 
 
 279
 The Federalist No. 69, at 446 (Modern Library ed. 1937).
 
 
 280
 A modern commentator similarly argues that the Impeachment Clause
 
 
 281
 sharply separates removal from office from subsequent punishment after indictment. . . . Removal would enable the government to replace an unfit officer with a proper person, leaving "punishment" to a later and separate proceeding, if indeed the impeachable offense were thus punishable.
 
 
 282
 Berger, Impeachment: The Constitutional Problems 79 (1973). See generally authorities collected in Brief for Petitioner at 17-26.
 
 
 283
 Sound policy reasons preclude criminal prosecution until after a President has been impeached and convicted. To indict and prosecute a President or to arrest him before trial, would be constructively and effectively to remove him from office, an action prohibited by the Impeachment Clause. A President must remain free to travel, to meet, confer and act on a continual basis and be unimpeded in the discharge of his constitutional duties. The real intent of the Impeachment Clause, then, is to guarantee that the President always will be available to fulfill his constitutional duties.
 
 
 284
 Finally, having established that criminal prosecution of an incumbent President must follow impeachment, I come to the reasons this court cannot consider questions of presidential guilt, at least at this stage of the proceedings. Counsel for the President seem to place their argument upon the irrelevance of presidential guilt to the grand jury because of its inability to indict the President:[118]
 
 
 285
 . . . there seems to be a suggestion at pages 19-22 of the Opinion [below] that an otherwise valid claim of privilege by the President would be overridden if the evidence sought would show that the President himself had been guilty of a crime. But if there were such evidence of crime against an incumbent President-and there is none in this case-it could not be relevant to the work of a grand jury or of the District Court because of the inability to indict a President prior to impeachment.
 
 
 286
 This is an insufficient reason, however, since evidence of presidential involvement in a criminal conspiracy might be relevant to establish the case against his advisers.[119] I prefer to rely upon a discrete, but closely related proposition. That is, that a judicial determination of a prima facie case against the President and a grand jury determination of whether or not to indict are sufficiently comparable in the impeachment context so that if one is constitutionally prohibited, the other must be also, for each is a finding that it is probable that the President has committed a crime. There is a distinction, of course, in that an indictment initiates actual criminal prosecution, but this is not a dispositive distinction; a judicial determination that it is more probable than not that the President himself is guilty of criminal activity would just as effectively disable a President in the discharge of his constitutional duties. The courts cannot properly, in effect, ex cathedra stamp their own imprimatur of guilt upon an incumbent President, if to do so would vitiate the sound judgment of the Framers that a President must possess the continuous and undiminished capacity to fulfill his constitutional obligations. In my opinion such a judicial determination of the probability of presidential guilt would have just such an effect. For these reasons, a court should not directly confront an only obliquely urged assertion of a prima facie case against an incumbent President.
 
 
 287
 D. Prior Testimony by Presidential Advisers Does Not Require
 
 Disclosure of the Tape Recordings
 
 288
 The Special Prosecutor contends that whatever privilege the President may have possessed has been waived by the President's statement of May 22, 1973 allowing testimony by his counsel and aides.[120] He argues that a distinction between tape recordings and testimony would be "an intolerable distinction [because] [c]onfidentiality no longer exists in any real sense."[121]
 
 
 289
 As a starting point, the privilege has not been waived at least as to any matters not already testified to by his advisers. The confidentiality surrounding as yet undisclosed conversations has not been impaired. As to those portions of the tape recordings that have been the subject of testimony before the Senate Investigating Committee, the resolution of the waiver issue is more complex, but the answer appears equally clear. There has been no waiver. This conclusion rests upon three factors: the strict standards applied to privileges of this nature to determine waiver; the distinction between oral testimony and tape recordings; and, most important, considerations of public policy that argue persuasively for a privilege that permits the Chief Executive to disclose information on topics of national concern without decimating entirely his right and duty to withhold that which properly ought to be withheld in the public interest.
 
 
 290
 The determination of whether the President has waived his privilege does not depend upon whether it is purely one of constitutional dimensions, only an evidentiary privilege or one that partakes of attributes of both. For, whatever its source, the privilege is sufficiently essential to the effective functioning of the Presidency to require that the standards employed to determine its waiver be as rigorous as those applied to protect constitutional rights generally.
 
 
 291
 This simply recognizes that the present and future ability of Presidents effectively to discharge their constitutional duties is as fundamental to our democratic form of government as are the rights guaranteed by the Constitution to each individual. It is well established in the law that the presumption is against waiver of fundamental or constitutional rights. Indeed, "courts indulge every reasonable presumption against waiver" of such rights. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 57 S.Ct. 809, 81 L.Ed. 1177 (1937); Hodges v. Easton, 106 U.S. 408, 1 S. Ct. 307, 27 L.Ed. 169 (1882). Thus a heavy burden must be met by the Special Prosecutor to establish waiver in this case.
 
 
 292
 In Reynolds the Supreme Court indicated that at least some of the significance attached to the fifth amendment privilege against self-incrimination applied as well to the military or state secrets privilege. The adoption in Reynolds of similarly stringent procedures to establish a valid invocation of the privilege implicitly recognized that the two privileges are of equal significance in our governmental system.[122] While counsel for the President are not entirely correct in their assertion that Reynolds is dispositive of the waiver issue here,[123] that case nonetheless suggests a helpful framework for analysis. Suppose in that case the Government was willing to permit testimony not only as to non-classified matters, but also as to general descriptions of classified matters. Such an offer could not be construed as a waiver of the Government's privilege to refuse to produce the specifications and blueprints of the secret military technology there in question.[124]
 
 
 293
 Similarly, in this case there exists a valid and tenable distinction between testimony and tape recordings. Confidentiality is composed of many elements and the difference in degree between allowing generalized, selective testimony and the recordings themselves is sufficiently great to constitute a difference in kind. Counsel for the President have well stated that distinction:
 
 
 294
 Recordings are the raw material of life. By their very nature they contain spontaneous, informal, tentative, and frequently pungent comments on a variety of subjects inextricably intertwined into one conversation.[125]
 
 
 295
 The distinction between testimony and tape recordings is not drawn for the purpose of preserving the right, in itself, of public officials to speak pungently and bluntly. Rather, what is sought to be preserved are the qualities of directness and candor that flow from discussions where it is unnecessary for the participants to dissemble, to seek the felicitous phrase or to be concerned about interpretations that may be skewed if heard by an unfriendly audience. Failure to recognize the distinction between testimony and recordings here would impede, rather than promote, open and frank discussions. Thus a waiver as to testimony cannot be construed as a waiver of the right to withhold the tape recordings.[126]
 
 
 296
 The proper resolution of the waiver issue depends more fundamentally, however, upon a reasoned compromise between two clear and well-established principles that sustain the efficacy of democratic government in modern times. That is, the general right and need of the public to be well informed, and the imperative need of government to maintain secrecy and confidentiality in certain situations.[127] Although seemingly antagonistic, both principles emerge from, and are but the recognized end result of, that determination ever present in the law: "Where lies the public interest?" The continued vitality of these two principles perforce demands that any rule on waiver of presidential privilege be formulated to, at once, preserve the privilege to the greatest extent consistent with the public interest and promote as full disclosure by high public officers as possible. In this case that goal would best be achieved by holding that the privilege has not been waived. The policy favoring openness in government dictates that a President should be able to disclose certain selected information relevant to topics of national concern and to permit testimony by subordinate executive officers on such topics, without being compelled to make a complete disclosure of that which is essential properly to maintain the confidentiality and integrity of advice and information furnished to the Presidency.[128]
 
 
 297
 The majority prefers not to confront this problem directly, but merges what is essentially a question of waiver into its initial balancing process to determine that the need to preserve confidentiality in this case is lessened. Having done this, the majority then strikes the balance against presidential privilege. But this does not resolve the dilemma posed. Whether future Presidents perceive the question of partial disclosure to enter at the balancing stage or as a waiver determination, they will be reluctant partially to disclose information if such disclosure would, under either mode of analysis, increase the probability of compelled full disclosure. The strong public interest in preserving this latitude for future Presidents requires a finding that on the facts presented in this case executive privilege has not been waived.
 
 V. CONCLUSION
 
 298
 For the reasons above stated it is my conclusion that the presidential communications privilege may be exercised to decline to produce the recordings, and that this privilege has not been waived. I would thus enter judgment accordingly in all cases.
 
 
 299
 If this rule were recognized, the President would then be free voluntarily to type up a transcript of the recordings that are the subject of this litigation and present it to the grand jury with the material deleted that he considers confidential. He could explain the deleted matter.[129] As to the deleted material the President's action would be submitted to the test of public opinion and eventually, when the tapes are released for posterity, to the test of history.[130]
 
 
 300
 *****
 
 
 301
 * * *
 
 
 302
 WILKEY, Circuit Judge, dissenting.***
 
 
 303
 The critical issue on which I part company with my five colleagues is, in the shortest terms, Who Decides?
 
 
 304
 There is no issue as to the existence of Executive Branch privilege, and questions as to its scope and applicability to a given set of facts will be relatively easy to determine once the principal question is settled. The basic issue is who decides the scope and applicability of the Executive Branch privilege, the Judicial Branch or Executive Branch?
 
 
 305
 Throughout the Per Curiam this issue appears obfuscated; there is an effort to slide away from the square confrontation produced by the Judicial Branch ordering the Executive Branch to turn over records of private conversations in the Chief Executive's own office. The reluctance of my colleagues is understandable; no court has ever done this before. Even the great Chief Justice Marshall shied away from making a final order to the Chief Executive to produce the full text of correspondence, a final order which, if it had ever been issued, President Jefferson was fully prepared to ignore.[1]
 
 
 306
 The Per Curiam here never confronts the fundamental Constitutional question of separation of powers, but instead prefers to treat the case as if all were involved was a weighing and balancing of conflicting public interests. There are conflicting public interests involved, they must be carefully weighed, balanced, and appraised; the President says he has done just that. Therefore, the most fundamental, necessarily decisive issue is, Who Does the weighing and balancing of conflicting public interests? The District Judge or the President? The answer to this question necessarily involves the Constitutional question of separation of powers. But the whole line of reasoning, the whole line of authorities, relied on by the Per Curiam does not deal with the separation of powers issue at all.
 
 
 307
 I. The Dual Origin of the Privilege Asserted
 
 
 308
 I respectfully submit that the errors in the Per Curiam's analysis stem from a frequent source of confusion, the failure to recognize and separate the two origins of the Executive Branch privilege: on one hand, the common sensecommon law privilege of confidentiality necessary in government administration, which has been partly codified in statutes such as the Freedom of Information Act; on the other hand, the origin of the privilege in the Constitutional principle of separation of powers. The answer to the overriding issue, Who Decides, and answers to all the subsidiary questions hinge upon the correct analysis of the nature and source of the privilege. Historical practice, by the Judiciary, the Congress, and the Executive, reflects implicitly the dual origin of the privilege of confidentiality asserted at one time or another by each Branch.
 
 
 309
 To understand the legal principles on which the Per Curiam relies, and why they cannot be decisive of this case, I proposed first to discuss the nature of the common sense-common law origin of governmental privilege. To understand the legal principles on which this case, in my opinion, necessarily turns, the remainder of the opinion is devoted to the Constitutional principle of separation of powers as applied to the case at bar.
 
 
 310
 A. The Common Sense-Common Law, Statutory Origin of
 
 Privilege
 1. Historically
 
 311
 The oldest source of Executive Branch privilege, the common sense-common law privilege of confidentiality, existed long before the Constitution of 1789, and might be deemed an inherent power of any government. As President Thomas Jefferson wrote to George Hay, United States Attorney for Virginia, on 17 June 1807:
 
 
 312
 With respect to papers, there is certainly a public and a private side to our offices. To the former belong grants of land, patents for inventions, certain commissions, proclamations, and other papers patent in their nature. To the other belong mere executive proceedings. All nations have found it necessary, that for the advantageous conduct of their affairs, some of these proceedings, at least, should remain known to their executive functionary only. He, of course, from the nature of the case, must be the sole judge of which of them the public interests will permit publication.[2]
 
 
 313
 Historically, apart from and prior to the Constitution, the privilege against disclosure to the public, the press, or to other co-equal branches of the Government arises from the undisputed principle that not all public business can be transacted completely in the open, that public officials are entitled to the private advice of their subordinates and to confer among themselves freely and frankly, without fear of disclosure, otherwise the advice received and the exchange of views may not be as frank and honest as the public good requires.
 
 
 314
 No doubt all of us at times have wished that we might have been able to sit in and listen to the deliberation of judges in conference, to an executive session of a Congressional committee or to a Cabinet meeting in order to find out the basis for a particular action or decision. However, Government could not function if it was permissible to go behind judicial, legislative or executive action and to demand a full accounting from all subordinates who may have been called upon to make a recommendation in the matter. Such a process would be self-defeating. It is the President, not the White House staff, the heads of departments and agencies, not their subordinates, the judges, not their law clerks, and members of Congress, not their executive assistants, who are accountable to the people for official public actions within their jurisdiction. Thus, whether the advice they receive and act on is good or bad there can be no shifting of ultimate responsibility.[3]
 
 
 315
 The Framers of the Constitution itself understood this principle very well. One of the first acts of the Constitutional Convention, 29 May 1787, was to resolve "that nothing spoken in the House be printed, or otherwise published, or communicated without leave."[4] In that historic summer in Philadelphia the Framers produced "the most wonderful work ever struck off at a given time by the brain and purpose of man."[5] But at the conclusion of their historic labors they thought it wise to preserve the confidentiality of exactly how they had done it. On 17 September 1787, as one of their final acts, they directed that all their records on the Convention be turned over to George Washington, not only their presiding officer but one whose complete discretion and probity had long been established.[6] As late as 1831, forty-four years after the Convention, Madison thought it was not yet appropriate for his Notes to be published.[7] He thought "no Constitution would ever have been adopted by the Convention if the debates had been public."[8]
 
 
 316
 2. Litigation in Which the Government is a Party
 
 
 317
 Passing from the Constitutional Convention of 1787 to the most recent Supreme Court case on this point in 1973, Environmental Protection Agency v. Mink,[9] the Court quoted with approval the earlier statement of Mr. Justice Reed, "There is a public policy involved in this claim of privilege for this advisory opinion-the policy of open, frank discussion between subordinate and chief concerning administrative action. . . ."[10] Mr. Justice Reed also pointed out that discussions of this kind are regarded as privileged and are "granted by custom or statute for the benefit of the public, not of executives who may happen to then hold office."[11] Observe that Mr. Justice Reed referred to the privilege as being "granted by custom or statute," and not derived from a Constitutional source. This is accurate when we are dealing with this age-old, common sense-common law privilege, which has been codified in statutes from time to time, the latest being the Freedom of Information Act.[12]
 
 
 318
 Judge Robinson of this court, when sitting as a District Judge, discussed the source of the Executive Branch privilege in these terms, "This privilege, as do all evidentiary privileges, effects an adjustment between important but competing interests . . . in striking the balance in favor of nondisclosure of intragovernmental advisory and deliberative communications. . . ."[13]
 
 
 319
 United States v. Reynolds[14] illustrates the application of this common sense, common law privilege to a situation in which the sought evidence contained military secrets. It was stated, and has been often quoted, that "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers."[15] This language may lead to confusion if it is not recognized that in Reynolds the Supreme Court dealt only with this long established (custom or statute, according to Mr. Justice Reed) privilege of confidentiality in government in the format of a Tort Claim Act suit against the Government. It specifically did not decide any Constitutional claim of Executive discretion based on separation of powers.[16] Though the Court contrived a "balancing" or "necessity" formula, the Court held that "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake."[17] It further held that military secrets were at stake, and even in camera inspection would not be permitted.
 
 
 320
 Reynolds, like innumerable other cases in which a court has pronounced that it is up to the Judiciary to decide the existence and applicability of a privilege, represents civil litigation, in which either the United States or some Government agency as a party is opposed to some private individual or corporation. Cases under the Jencks Act[18] are examples illustrating the same situation in the criminal field. In none of these cases has the Government ever been required to disclose the matter which it desired to retain confidential. Whether the action is civil or criminal, the Government always has had the option of disclosure or dismissing the action and retaining the confidentiality of the material.
 
 
 321
 More relevant to the immediate point under discussion, in these cases the courts did engage in a balancing of conflicting public interests, i. e., the public interest in seeing justice done between litigants in the court, and the public interest in seeing Governmental matters of the highest importance kept confidential. Observe that in this typical litigation situation, in which the court balanced conflicting public interests, the ancient common sense-common law Government administrative privilege of confidentiality is all that is ever involved. There is no question of the principle of separation of powers derived from our Constitution, as the Supreme Court specifically said in Reynolds.
 
 
 322
 3. Individual Inquiry of a Governmental Official or Agency
 
 
 323
 Another example of the same ancient governmental privilege of confidentiality is involved when a private individual or corporation requests information from a Government official or agency, and such is denied. For many years the Government bureaucracy engaged in a self-protective exercise of claiming "Executive privilege," sometimes based on ordinary "housekeeping" statutes,[19] sometimes invoking the Constitutional principle of separation of powers, although what that could have to do with rejection of a request when ordinary members of the public, not another branch of the Government, were seeking information, was never made clear. In order to assure the American public the necessary access to Governmental information, and to prohibit the abuse of so-called "Executive privilege," the Congress finally passed the Freedom of Information Act.[20]
 
 
 324
 In so doing, the Congress itself did the balancing in advance between the competing public interests represented by the right of the people to know how their Government conducts its business, and the recognized necessity of keeping certain types of information strictly confidential. The Freedom of Information Act contains seven categories of documents or information which are exempt from disclosure. In other words, the Congress has judged that, if the material sought falls within one of these seven exemptions, the public interest in maintaining confidentiality outweighs the public interest in the right to know Governmental affairs. The first exemption deals with secrets of state or national security, the others represent categories perhaps of lesser importance, but all are kept confidential, once it is determined the material sought falls within one of the seven exempt categories.
 
 
 325
 If the member of the public does not accept the denial by the Governmental agency, he can go to court to seek the information. If litigation results, in the typical Freedom of Information Act case, the court properly does not balance the public interest represented on both sides; the court merely determines into which category, exempt or non-exempt from disclosure, the material sought belongs. Once this is determined, then the Congress has already given the answer in the Freedom of Information Act itself. If the court determines the material falls outside one of the claimed exempt categories, then the private individual is granted access. There is no Constitutionally derived privilege involved at all; the rights are purely statutory, a codification of many categories of information previously swept within the vague penumbra of "Executive privilege," and many known to the common law and to the jurisprudence of other nations in which separation of powers is unknown.[21]
 
 4. The First Amendment
 
 326
 I am aware of, and impressed by, the strong argument which can be made that the Executive (as well as the Congressional and Judicial) right to privacy is likewise found in the First Amendment, but I resist going into it at length here. Certainly the Chief Executive's right to be fully, frankly, and confidentially informed is equal to that of any other citizen in the land; his need is undeniably greater. To breach his privacy would unquestionably have a "chilling effect" on those who otherwise would counsel and confide in the President with complete candor and honesty.[22]
 
 
 327
 Legal support for the relevance of the First Amendment here is found in such decisions as Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,[23] and NAACP v. Alabama.[24] In Noerr the Supreme Court relied at least in part on the First Amendment to legitimatize joint efforts by businessmen to influence legislative or executive action, even if designed to injure their competitors.
 
 
 328
 Rather than consider the First Amendment as a separate ground for sustaining the Executive's right to privacy, I find it easier to say that the First Amendment in 1789 provided a Constitutional underpinning for the long recognized customary Governmental privilege of privacy. Such a First Amendment right in the Executive would apply, as does the ancient common sense-common law privilege now partly codified in statute, in the Executive's relations with the public and the press, as well as other branches of the Government.
 
 5. The Chief Executive
 
 329
 In theory, if only the ancient customary Governmental confidentiality privilege is involved, whether the Chief Executive should disclose the information should be decided no differently from the case of any other Government official. Even though the President represents the repository of information of the highest confidentiality, it would be permissible for the courts to talk in terms of balancing the public interest of those seeking disclosure versus the public interest of the President in retaining confidentiality, while recognizing that any President's assertion of the confidential nature of documents or communications must be accorded the greatest deference by the courts.
 
 
 330
 As a practical matter, as history shows, the theory breaks down. Not only is the grist of the Presidential mill of a higher quality than that processed by the average bureaucrat, but the institutions or individuals daring to confront the Chief Executive directly have been of a character and power to invoke immediately the other source of the Chief Executive's privilege, the Constitutional doctrine of separation of powers. In the only instances in history of which I am aware, in which demand for documents was made directly upon the President, the demand came from one of the other two co-equal Branches, the Congress or the Judiciary. Beginning with Washington's administration, the Congress has made repeated demands on the Chief Executive for documents, demands which have never been adjudicated by any court employing a balancing test of the public interests involved. The trial of Aaron Burr is the only instance[25] in which demand by subpoena on the President himself was ordered by a court, and this by the Chief Justice himself at the behest of a former Vice President of the United States, then on trial for his life on a charge of treason. In other words, the men and issues were large.
 
 
 331
 We have read and heard eloquent language on the unique nature of the American presidency from both counsel, who agree as to the overriding importance of "preserving the integrity of the Executive Office of the President."[26] We are cautioned that "[n]o substitute offers itself for the American presidency, either domestically or in the world. It will be easier to tear down than to build back."[27] This argument in itself may be good and sufficient reason to sustain the President's assertion of privilege in the circumstances of this case, yet this appears to necessitate a Constitutional value judgment not specifically made in the Constitution itself. Further, analytically it may be that such argument on the unique nature and supreme importance of the presidency in our system is but the long established Governmental privilege of confidentiality raised to the Nth power.
 
 
 332
 In summary of the common sense-common law privilege of Governmental confidentiality, codified in statute as in the Freedom of Information Act, the courts do decide whether the privilege exists and the courts do decide as to its scope and applicability to a given state of facts. In so doing, the courts do balance one public interest versus another. If custom, common law, and statute were the only sources of the Chief Executive's privilege, he, too, might find his view of the public interest overridden by the "balancing" of competing public interests done by a court. But the President has another source of power.
 
 
 333
 B. Separation of Powers-the Tripartite Privilege
 
 1. Judicial versus Executive
 
 334
 We now turn to the second source of the Executive Branch privilege, the principle of separation of powers in our Constitution. Congressional legislation, e. g., the Freedom of Information Act, merely redefined the common sense-common law privilege of confidentiality in the conduct of Government business. It is not unreasonable that the Congress should define how much of Governmental business can safely be made public. But none of this legislation, not even the Freedom of Information Act, touches the Constitutional basis of Executive Branch privilege derived from the principle of separation of powers-nor could it.
 
 
 335
 My colleagues in the Per Curiam reject separation of powers, and concentrate entirely on the common sense-common law, statutorily defined source of the privilege, which is part of the story; but this part, as is made clear in the Per Curiam opinion and in the Briefs of the Special Prosecutor, is subject to balancing, weighing, showing of need, and in general a comparative evaluation of conflicting "public interests" by the courts.
 
 
 336
 Not so the Executive Branch privilege which arises from the principle of the separation of powers among the Legislative, Executive, and Judicial Branches of our Government. We must recognize that this Constitutional privilege, if derived from the separation of powers, as it is, is tripartite. Chief Justice Taft was keenly aware of this when he wrote: "Montesquieu's view that the maintenance of independence as between the legislative, the executive and the judicial branches, was a security for the people had [the Framers'] full approval. . . . From this division on principle, the reasonable construction of the Constitution must be that the branches should be kept separate in all cases in which they were not expressly blended, and the Constitution should be expounded to blend them no more than it affirmatively requires. Madison, 1 Annals of Congress, 497. This rule of construction has been confirmed by this Court . . . ."[28]
 
 
 337
 Observe that it is the Judicial Branch, according to District Judge Sirica's opinion, to whom the tapes are to be handed over for examination in camera. Likewise, it is the grand jury to whom the Special Prosecutor wishes to present the tapes with or without the intervention of the District Judge. The grand jury, as is shown by an analysis developed later, is nothing but an appendage of the Judicial Branch, and has always been recognized as such. The Supreme Court unanimously expressed the principle applicable to this situation:
 
 
 338
 The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the powers of these departments by the Constitution; and in the rule which recognizes their essential coequality. The sound application of a principle that makes one master in his own house precludes him from imposing his control in the house of another who is master there.[29]
 
 
 339
 If the Chief Executive can be "coerced" by the Judicial Branch into furnishing records hitherto throughout our history resting within the exclusive control of the Executive, then the Chief Executive is no longer "master in his own house."
 
 
 340
 This is not a matter of "coercing" the Executive to "obey the law"; there has never before in 184 years been any such law that the Executive could be compelled by the Judiciary to surrender Executive records to the Judiciary. This is an assertion of privilege by the Executive, not a refusal to obey a court's interpretation of the law. This the Executive has always done, even when the Executive's interpretation of the law was different from the court's, e. g., Youngstown Sheet & Tube Co. v. Sawyer.[30] But also, the Executive has always been the one who decided whether the Executive Branch privilege of confidentiality of its records should be asserted, and to what extent, when confronted with demand of another Branch for such records.
 
 
 341
 In the case at bar we have an assertion of privilege by the Executive Branch in response to a demand by the Judicial Branch for the records of the Executive Branch. This is the first time that this precise situation has occurred since the famous trials of Aaron Burr,[31] but whereas this confrontation between the Judicial Branch and the Executive Branch is almost unique, the tripartite privilege has been asserted innumerable times in various alignments of conflict among the three Branches.
 
 2. Legislative versus Executive
 
 342
 The most highly publicized conflicts have been, of course, the demands by Congress on the Executive for Executive papers and information. The first two examples occurred in Washington's administration, the call for the papers relative to General St. Clair's military expedition and later the Jay Treaty.[32] The historical evidence shows that Washington rejected the demands of Congress squarely on the ground of separation of powers. Numerous other examples occurred. Never in 184 years, until Senator Ervin's committee filed the pending action in Judge Sirica's court for these same Watergate tapes, has the Congress desired to take the Constitutional separation of powers issue to a court for adjudication. The reasons are obvious: (1) if the Constitutional principle of separation of powers was valid and effective as a barrier, Congress would lose; (2) acutely aware of its own assertions of privilege, even if Congress won and established that the separation of powers was no barrier to a demand of one Branch for the papers of another, on a reciprocal basis Congress would have to abandon its equally timehonored practice of refusing the demands of the Judicial Branch for its papers; and (3) submitting a dispute between two co-equal Branches to the third Branch would recognize that the Judiciary is "more equal" than the other two.
 
 
 343
 To see the relevance of the Congressional demands on the Executive to the Judicial subpoena on the Executive in the case at bar, it is helpful to note that a Legislative and Judicial subpoena have precisely the same coercive effect on the recipient, and both Congress and the courts have independent power to punish for contempt. Under 2 U.S.C. Sec. 190b(a) standing committees of Congress and their subcommittees are authorized "to require by subpena or otherwise the attendance of such witnesses and the production of such correspondence, books, papers, and documents . . . as they deem advisable."[33]
 
 
 344
 Wilful noncompliance with a Congressional subpoena constitutes contempt of Congress, a misdemeanor.[34] In such instances, the Speaker of the House or President of the Senate certifies a statement of the facts to the appropriate United States Attorney, whose duty is to bring the matter before a grand jury.[35] However, these provisions do not impair Congress' power to punish for contempt by its own action.[36] In Jurney v. MacCracken the Supreme Court noted "[t]he power to punish a private citizen for a past and completed act [of contempt] was exerted by Congress as early as 1795 [footnote omitted]; and since then it has been exercised on several occasions."[37] Here the Court was concerned "with vindication of the established and essential privilege of requiring the production of evidence. For this purpose, the power to punish for a past contempt is an appropriate means."[38]
 
 
 345
 Years ago a distinguished scholar attempted to visualize how an authoritative determination of the Executive's assertedly Constitutional right to privacy might be brought about. After pointing out that while "the President and the heads of executive departments have repeatedly, and sometimes brusquely, rejected such congressional demands," and Congress had never sought the aid of the Attorney General or the courts, nor exercised its "power to punish contempts without invoking the aid of the executive and the judiciary," Professor Joseph Bishop concluded:
 
 
 346
 Such an episode . . . would furnish the courts an admirable occasion to decide the precise question of the constitutional authority of the executive to withhold the desired data. But it is not likely to arise. . . .
 
 
 347
 It is, however, conceivable that the Supreme Court may yet be called upon to face the closely related and logically indistinguishable question of the executive's power to reject a judicial subpoena. If, in litigation to which the government is not a party, a court becomes convinced that a document in the possession of the government is relevant, and if it somehow manages to satisfy itself that that information is unprivileged, . . . the courts may yet have to decide the ultimate reach of the executive's discretion to grant or withhold information.[39]
 
 
 348
 Professor Bishop's hypothetical of 1957 is not precisely with us, but almost. Instead of "litigation to which the government is not a party," we have "litigation in which the government is on both sides" (the President and the Special Prosecutor), which gives us the same Constitutional confrontation and question foreseen by Professor Bishop, i. e., "the executive's power to reject a judicial subpoena."
 
 
 349
 The critical points to be understood from the hypothetical situation, which Professor Bishop foresaw would pose the ultimate Constitutional issue, are these:
 
 
 350
 (1) The Congressional demand for Executive papers (tapes) is "logically indistinguishable" from the demand on the Executive by Judicial subpoena, i. e., both test the Constitutional separation of powers basis of Executive privilege; and
 
 
 351
 (2) Both the Congressional and the Judicial demands on the Executive are to be distinguished from the false confrontation found in innumerable examples of litigation (e. g., Reynolds) in which the Government (Executive) is a party, because the Executive always has an out (abandon the litigation), and thus is never confronted with a true unavoidable demand for the papers or information.
 
 3. Judicial versus Legislative
 
 352
 Turning to the other type of repeated conflict, the Legislative Branch has never acceded to a demand of the Judicial Branch for papers in any case without an assertion and preservation of Congressional privilege. The latest example of Congressional refusal to furnish to a court papers relevant to a criminal prosecution was in United States v. Brewster.[40] There the Senate, in accord with ancient and invariable precedent, on 4 October 1972 resolved:
 
 
 353
 Whereas in the case of the United States of America against Daniel B. Brewster, et al. (criminal action numbered 1872-69), pending in the United States District Court for the District of Columbia, a subpena ad testificandum and duces tecum was issued by such court addressed to David Minton, staff director and counsel of the Committee. . . .
 
 
 354
 Resolved, That by the privileges of the Senate of the United States no evidence in the possession and under the control of the Senate of the United States can, by the mandate of process of ordinary courts of justice, be taken from such possession or control but by its permission; be it further
 
 
 
 * * *
 Resolved, That David Minton . . . be authorized to appear at the time and place and before the court named in such subpena, but shall not take with him any papers, documents, or evidence on file in his office, under his control, or in his possession as staff director and counsel. . . .[41]
 The comparison with the case at bar is striking. Here we have a Judicial subpoena duces tecum directed to the Executive for documents and tapes. The President has said his individual aides who were present at the times the tapes were recorded may testify as to all matters relevant to any criminality which is the subject of the Watergate grand jury inquiry, but may not furnish the tapes.[42] In Brewster we had a Judicial subpoena duces tecum directed to the Senate for documents. The Senate permitted the individual aide to testify personally (as did the President) but forbade him to produce any of the documents (as did the President with regard to the tapes). The responses of the President and the Senate to the Judicial subpoenas are precisely equal, and equally justified (or unjustified) on the same Constitutional ground of separation of powers.
 One further point of comparison: with reference to the Judicial subpoena issued for the Senate papers in the criminal prosecution of Senator Brewster, Who Decided how much, if any, of the subpoenaed papers would be produced? The United States court? Not in Brewster, and not in any case for 184 years. The Senate, a Branch of the Government co-equal under our Constitution, decided what would be furnished the court and what retained as confidential, precisely as has the Chief Executive in the case at bar.
 To cite but two of the best known recent examples, similar assertions of Legislative privilege took place with reference to criminal prosecution in United States v. Calley[43] and United States v. Hoffa.[44] Other similar precedents in both Houses are ancient, numerous, and established beyond question in the Legislative Branch.[45]
 The principle of separation of powers, with a resulting Judicial privilege, works reciprocally when the demand is made by the Congress instead of to the Congress. In 1953 Mr. Justice Tom Clark refused to respond to a subpoena to appear before the House Un-American Activities Committee, on the ground that the "complete independence of the Judiciary is necessary to the proper administration of justice."[46]
 Senator Stennis once summed up the Congressional privilege and its origin very well:
 We now come face to face and are in direct conflict with the established doctrine of separation of powers. . . . I know of no case where the court has ever made the Senate or the House surrender records from its files, or where the Executive has made the Legislative Branch surrender records from its files-and I do not think either one of them could. So the rule works three ways. Each is supreme within its field, and each is responsible within its field.[47]
 
 
 [4]
 Who Decides?
 I thus reach the conclusion, differing from the majority of my colleagues, that the privilege asserted by the President here derives both from the Constitutional principle of separation of powers and from the common sense-common law, statutory privilege of confidentiality of Governmental decision-making, whatever the Branch. The latter may be subject to weighing and balancing of conflicting public interests, as many of the cases have done, but never in a case involving the President as a party. But where the privilege of the Chief Executive is derived from the Constitutional principle of separation of powers, it is no more subject to weighing and balancing than any other Constitutional privilege can be weighed and balanced by extraneous third parties.
 Every President, beginning with Washington and Jefferson, has asserted that the privilege and the scope and applicability are for him alone to decide. This is precisely what Congress does when it either grants or withholds documents in response to the request of a court for evidence in a criminal case. This is what no doubt this court would do if confronted with a demand by a Congressional committee for any of our internal documents. We would weigh and decide and assert the privilege as we saw it, not as a Congressional committee would see it. We would do so on the Constitutional ground of separation of powers. And this is what the President has done here.
 We all know that when a Constitutional privilege under the Fifth Amendment is asserted by the humblest individual, the court does not weigh and balance the public interest in having the individual's testimony. All the court can do is make a preliminary inquiry as to a prima facie justification for the assertion of the privilege. It is up to the individual to decide whether he will assert the privilege. Other privileges, such as husband-wife, lawyer-client, priest-penitent, when recognized by the law, come into being on a showing that the relationship exists. There is no weighing of the public interest in having the testimony compared to the public interest in the particular individual maintaining his privileged communication or document. Nor does the court invite the holder of the privilege to disclose the privileged information in camera so that the court may weigh the "conflicting public interests" involved in disclosure or confidentiality. Even to hint at such a procedure in regard to these privileges is to demonstrate the inherent incongruity of positing the existence of the privilege and yet asserting that someone other than the holder of the privilege will decide by a balancing of interests test whether it can be exercised.
 Nor is logical analysis advanced by a parade of examples in which the public interest in disclosure is heavily exaggerated. Of course one can imagine innumerable instances in which a court, Congress, or the Executive, ought to disclose the documents in the public interest, and probably would. The more exaggerated the example, the more certain it is that a court would decide to disclose to the Attorney General or a Congressional committee, or the Executive would decide to disclose to a court or Congressional committee, internal documents which otherwise would be kept confidential. But the more certain it is that the holder of the documents-the holder of the privilege-will decide to disclose does not alter the fact that it is the holder of the Constitutional privilege Who Decides.
 In conclusion, I find the suggested procedure by the Per Curiam (supra at 720-721) a very logical exercise in determining what evidence should be made available. But going back to the fundamental question of Who Decides, this procedure is one which might be gone through by the President, but not by the Judicial Branch. If the Constitutional privilege has been asserted, then no court has the right to determine what the President will or will not produce.
 The Per Curiam completely ignores the Constitutional principle of separation of powers as the source of the President's privilege asserted here. The Per Curiam treats the privilege as being solely derived from the age-old common sense-common law recognition that Government business cannot be conducted without some degree of confidentiality, and therefore the Judiciary should "weigh" and "balance" the degree of confidentiality permitted in light of "conflicting public interests" in that confidentiality compared to disclosure, just as if the Executive were engaged in litigation with another party and could be compelled to disclose on pain of losing the litigation if the court's view of the public interest were not accepted by the Executive. But this is no such case, and everything else in the Per Curiam opinion logically hinges on the validity of this analysis. But neither we nor any other court can so easily discard the Constitution, including the principle of separation of powers, and including the tripartite privilege universally derived from that principle of separation of powers.
 II. Development of the Tripartite Privilege with Reference
 to Executive Documents
 A. The Legislative Decision of 1789
 In 1789 the First Congress faced the issue of the proper relationship between the Executive and the Legislature. Specifically, the Congress considered the questions of who should have custody of Executive papers and who should have power of removal of Executive officers subordinate to the President. The First Congress' deliberation on these matters is especially significant because many members of the Congress had also actively participated in the drafting of the Constitution.[48]
 The background for the Legislative decision of 1789 lay in the earlier decision of the Continental Congress to establish a Department of Foreign Affairs. The Continental Congress passed a resolution providing that the Foreign Affairs department would be headed by an officer appointed by the Congress, who would hold office "during the pleasure of Congress."[49] The resolution further required that the officer take custody of the books, records, and papers relating to his department, and that any member of Congress should have access to any of these papers.[50] Thus, the Department of Foreign Affairs as envisioned by the Continental Congress was under the control of the Congress.[51]
 After the enactment of the Constitution, the First Congress considered the proper position of the Department of Foreign Affairs and its Secretary. The Act finally passed by the Congress changed the status of the Secretary and his department significantly. The Act specifically made the department an Executive department, and the Secretary subject to the direction of the President.[52] The Secretary was to take charge and custody of all papers relating to the department, except that "whenever the [Secretary] shall be removed from office by the President of the United States, or in any other case of vacancy,"[53] the Chief Clerk, appointed by the Secretary, was to take custody. Nothing was said in the Act concerning either the Congress' right to access to the papers, nor the Congress' right to determine removal of the Secretary.
 The omission of the provision granting the Continental Congress access to the papers of the department is a glaring omission with no illumination provided by the debate in the First Congress. The reports of the debates do not indicate that the question was even discussed.[54] This omission is explained only by the fact that the Department was to be an arm of the Executive, unlike the predecessor department which was an arm of the Continental Congress, an explanation which is not only inherently persuasive, but demonstrated by the rationale in the debate and action on the allied removal provision. The omission could not have been other than a conscious one, as many members of the First Congress had participated in the Continental Congress.[55]
 On the other hand, however, there was strenuous controversy and debate in the First Congress over the question of removal of the Secretary. The first draft of the bill before the House, as proposed by James Madison, had provided specifically that the Secretary was to "be appointed by the President, by and with the advice and consent of the Senate; and to be removable from office by the President."[56] During more than a month's discussion,[57] the House considered various aspects of removal of the Secretary, including the question of how the removal power fit within the Constitutional division into three governmental branches.
 Some members of the House feared that the original wording in the Madison bill suggested that the legislature was granting to the President the power of removal, and that this power might be taken from the President by a later Congress.[58] These men felt that the Constitution had already provided the President the power to remove his subordinates, and no statute was necessary. Consequently Mr. Benson of the House suggested an amendment to the bill to delete the clause "to be removable by the President" and to put that phrase in a position in the bill where it would not appear as a legislative grant but merely a statement of legislative construction of the Constitution.[59]
 After lengthy debate, Mr. Benson moved to insert the clause concerning removal in the description of the duties of the clerk, where it now appears. Madison, who had been persuaded by the wisdom of Benson's suggestions, seconded the motion, and it carried by a vote of 30 to 18.[60] Subsequently the House voted on the second part of Benson's motion, to delete the clause concerning removal which appeared in the first section of the bill. This, too, was supported by Madison, who felt that Congress did not have power to grant the removal power to the President.[61] The amendment passed, 31 to 19.[62] The full bill later passed in the House and was sent to the Senate.
 Chief Justice Taft believed that James Madison's "arguments in support of the President's constitutional power of removal independently of Congressional provision, and without the consent of the Senate, were masterly, and he carried the House."[63] Among those voting with Madison in support of the final bill were Carroll, Clymer, Fitzsimons, and Gilman; of the opposite view were Gerry and Sherman; all had been in the Constitutional Convention two years before.[64]
 Since the bill enacted at the same session establishing the Department of the Treasury contained somewhat different language, it is illuminating to see how that came about. The original bill contained a clause making it the duty of the Secretary "to digest and report plans for the improvement and management of the revenue . . . ."[65] This had been drafted by Hamilton, the Secretary-designate in the Washington administration, as a device to establish his liaison and influence with the Congressional branch. Hamilton's motives did not go long undetected. Significantly, the revulsion of and opposition in the House was based on the Constitutional principle of separation of powers. A motion was made to strike the offending words, on the ground "that to permit the secretary to go further than to prepare estimates would be a dangerous innovation on the constitutional privilege of that house."[66] It was noted that "the authority contained in the bill to prepare and report plans would create an interference of the executive with the legislative powers, and would abridge the particular privilege of that house to originate all bills for raising a revenue."[67] Madison observed that "the words of the bill were precisely those used by the former [continental] congress on two occasions."[68]
 This was not to be acceptable here, for the First Congress realized it was structuring a government in accordance with a new Constitutional principle, the separation of powers, and the members were resolved to be faithful to that hitherto untried principle. Finally, in this debate on the Treasury, an amendment was adopted. The word "prepare" was substituted for "report" in order that "[t]he secretary would then only report his plans if requested by the house."[69] Thus was the Constitutional principle of separation of powers scrupulously adhered to by the First Congress.
 It is significant that the bill establishing the War Department[70] was on the Foreign Affairs Department model, not that of the Treasury. The same held true of other subsequently established departments. The Treasury statute remained unique in its specific reference to the Secretary's duty "to make report . . . as he may be required"; this is in part explainable perhaps by the House's Constitutional duty to originate revenue bills (although the statute refers to "either branch"), but certainly because the draft statute originated with Hamilton, who put in the clause for his own purposes, only to see it modified (but not eliminated) in a manner to reflect the House's preoccupation with the principle of separation of powers.
 The Legislative decision of 1789, in establishing the Departments of Foreign Affairs (State), Treasury, and War, made by the First Congress, guided by the men who had drafted the Constitution only two years before, vividly demonstrates their understanding of separation of powers as established by the Constitution.[71]
 B. Congressional Demands for Executive Papers
 Throughout this nation's 184-year Constitutional history, Congress and the Executive have succeeded in avoiding any near-fatal confrontation over attempts by Congress to procure documents in the Executive's possession. In recognition of the delicate balance created by the doctrine of separation of powers, the two Branches have generally succeeded in fashioning a modus vivendi through mutual deference and cooperation. Thus, when a Congressional committee calls on an Executive official to produce documents or other needed material, "the call is usually qualified by the softening phrase 'if the public interest permits."'[72] Similarly, as one commentator observed:
 It is obvious that in a large majority of cases it is greatly to the advantage of the executive to cooperate with Congress, and in a large majority of cases it does so. Congressional control over appropriations and legislation is an excellent guarantee that the executive will not lightly reject a congressional request for information, for it is well aware that such a rejection increases the chance of getting either no legislation or undesired legislation.[73]
 In certain instances, however, the Chief Executive has asserted a privilege to withhold information from Congress, and such assertions have often been grounded on a Constitutional separation of powers rationale. When made, the Executive assertion of privilege has always prevailed.[74]
 Historically, the first time Congress attempted to probe into documents under the Executive's custody was in March 1792, when the House of Representatives passed a resolution providing:
 Resolved, That a committee be appointed to inquire into the causes of the failure of the late expedition under Major General St. Clair; and that the said committee be empowered to call for such persons, papers and records, as may be necessary to assist their inquiries.[75]
 When the committee asked President Washington for the papers relevant to General St. Clair's campaign, the President called a meeting of his Cabinet. Washington reasoned that since the committee's request was the first of its kind, his response would set a precedent and therefore should be well considered. Secretary of State Jefferson, Treasury Secretary Hamilton, Secretary of War Knox, and Attorney General Randolph attended the meeting. The unanimous conclusion reached by Washington and his Cabinet was, as described by Jefferson:
 First, that the House was an inquest, and therefore might institute inquiries. Second, that it might call for papers generally. Third, that the Executive ought to communicate such papers as the public good would permit, and ought to refuse those, the disclosure of which would injure the public: consequently were to exercise a discretion. Fourth, that neither the committee nor House had a right to call on the Head of a Department, who and whose papers were under the President alone, but that the committee should instruct their chairman to move the House to address the President.[76]
 The Washington administration thus expressed the view that it is is in the President's discretion to determine whether disclosure of Executive documents would be consistent with the public interest.
 In 1796 the House made its second attempt to procure documents from the Washington administration when it passed a resolution asking the President to give the House a copy of papers and correspondence pertaining to the negotiation of the Jay Treaty with Great Britain. The House contended that it could not appropriate funds to implement the treaty until it was allowed access to the papers that it sought. On 30 March 1796 President Washington responded in part as follows:
 As therefore it is perfectly clear to my understanding that the assent of the house of representatives is not necessary to the validity of a treaty; . . . and as it is essential to the due administration of the government that the boundaries fixed by the constitution between the different departments should be preserved; a just regard to the constitution, and to the duty of my office, under all the circumstances of this case, forbid a compliance with your request.[77]
 Clearly, the President was asserting a Constitutional basis for withholding evidence from Congress.
 President Jackson forcefully claimed Executive privilege in 1835 when the Senate requested that he hand over copies of the allegations that resulted in the discharge of Gideon Fitz from the office of Surveyor-General. The President refused to furnish the information requested on the ground that it related to subjects exclusively committed to the Executive Branch. The President's message to the Senate referred to similar requests in the past, all of which he regarded as unconstitutional:
 Their continued repetition imposes on me, as the representative and trustee of the American people, the painful but imperious duty of resisting to the utmost any further encroachment on the rights of the Executive.[78]
 During the administration of President Tyler, the House directed the Secretary of War to disclose to the House reports made to the Department of War by Lieutenant Colonel Hitchcock regarding the affairs of the Cherokee Indians and alleged frauds that he had been commissioned to investigate. In a message dated 31 January 1843 President Tyler refused to turn over much of the requested information, with the following observations which bear a particular relevance to the case at bar:
 The injunction of the Constitution that the President "shall take care that the laws be faithfully executed," necessarily confers an authority, commensurate with the obligation imposed, to inquire into the manner in which all public agents perform the duties assigned to them by law. To be effective, these inquiries must often be confidential. They may result in the collection of truth or of falsehood; or they may be incomplete, and may require further prosecution. To maintain that the President can exercise no discretion after the time in which the matters thus collected shall be promulgated, or in respect to the character of the information obtained, would deprive him at once of the means of performing one of the most salutary duties of his office. An inquiry might be arrested at its first stage, and the officers whose conduct demanded investigation may be enabled to elude or defeat it. To require from the Executive the transfer of this discretion to a coordinate branch of the Government is equivalent to the denial of its possession by him and would render him dependent upon that branch in the performance of a duty purely executive.[79]
 The President further stated that "[t]he practice of the Government since its foundation has sanctioned the principle that there must necessarily be a discretionary authority in reference to the nature of the information called for by either House of Congress,"[80] and showed through historical precedent that that authority had always been exercised by the President. So again separation of powers was invoked as a barrier to disclosure of documents in the custody of the Executive.
 President Cleveland delivered a famous message to the Senate on 1 March 1886 in which he responded to frequent Senate demands for papers from heads of Executive departments which had been created by Congress. He stated:
 The requests and demands which by the score have for nearly three months been presented to the different departments of the Government, whatever may be their form, have but one complexion. They assume the right of the Senate to sit in judgment upon the exercise of my exclusive discretion and Executive function, for which I am solely responsible to the people from whom I have so lately received the sacred trust of office. My oath to support and defend the Constitution, my duty to the people who have chosen me to execute the powers of their great office and not relinquish them, and my duty to the chief magistracy which I must preserve unimpaired in all its dignity and vigor, compel me to refuse compliance with these demands.[81]
 In 1909 the Senate attempted to obtain from Theodore Roosevelt's Attorney General papers relating to the administration's decision not to proceed against United States Steel Corporation for its absorption of Tennessee Valley Coal & Iron Company. In a message to Congress on 6 January 1909, President Roosevelt described his response to the Senate's demands and cited his reasons therefor:
 I have thus given to the Senate all the information in the possession of the executive department which appears to me to be material or relevant, on the subject of the resolution. I feel bound, however, to add that I have instructed the Attorney General not to respond to that portion of the resolution which calls for a statement of his reasons for nonaction. I have done so because I do not conceive it to be within the authority of the Senate to give directions of this character to the head of an executive department, or to demand from him reasons for his action. Heads of the executive departments are subject to the Constitution, and to the laws passed by the Congress in pursuance of the Constitution, and to the directions of the President of the United States, but to no other direction whatever.[82]
 On 20 January 1944, FBI Director J. Edgar Hoover appeared in answer to a subpoena before the House Select Committee to Investigate the Federal Communications Commission. Mr. Hoover was asked to produce a copy of the directive to him from the President ordering him not to testify before the committee with respect to certain matters. Hoover refused, for reasons stated in a letter from the Attorney General to the chairman of the committee:
 It is my view that as a matter of law and of long-established constitutional practice, communications between the President and the Attorney General are confidential and privileged and not subject to inquiry by a committee of one of the Houses of Congress. In this instance, it seems to me that the privilege should not be waived; to do so would be to establish an unfortunate precedent, inconsistent with the position taken by my predecessors.[83]
 Another forceful assertion of a Constitutionally-based Executive privilege occurred in 1954 during the McCarthy subcommittee probe into the affairs of the Army. In a letter dated 17 May 1954 President Eisenhower instructed the Secretary of Defense to forbid Department of Defense employees to testify or produce documents regarding internal consultations or communications within the Department. The President cited as reasons for his directive the following:
 [I]t is essential to the successful working of our system that the persons entrusted with power in any one of the three great branches of Government shall not encroach upon the authority confided to the others. The ultimate responsibility for the conduct of the executive branch rests with the President.
 Within this constitutional framework each branch should cooperate fully with each other for the common good. However, throughout our history the President has withheld information whenever he found that what was sought was confidential or its disclosure would be incompatible with the public interest or jeopardize the safety of the Nation.[84]
 As this survey demonstrates, history abounds of instances in which a Presidential claim, that the Constitutional system gives the President discretion to withhold documents from Congress, has prevailed against Congressional demands for Executive papers. These 184 years of Constitutional practice in the context of Congressional-Presidential relations cannot be ignored when, as in this case, the Judiciary confronts the President with a demand for documents "logically indistinguishable"[85] from a Congressional demand in the Constitutional issue raised.
 C. Judicial Demands for Executive Papers-The Trials of Aaron
 Burr
 Congressional demands for Executive papers are as numerous as autumn leaves, and frequently fall due to a frost between the two ends of Pennsylvania Avenue. In contrast, Judicial demands for Executive documents can be summarized in the drama and legal intricacies of one cause celebre, the two trials of Aaron Burr in 1807, the major historical example of the issuance by a federal court of a subpoena duces tecum directing the President to produce documents.[86] Although the United States Circuit Court for Virginia, per Chief Justice Marshall,[87] issued the subpoena duces tecum to President Jefferson, the court never directly decided the question of the scope of the President's asserted privilege to withhold documents or portions thereof, nor did it determine who should decide the scope of the privilege.[88]
 In the first trial on the charge of treason, the defendant Burr requested the aid of the court in obtaining a letter written by General Wilkinson to President Jefferson on 21 October 1806, the President's response to the letter, and supporting documents.[89] The Wilkinson letter, Burr alleged in an affidavit,[90] would be of great importance in his proof of his innocence, for Wilkinson was an essential witness against him.[91] "Great importance" was hardly an overstatement of Burr's need for the letter; it had been mentioned in President Jefferson's message to Congress on the horrendous conspiracy, it probably formed the foundation of the Executive's charges against Burr, and Jefferson's message to Congress summed up his opinion-Burr's "guilt is placed beyond question."[92]
 The United States Attorney, however, contended that it would be improper to require the President to produce the letter, that the letter was a private, confidential communication, and that it might contain vital state secrets.[93] This contention reflected the views of President Jefferson, who forcefully wrote United States Attorney Hay on 12 June 1807 that
 Reserving the necessary right of the President of the U.S. to decide, independently of all other authority, what papers, coming to him as President, the public interests permit to be communicated, & to whom, I assure you of my readiness under that restriction, voluntarily to furnish on all occasions, whatever the purposes of justice may require. . . . I . . . devolve on you the exercise of that discretion which it would be my right & duty to exercise, by withholding the communication of any parts of the letter which are not directly material for the purposes of justice.[94]
 The accused, however, argued that a subpoena should issue notwithstanding the possibility of confidential communications not relating to the case or state secrets, but suggested that the President might point out the confidential passages, which need not be read in open court.[95]
 After consideration of these arguments, Marshall held that a subpoena duces tecum could issue to the President. He reasoned that an accused has a right to the compulsory process of the court, notwithstanding the position of the person to whom the subpoena was directed, so long as the document or paper itself was proper for production. Chief Justice Marshall wrote,
 The propriety of introducing any paper into a case, as testimony, must depend on the character of the paper, not on the character of the person who holds it.[96]
 and further stated that any exception to this rule of general obligation to compulsory process must be sought in the law of evidence.[97] Marshall thus seemed to rely on the evidentiary nature of the asserted privilege, and did not refer to a possible Constitutional basis.
 Thus, considering the question on customary rules of evidence, Marshall found no exception therein for the President, "The court [could] perceive no legal objection to issuing a subpoena duces tecum to any person whatever, provided the case be such as to justify the process," although he carefully distinguished the issuance of a subpoena from the subsequent step of compelling compliance with the subpoena (a distinction made validly in the case at bar):
 [W]hatever difference may exist with respect to the power to compel the same obedience to the process, as if it had been directed to a private citizen, there exists no difference with respect to the right to obtain it.[98]
 The court anticipated that objections of the President to compliance with the subpoena could and should be shown on the return of the subpoena, but should not be taken into account in the decision to issue the subpoena.[99]
 Marshall admittedly was troubled by the possibility that the letter might contain "matter which ought not be disclosed."[100] He acknowledged that this was a "delicate question," but stated that
 At the present it need only be said that the question does not occur at this time. There is certainly nothing before the court which shows that the letter in question contains any matter the disclosure of which would endanger the public safety. If it does contain such matter, the fact may appear before the disclosure is made. If it does contain any matter which it would be imprudent to disclose, such matter, if it be not immediately and essentially applicable to the point, will, of course, be suppressed. . . . Everything of this kind, however, will have its due consideration on the return of the subpoena.[101]
 Later in the opinion the court reiterated this point, with respect to the written response of the President to the Wilkinson letter.[102]
 The court noted that it had great respect for the President. Yet it felt that the reputation of the court would be tarnished if it refused to aid an accused in procuring papers which he deemed essential for his defense.[103]
 President Jefferson attacked this decision as violating the Constitutional principle of independence of the Branches of Government, a point to which Marshall nowhere directly adverted at any time in his opinions in the Burr trials.[104] In a letter to Hay on 20 June 1807 Jefferson wrote,
 The leading principle of our Constitution is the independence of the Legislature, executive and judiciary of each other, and none are more jealous of this than the judiciary. But would the executive be independent of the judiciary, if he were subject to the commands of the latter, & to imprisonment for disobedience . . . ?[105]
 It is highly significant that President Jefferson, himself a lawyer with more formal legal training than Marshall,[106] had, at the very outset of the matter, gone to the very root of the Constitutional question from the point of view of the Executive. Anticipating that at some point in the great drama, taking place in the Richmond courtroom ninety miles to the south of the White House, there would be a confrontation between the Executive and Judicial powers, on 2 June 1807 Jefferson had written to Hay:
 The Constitution intended that the three great branches of the government should be co-ordinate, and independent of each other.[107]
 When notified of the issuance of the subpoena, Jefferson on 12 June immediately replied: "Sir,-Your letter of the 9th is this moment received. Reserving the necessary right of the President of the U.S. to decide, independently of all other authority, what papers, coming to him as President, the public interests permit to be communicated, & to whom, . . .". (As quoted at p. 782, supra.) The acquittal of Burr for treason came many weeks later, but the battle over the subpoena was to go on.
 In the second part of the Burr litigation, when Burr was on trial for a misdemeanor (beginning a military expedition against the territory of Spain), the Burr request for the Wilkinson letter of 21 October 1806 again drew the attention of the court.[108] In the course of argument Burr referred to the letter and noted that it had not yet been produced.[109] The U.S. District Attorney Hay indicated that he could produce a copy of the letter, but not the original.[110] The court, per Justice Marshall, then stated that a copy would not be admissible unless the loss of the original were proved.[111]
 During later argument the same day, 3 September 1807, Burr made a new request, for a letter from General Wilkinson to President Jefferson written on 12 November 1806, which he also felt was material to his defense.[112] Hay then proposed to produce the 12 November letter and let the clerk of the court in confidence copy those parts of the letters which were relevant and which could be made public. Burr's counsel, however, demanded the whole of the letters. Hay next suggested that Burr's counsel should examine the letters; Hay would rely on their integrity not to disclose confidential passages, and if any disagreement arose, Hay would let the court decide.[113] Burr's counsel refused to inspect anything which Burr himself could not inspect.
 Hay finally responded to the Burr demands by asserting the ultimate position that the President had kept for himself the power to decide what portions of the letter should be made public, but that he wished to make all but the most confidential sections public,[114] as the President had specifically stated in his letters to Hay.[115] President Jefferson maintained that he found the source of his powers in both the common practice of all nations' executives and in the Constitution.[116]
 While Jefferson had been willing earlier to comply substantially with the subpoena,[117] he now felt that Burr had converted the trial into a contest between the Executive and the Judiciary. He was disappointed that Justice Marshall had allowed this, but he hoped that Marshall would not press on with the conflict. If Marshall did continue, however, Jefferson noted that the powers given the Executive by the Constitution would enable him to prevail.[118] Jefferson was determined to resist the execution of the process and was willing to use force if necessary, although he hoped that Marshall would not push the issue to a head.
 On 4 September 1807 Burr again demanded the letters of General Wilkinson written to President Jefferson on 21 October and on 12 November 1806. Burr stated in court that the President was in contempt for failure to comply with the subpoena issued for the 21 October letter, but he hoped that the President would produce the letters without the necessity of resorting to contempt proceedings.[119] Burr indicated he might accept a copy of the 21 October letter, the original of which had apparently been mislaid, but only if the copy were properly authenticated.[120]
 After lengthy debate, the court issued a second subpoena duces tecum, to the United States Attorney, which was returned with a copy of the 12 November 1806 letter, the copy excepting the parts not material or relevant in Hay's opinion. Hay indicated that this power of selection of the passages to be made public had been delegated to him by the President.[121] However, the United States Attorney was willing to submit the original letter to the court so that it could test the accuracy of his opinion, and he also certified that the deleted parts contained opinions about certain persons which would not be admissible in court.[122] Burr still was not satisfied, and the court apparently would be required to resolve the issue.
 Chief Justice Marshall recognized that while the President was subject to the general rule requiring compliance with a subpoena, nevertheless the President may have "sufficient motives for declining to produce a particular paper, and those motives may be such as to restrain the court from enforcing its production."[123] He continued by stating that
 The occasion for demanding it ought, in such a case, to be very strong, and to be fully shown to the court before its production could be insisted on. I admit, that in such a case, much reliance must be placed on the declaration of the president; and I do think that a privilege does exist to withhold private letters of a certain description.[124]
 This expression of acknowledgment of some kind of Executive privilege for confidential communications, made by Marshall on 4 September 1807, is reminiscent of Marshall's statement four years earlier in Marbury v. Madison, that Attorney General Lincoln need not disclose anything which had been communicated to him in confidence.[125]
 Marshall was troubled, however, by the possibility of denying the accused information which might be of aid in his defense. He indicated that the court would give great deference to the reasons of the President for withholding the information, and would require the accused to show that the material was essential to the defense.[126] Here, however, it had been Hay, rather than the President, who had decided which specific passages should be withheld. This gave Marshall still another opportunity to avoid the direct Constitutional clash:
 Had the president, when he transmitted it, subjected it to certain restrictions, and stated that in his judgment the public interest required certain parts of it to be kept secret, and had accordingly made a reservation of them, all proper respect would have been paid to it; but he has made no such reservation. . . . In regard to the secrecy of these parts which it is stated are improper to give out to the world, the court will take any order that may be necessary. I do not think that the accused ought to be prohibited from seeing the letter; but, if it should be thought proper, I will order that no copy of it be taken for public exhibition, and that no use shall be made of it but what is necessarily attached to the case.[127]
 The great Chief Justice had finessed the issue.
 Hay immediately sought instructions from the President, and on 9 September he presented the court with "a certificate from the president, annexed to a copy of Gen. Wilkinson's letter, excepting such parts as he deemed he ought not permit to be made public."[128] The President's certificate, dated 7 September 1807, noted that
 On re-examination of a letter of Nov. 12, 1806, from Genl. Wilkinson to myself, . . . I find in it some passages entirely confidential, given for my information in the discharge of my executive functions, and which my duties & the public interest forbid me to make public. I have therefore given above a correct copy of all those parts which I ought to permit to be made public. Those not communicated are in nowise material for the purposes of justice on the charges of treason or misdemeanor depending against Aaron Burr; they are on subjects irrelevant to any issues which can arise out of those charges, & could contribute nothing towards his acquittal or conviction.[129]
 The trial proceeded, and Burr was found by the jury to be not guilty.[130] The full Wilkinson to Jefferson letter of 12 November 1806 was never produced.
 My colleagues "think the Burr case makes clear that application of Executive privilege depends on a weighing of the public interest protected by the privilege against the public interests that would be served by disclosure in a particular case." (Per Curiam, supra at 716.) Not so, not by a long shot, not by the difference between a United States Attorney and a President.
 Marshall might have been willing to pit the Judiciary versus the Executive by a final order to produce the whole letter or else, when only the excerpted letter was furnished and the deletions were done by the judgment of the U.S. Attorney. But when the President himself later came forth with his excerpted version and certificate as to what had been deleted and why, Marshall said nothing and he did nothing.
 The full 12 November letter was never produced; the 21 October letter was never produced in the first trial for treason, and there is no record that even a copy was produced in the second trial for misdemeanor.
 If we go on what was actually done, the Burr trials prove that the final "weighing of the public interest" is done by the Chief Executive. If we go on what was said by Marshall, the Burr trials leave the ultimate issue of Who finally decides the public interest completely undecided, for Marshall never faced up, even verbally, to a confrontation with the President himself with the issue drawn on the question of separation of powers.[131]
 These two great Constitutional and political antagonists-Marshall and Jefferson, Chief Justice and President-had circled each other warily, each maintaining his position, each, out of respect for the other and for the delicate fabric of the Constitution, not forcing the ultimate issue. Who should decide the scope and applicability of the Chief Executive's privilege? The Burr trials give no definite answer. Who did decide the Chief Executive's privilege? The portions of the letter determined by the President to be confidential remained confidential; the full letter was never produced to the court.
 III. Relationship of the Grand Jury to the Judiciary and to
 the Executive
 In my view, the case at bar presents the same conflict between the Judiciary and the Executive which faced Chief Justice Marshall in the Burr trials. I would decide the question the same way Marshall actually left it; my colleagues would decide the question by asserting a Judicial supremacy over the Chief Executive, which Marshall may have hinted he preferred, but which he was too prudent finally to assert.
 There is a third position which is argued by the Special Prosecutor, and indeed is relied on by the District Judge, hence must be addressed briefly here. The Special Prosecutor contends, ". . . it is a false conflict to see the present controversy as a struggle between the powers of the Judiciary and the prerogatives of the President. Rather, what is involved is the respondent's refusal to respond to a demand from the people, speaking through their organ, the grand jury."[132] And, ". . . the grand jury's 'authority is derived from none of the three basic divisions of our government, but rather directly from the people themselves.' (Citation omitted.)"[133] Judge Sirica held, "[t]he grand jury derives its authority directly from the people . . .."[134]
 In the first place, it is undeniable that, under the very terms of Judge Sirica's Order and Opinion, the nine tapes are to be turned over to the District Court, and the grand jury may never see or hear any of them after the District Judge's review in camera. So the Judiciary-Executive confrontation is there at the outset, whatever the character of the grand jury. In the second place, the grand jury is only an appendage of the court under whose direction it operates. When the grand jury functions, it functions within the recognized tripartite division of powers as an arm of the Judicial Branch.
 A. Background
 The Supreme Court has described the grand jury as "brought to this country by the early colonists and incorporated in the Constitution by the Founders. There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor."[135] In its formative stages in England, the jury[136] was "a body of neighbors summoned by some public officer to give, upon oath, a true answer to some question."[137] In the twelfth century Henry II made extensive use of the jury as a source of general information necessary for the administration of his centralized government. The jury's role as a source of general information for the Crown diminished when Parliament became the grand inquest of the nation.[138] "So gradually, in the course of the fourteenth century, the use of the jury in connection with the central government came to be chiefly confined to judicial functions."[139]
 In the thirteenth century and early part of the fourteenth, members of the grand jury that accused a person of crime often served on the petit jury that tried him.[140] However, by 1351-52 no indictor could serve on the trial jury if he were challenged for cause by the accused.[141] It seems clear that in early England the grand jury was as much a part of the judicial machinery as the petit jury.
 From a tool of the Crown for ferreting out criminals, the grand jury later evolved into a protector of the citizenry against arbitrary prosecution. The grand jury's role as a shield dates from the 1681 case of the Earl of Shaftesbury, in which the grand jury wrote "Ignoramus" ("we ignore it") on the bill of indictment presented by the Crown against Shaftesbury.[142] The protective function of the grand jury was recognized by the drafters of the Bill of Rights when they provided in the Fifth Amendment that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ."[143] In Wood v. Georgia the Court emphasized the protective role of the grand jury:
 Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will.[144]
 In addition to its historical roles as an accusatory body and as a shield of the innocent, the grand jury has traditionally been accorded broad powers to investigate possible wrongdoing.[145] Thus, a grand jury may initiate an independent investigation and request that charges be made against those whose wrongdoing was discovered.[146]
 B. Relationship of the Grand Jury to the Judiciary
 From the above survey of the history and traditional functions of the grand jury, it should be clear that the grand jury operates within the judicial sphere of Government. The Supreme Court has so treated it: "The grand jury is an arm of the court and its in camera proceedings constitute 'a judicial inquiry."'[147] Perhaps the fullest exposition of the judicial nature of the grand jury's activities is contained in In re National Window Glass Workers:
 A grand jury has no existence aside from the court which calls it into existence and upon which it is attending. A grand jury does not become, after it is summoned, impaneled, and sworn, an independent planet, as it were, in the judicial system, but still remains an appendage of the court on which it is attending. No grand jury shall be summoned to attend any District Court unless the judge thereof, in his own discretion or upon a notification by the district attorney that such jury will be needed, orders a venire to issue therefor. [Citation omitted.] The District Court may discharge a grand jury whenever in its judgment it deems a continuance of the sessions of such a jury unnecessary. [Citation omitted.] All indictments or presentments of a grand jury become effective only when presented in court and a record is made of such action. A grand jury is not, therefore, and cannot become, an independent, self-functioning, uncontrollable agency. It is and remains a grand jury attending on the court, and does not, after it is organized, become an independent body, functioning at its uncontrolled will, or the will of the district attorney or special assistant.[148]
 Although a court has no authority to order the grand jury to return an indictment (or to refuse to do so),[149] it may exercise control over the grand jury in several significant respects.[150] The court summons and empanels the grand jury[151] and apparently has broad discretion to discharge it for any reason.[152] The grand jury's jurisdiction to investigate is limited to that of the presiding court.[153] In making its inquiries, the grand jury must rely on the process of the court to procure evidence and summon witnesses and must look to the power of the court to enforce its subpoenas.[154] "Unreasonable or oppressive" subpoenas may be quashed or modified by the court on motion.[155] The court has considerable discretion to instruct the grand jury and to prescribe rules for the conduct of its proceedings.[156] In summary, the court has broad supervisory authority with respect to the activities of the grand jury.
 The nature of the grand jury's functions and its subordination to the supervisory authority of the court place it squarely within the Judicial Branch. Moreover, in order to perform its protective function,[157] the grand jury must remain detached from and independent of the Executive Branch. Therefore, the grand jury is under no compulsion to follow the orders of the prosecutor.[158] Its power to investigate and return a presentment based on its findings is not impaired by the prosecutor's discretion to decide whether or not to proceed with a prosecution.[159]
 Thus, for purposes of applying the doctrine of separation of powers, the grand jury must be aligned with the Judicial Branch. As one court stated in Hammond v. Brown,
 The grand jury in its inquest of crimes and offenses is part of the judicial branch of government. Like other branches of government the judicial branch is subject to the doctrine of separation of powers. [Citation omitted.] The grand jury is part of the judicial branch of government and is separate and distinct from the legislative and executive branches of government; and the grand jury, therefore, may not "impinge upon the authority or rights of the others" . . . . [Citation omitted.[160]
 IV. Amenability of the President to Judicial Process-An
 Illusory Issue in the Instant Case
 My colleagues have decided an "immunity" issue, which, in my humble judgment, is a non-issue in this case-both from the majority view and my own.
 A. If the President has the power and responsibility to decide where lies the public interest in disclosure or nondisclosure, as I believe, what business does any court have issuing any "Order"? Apparently none, for the Per Curiam opinion states: "If the Constitution or the laws of evidence confer upon the President the absolute discretion to withhold material subpoenaed by a grand jury, then of course we would vacate, rather than approve with modification, the order entered below." (Per Curiam, supra at 712.)
 B. If the court has the power to weigh and balance the public interest in the confidentiality of Executive records, but the court has no physical power to enforce its subpoena should the President refuse to comply-as my colleagues apparently recognize full well (Per Curiam, supra at 708 and notes 32-33)-then what purpose is served by determining whether the President is "immune" from process?
 It can hardly be questioned that in any direct confrontation between the Judiciary and the Executive, the latter must prevail. Therefore, the "issue" of whether the President is amenable to court process is an illusory one. No one questions that the court can issue to the President a piece of paper captioned "Subpoena" and that the President owes some obligation at least to inform the court of how he intends to respond. But our history is full of examples of situations in which direct confrontations between two or more of the co-equal Branches were avoided by one of the Branches deciding not to push its position to the limit.
 It should be crystal clear from the detailed account of the trials of Aaron Burr (II.C. supra) that Burr provides no support for my colleagues' deciding this "issue" as they do, for Chief Justice Marshall never came to the final confrontation with President Jefferson. Since the Burr trials represent the sole[161] example in our history of a court subpoena duces tecum to an incumbent President, it is with some astonishment that I read the majority's confident assertion: "The courts' assumption of legal power to compel production of evidence within the possession of the Executive surely stands on firm footing. Youngstown Sheet & Tube v. Sawyer, . . ." (Per Curiam, supra at 709) (emphasis supplied).
 Youngstown[162] involved no documents, no tapes, no Presidential conversations-no assertion of a Constitutional privilege of any kind. Youngstown represents the Judicial power, by compulsory process or otherwise, to prohibit the Executive from engaging in actions contrary to law. Youngstown represents the principle that no man, cabinet minister or Chief Executive himself,[163] is above the law; Youngstown says nothing about Which Branch Decides a Constitutional privilege based on separation of powers.
 Nor are the other authorities cited by the majority opinion to decide the unnecessary question of Presidential "immunity" any more relevant. United States v. United States District Court[164] involved a Fourth Amendment violation by wiretapping, and the consequent required disclosure or dismissal in the well-known adversary litigation situation. Kendall v. United States ex rel. Stokes[165] was a mandamus to a cabinet officer to comply with an act of Congress, with no privileged communications whatsoever involved. State Highway Commission v. Volpe[166] involved an injunction against a cabinet officer, with no privileged communications asserted.
 Thus, the real issue, even by the analysis in other parts of the Per Curiam opinion, is whether it is appropriate for the court to determine the legal validity of a claim of privilege by the President, or whether the Constitutional principle of separation of powers requires the court to yield to the President's judgment as to where the public interest lies. My answer would be the latter. But taking the answer given by the Per Curiam as correct and at the broadest, the proper role of the court is to decide the legal issue of the nature and extent of the President's privilege, and, given the court's admitted lack of physical power to enforce compliance, express such conclusions in a declaratory judgment form. The court need not issue any process to be served on the President, so the question of "immunity" need never arise. If the court's decision is adverse to the President, he must decide whether to comply or risk adverse political consequences.
 Whatever the court's decision here, whichever rationale is followed, it seems clear that any issue of Presidential "immunity" or amenability to court process is totally illusory.
 V. Application of the Constitutional Tripartite Privilege
 A. Procedures and Practicalities-Statutes and the
 Constitution
 Parts V and VI of the Per Curiam opinion suggest certain procedures to be followed by the District Court on remand, derived from Environmental Protection Agency v. Mink[167] and our own opinions in Vaughn v. Rosen[168] and Cuneo v. Schlesinger.[169] The procedures themselves are irreproachable, and might well be workable, if we were dealing with a usual statutory privilege and the ordinary papers of the bureaucracy.
 We are not; whence arise two great objections to the Per Curiam recommended solution: (1) the Constitutional barrier of separation of powers, which means that neither the authorities nor the techniques relied on are applicable here; and (2) certain practical problems inherent in the Judiciary dealing with the most confidential communications of the Chief Executive.
 
 
 [1]
 The Authorities
 Mink, Vaughn, and Cuneo all dealt with statutory exemptions from disclosure specifically defined in the Freedom of Information Act.[170] No Constitutional privilege was ever invoked. The same can be said of Carl Zeiss[171] and Soucie v. David.[172] In these cases the "courts appropriately examine[d] a disputed item in camera" (Per Curiam, supra at 720), because the statute provided the indispensable guidelines for District Court examination and decision; i. e., the statute specifically defined and described the categories of information which were to be exempt from disclosure.
 In this situation the task of the District Judge is clear and definite; he is to look at the confidential material (properly segmented for intelligent decision-making) in camera, and make a factual etermination[173] as to whether the subject matter fits within or without the statutorily exempted categories. If within any defined exemption, the information is kept confidential; if not within any of seven categories, the information is disclosed to the demanding party.
 The District Judge does no "balancing" or "weighing of conflicting public interests"; the balancing and weighing has already been done by the Congress in the statute itself. In category "(1) specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy," the undisputed fact of an Executive order categorizing a document as secret precludes even in camera inspection by the District Judge, as the Supreme Court held in Mink. There is no factual question left for the judge to determine, so no inspection violating Executive secrecy is permissible. With regard to other claimed categories of exemption in Mink, as in Vaughn and Cuneo, in camera inspection was needed to determine the fact of the proper classification.
 This is comparable to United States v. Reynolds,[174] which antedates the Freedom of Information Act. There the Supreme Court, after determining as a fact from the showing made by the Government that the material related to important national defense secrets, forbade even in camera inspection. And, as my colleagues correctly point out, ". . . the Court formally reserved decision on the Government's claim that the Executive has an absolute discretion constitutionally founded in separation of powers to withhold documents." (Per curiam, supra at 714.[175] )
 If we look at Part VI of the Per Curiam spelling out the procedure prescribed for the District Judge, aside from the category of national defense or foreign relations (supra at 721-722), by what criteria, by what guidelines, with reference to what categories of information communicated to or in the presence of the President, will the District Judge decide what is to be disclosed to and what kept from the Special Prosecutor and grand jury? By what standards is the District Judge to weigh or balance the conflicting claims of the Chief Executive and the Special Prosecutor? By the amorphous standard of "the public interest"? With all due respect to Chief Judge Sirica, why is any one of 400 District Judges better equipped than the Chief Executive of the Nation to determine "the public interest"?
 There is missing completely from the situation here the absolutely indispensable ingredient which made the techniques of classification and in camera inspection feasible in Mink, Vaughn, and Cuneo,. e., categories of information previously specifically defined by statute as disclosable or confidential. In the situation here, what the District Judge must do is to make the value judgment as to disclosure or confidentiality, which was made by Congress on material subject to statutory mandate, and which here constitutionally belongs to the Chief Executive himself, not to a District Judge, under the doctrine of separation of powers.
 
 
 [2]
 Pragmatic Considerations
 The first problem is that of security, an omnipresent consideration when the office of the President is concerned. If in camera examination involved only one United States District Judge, the violation of Executive privacy might be tolerable. Such restricted access is remote as a practical prospect. There is the process of assembling, classifying, and furnishing the tapes to the court, necessarily involving counsel and other persons who previously have had no access to this stored information. There is the legal and clerical assistance the District Judge must require. There are the probable demands of prospective defendants to be confronted, which may call for access by the Special Prosecutor beyond what he originally required.[176]
 After the District Court's decision, then will arise the question of appeal. It is too much to expect any decree of the District Court to have either the wisdom or finality of Solomon's. A non-appealable Order of a District Judge, either suppressing or exposing the most confidential recorded conversations of the President, will satisfy no one. The alternative is equally unattractive. Appeal will involve three to nine (in some Circuits, more) judges in the Court of Appeals, with a minimum of clerical and legal staff assistance. Then will come the nine members of the Supreme Court with appropriate supporting personnel.
 As a member of the Federal Judiciary, the writer means no disrespect to its members or staff assistants. As the circle of "secrecy" widens, it will dissolve and vanish. All human experience teaches this-particularly in Washington, D. C.
 Nor is in camera inspection of Presidential material without danger to the Judiciary. The judge who suppresses eagerly sought information can never adequately justify his decision by a public explanation of his rationale in the usual opinion. The judge's decision may in truth be unjustifiable, grossly in error, because federal judges are not necessarily equipped with the type of information on which to base an intelligent decision on confidentiality. By the nature of the problem, the places the judge can turn for assistance are limited or nonexistent. The needed background information may be political in nature, as may the sought after information, and willy-nilly, whatever his decision, the judge may have injected himself and the whole Judiciary into what is basically part of the political process.B. A Healthy Tension
 Many speak as if all answers to all conceivable problems of our Government are to be found in specific Constitutional provisions. They imagine that somewhere in that magnificent document there must be the answer to how a conflict between the Executive and the Judiciary (or Executive and Legislative), each claiming to act within the powers of its Branch, should be resolved. I suggest that this is one of several major areas in which the Constitutional Convention deliberately provided no specific answer.
 I suggest that the best (and historically only) answer is that judgment on the proper exercise of the Executive and Judicial powers ultimately rests, and was intended to rest, with the American people. Having created three co-equal separate Branches, the Constitutional Convention did not foul up the grand design by providing that one Branch was to be superior and prevail over another, nor did the grand scheme entrust the decision between two conflicting Branches to the third Branch. This was graphically demonstrated by the Constitutional theory on which Washington and his cabinet first acted, that the Executive himself should determine what papers in the public interest could be furnished to another Branch.
 It was and is the President's right to make that decision initially, and it is the American people who will be the judge as to whether the President has made the right decision, i. e., whether it is or is not in the public interest that the papers (tapes) in question be furnished or retained. If his decision is made on visibly sound grounds, the people will approve the action of the Executive as being in the public interest. If the decision is not visibly on sound grounds of national public interest, in political terms the decision may be ruinous for the President, but it is his to make. The grand design has worked; the separate, independent Branch remains in charge of and responsible for its own papers, processes and decisions, not to a second or third Branch, but it remains responsible to the American people.
 This may seemingly frustrate the role of the Special Prosecutor in part of his work, it may frustrate what a Congressional investigative committee conceives to be its role, but in my judgment this was the way the Constitution was intended to work. The Constitution was not designed as an all-powerful efficient instrument of government. The primary concern in the minds of the Founding Fathers of 1787 was to devise a reasonably efficient method of government that above all did not have the inbuilt capacity to become oppressive.[177] And to that end they first designed the separation of powers, making each Branch independent, and then left inherent in the structure they had designed the possibility of irreconcilable conflict.[178] But in their view, the possibility of irreconcilable conflict was not necessarily bad, because above all this would guarantee that the National Government could never become an efficient instrument of oppression of the people.
 The Founding Fathers were not looking for the most efficient government design. After all, they had been subject to and rebelled against one of the most efficient governments then existing.[179] What the Founding Fathers designed was not efficiency, but protection against oppression.[180] Leaving the three Branches in an equilibrium of tension was just one of their devices to guard against oppression.[181]
 This healthy equilibrium of tension will be destroyed if the result reached by the Per Curiam is allowed to stand. My colleagues cannot confine the effect of their decision to Richard M. Nixon. The precedent set will inevitably have far-reaching implications on the vulnerability of any Chief Executive to judicial process, not merely at the behest of the Special Prosecutor in the extraordinary circumstances of Watergate, but at the behest of Congress. Congress may have equally plausible needs for similar information. The fact that Congress is usually or frequently locked in political battle with the Chief Executive cannot mean that Congress' need or right to information in the hands of the Chief Executive is any less than it otherwise would be. The courts will have been enlisted on one side of what would be even more undeniably and fundamentally a political question.
 The Per Curiam notes (at 722) that "[w]hat the courts are now called upon primarily to decide, . . . is how to reconcile the need of the United States, by its grand jury, with the legitimate interest of the President in not disclosing those portions of the tapes that may deal with unrelated matters." This is indeed revelatory. One would have thought that the President, not a Special Prosecutor or grand jury, should best determine "the need of the United States." One would have thought that when "the need of the United States" was to be evaluated, the President, not one of 400 District Judges, would be the most fitted to determine where the overall public interest lies. It is thus all too clear that, to reach the result achieved by the Per Curiam, somehow, subconsciously, it is essential to assume implicitly that the President no longer represents the United States or is qualified to determine where the overall public interest lies. Without that implicit assumption, the majority here would be powerless to reach the result it does.
 At an earlier point the Per Curiam defines the position of the Chief Executive here as "The President claims that, at least with respect to conversations with his advisers, the privilege is absolute, since he, rather than the courts, has final authority to decide. . . ." (Per Curiam, supra at 713.) My colleagues reject this claim on the basis that "The President's privilege cannot, therefore, be deemed absolute. . . . [A]pplication of Executive privilege depends on a weighing of the public interest. . . ." (Per Curiam, supra at 716.)
 In the first place, that answer represents the balancing test applicable to the ancient common sense-common law source of all Governmental privilege; it ignores totally the Constitutional source of the Chief Executive's privilege, separation of powers, which creates the basic question in this case: Under the Constitution, Who Decides?
 In the second place, the Constitutional principle also means this: with "absolute" privilege goes absolute responsibility. When we reach the level of the Chief Executive, this can only mean responsibility to the American people. I think the Framers meant it that way.
 Yet, my colleagues' answer doubtless has appeal to those who theoretically would reject a theoretical absolute. So, in the third place, whatever our answer in theory should be, we must realize both the question and the answer also ignore history. If the same question is phrased in regard to the holder of office in Congress, or the holder of office in the Judiciary, where privilege in regard to the private papers, documents, and deliberations of the Congress and the Judiciary are concerned, the answer is clear-the holder of the office has always been the absolute determinant of the privilege.
 Has a court ever refused to accept the determination of one House of Congress that its papers were privileged from judicial subpoena, and insisted on compliance with a subpoena duces tecum? Never. (E. g., Brewster, Calley, Hoffa, etc., etc.)[182] Has Congress ever refused to accept the determination of the Chief Executive that his papers were privileged from a Congressional committee demand, and sought to enforce it either by its own process or by judicial process? Never. (E. g., the Jay Treaty in Washington's administration, corporate bureau antitrust papers in Theodore Roosevelt's administration, etc., etc.)[183]
 To put the theoretical situation and possibilities in terms of "absolute" privilege sounds somewhat terrifying-until one realizes that this is exactly the way matters have been for 184 years of our history, and the Republic still stands. The practical capacity of the three independent Branches to adjust to each other, their sensitivity to the approval or disapproval of the American people, have been sufficient guides to responsible action, without imposing the authority of one co-equal Branch over another.[184]
 The American Constitutional design may look like sloppy craftsmanship, it may upset tidy theoreticians, but it has worked-a lot better than other more symmetrical models.
 At the least, this is a point in favor of its continuance unchanged; at the most, this may be all the answer we need.
 
 
 [1]
 The District Court's order is reproduced here in its entirety:
 This matter having come before the Court on motion of the Watergate Special Prosecutor made on behalf of the June 1972 grand jury of this district for an order to show cause, and the Court being advised in the premises, it is by the Court this 29th day of August, 1973, for the reasons stated in the attached opinion,
 Ordered that respondent, President Richard M. Nixon, or any subordinate officer, official or employee with custody or control of the documents or objects listed in the grand jury subpoena duces tecum of July 23, 1973, served on respondent in this district, is hereby commanded to produce forthwith for the Court's examination in camera, the subpoenaed documents or objects which have not heretofore been produced to the grand jury; and it is
 Further Ordered that the ruling herein be stayed for a period of five days in which time respondent may perfect an appeal from the ruling; and it is
 Further Ordered that should respondent appeal from the ruling herein, the above stay will be extended indefinitely pending the completion of such appeal or appeals.
 
 
 [2]
 By Order of the Attorney General No. 517-73, 38 Fed.Reg. 14, 688 (June 4, 1973), the Special Prosecutor is designated as the attorney for the United States to conduct proceedings before the grand jury investigating the unauthorized entry into the Democratic National Committee Headquarters and related offenses. He is specifically authorized "to contest the assertion of 'executive privilege."' See also Hearings before the Senate Comm. on the Judiciary, 93d Cong., 1st Sess. 159, 180-81 (1973). The Special Prosecutor, as Attorney for the United States, appears in this Court and the court below as counsel to the grand jury and an officer of the court
 
 
 [3]
 This, of course, does not signify agreement on the scope of the President's privilege, the proper content of any judgment by the Court, or the District Court's constitutional authority to issue an order to the President. Circuit Judges MacKinnon and Wilkey concur in part II of the Court's opinion and otherwise dissent for the reasons stated in their separate opinions
 
 
 [4]
 The subpoena, issued by the clerk under seal of the District Court pursuant to F.R.Crim.P. 17(a) and (c), was addressed to the President or "any subordinate officer, official or employee with custody or control" of the documents and objects specified in the attached schedule
 
 
 [5]
 For the Special Prosecutor's explanation of the relevance of those discussions, see Appendix II, infra. The subpoena also required production of two memoranda that had been written by and sent to certain of the President's advisers. The President has complied with the subpoena in so far as it concerned these items
 
 
 [6]
 Appendix to the Supplemental Brief for the United States (Special Prosecutor), at 30-31
 
 
 [7]
 Special Appearance at paragraphs 3 and 6, In re Grand Jury Subpoena Duces Tecum to Nixon, 360 F.Supp. 1 (D.C.D.C.1973)
 
 
 [8]
 Memorandum in Support at 3-11, id
 
 
 [9]
 In re Subpoena to Nixon, supra note 7, 360 F.Supp. at 11
 
 
 [10]
 See text at note 81, infra
 
 
 [11]
 No. 73-1989
 
 
 [12]
 "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. Sec. 1651(a) (1970)
 
 
 [13]
 Will v. United States, 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967), quoting Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 26, 63 S.Ct. 938, 87 L.Ed. 1185 (1943). For a full discussion of the general rules governing our authority to issue the writ, see Donnelly v. Parker, 158 U.S.App.D.C. ____, ____, ____, 486 F.2d 402, 405, 407-410 (1973)
 
 
 [14]
 Will v. United States, supra note 13, 389 U.S. at 95, 88 S.Ct. at 273, quoting De Beers Consol. Mines v. United States, 325 U.S. 212, 217, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945)
 
 
 [15]
 Parr v. United States, 351 U.S. 513, 520-521, 76 S.Ct. 912, 100 L.Ed. 1377 (1956)
 
 
 [16]
 Will v. United States, supra note 13, 389 U.S. at 96-98, 88 S.Ct. 269
 
 
 [17]
 United States v. Ryan, 402 U.S. 530, 532, 91 S.Ct. 1580, 1581, 29 L.Ed.2d 85 (1971). See also Cobbledick v. United States, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940). But see Carr v. Monroe Mfg. Co., 431 F.2d 384 (5th Cir. 1970)
 
 
 [18]
 Compare Schlagenhauf v. Holder, 379 U.S. 104, 110-111, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964)
 
 
 [19]
 Id
 
 
 [20]
 Bankers Life & Cas. Co. v. Holland, 346 U.S. 379, 385, 74 S.Ct. 145, 98 L.Ed. 106 (1953), quoting Ex parte Fahey, 332 U.S. 258, 260, 67 S.Ct. 1558, 91 L.Ed. 2041 (1947)
 
 
 [21]
 In so concluding, we do not discard the direct appeal as an alternative basis for review in the particular situation before us. The final-order doctrine, as a normal prerequisite to a federal appeal, is not a barrier where it operates to leave the suitor "powerless to avert the mischief of the order." Perlman v. United States, 247 U.S. 7, 13, 38 S.Ct. 417, 419, 62 L.Ed. 950 (1918). In the case of the President, contempt of a judicial order-even for the purpose of enabling a constitutional test of the order-would be a course unseemly at best. To safeguard against any possible miscarriage of justice, we make known our view that our jurisdiction exists by way of appeal if for any reason the President's application is not properly before us on the jurisdictional predicate he invokes
 
 
 [22]
 See United States v. United States District Court, 444 F.2d 651, 655-656 (6th Cir. 1971), aff'd, 407 U.S. 297, 301, n.3, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)
 
 
 [23]
 We think it clear, in any event, that the District Court's August 29th order is unappealable at the instance of the Special Prosecutor, either under 28 U.S.C. Sec. 1291 or Sec. 1292 (1970). In addition, since the order in no way finally decides that any of the subpoenaed material must be denied the grand jury, it cannot be deemed an order "suppressing or excluding evidence," or otherwise within the contemplation of the Criminal Appeals Act, 18 U.S.C. Sec. 3731 (1970). But see note 100, infra
 
 
 [24]
 Will v. United States, supra note 13, 389 U.S. at 98, 88 S.Ct. at 275
 
 
 [25]
 Id
 
 
 [26]
 Supra note 18
 
 
 [27]
 Supra note 18, 379 U.S. at 110, 85 S.Ct. 234
 
 
 [28]
 Id. at 111, 85 S.Ct. at 239
 
 
 [29]
 Id
 
 
 [30]
 See Ex parte Republic of Peru, 318 U.S. 578, 584, 63 S.Ct. 793, 87 L.Ed. 1014 (1943)
 
 
 [31]
 See, e. g., Ex parte Skinner & Eddy Corp., 265 U.S. 86, 95-96, 44 S.Ct. 446, 68 L.Ed. 912 (1924)
 
 
 [32]
 Glidden v. Zdanok, 370 U.S. 530, 568-571, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); Baker v. Carr, 369 U.S. 186, 208-237, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). See also South Dakota v. North Carolina, 192 U.S. 286, 318-321, 24 S.Ct. 269, 48 L.Ed. 448 (1904); La Abra Silver Mining Co. v. United States, 175 U.S. 423, 461-462, 20 S.Ct. 168, 44 L.Ed.223 (1898)
 
 
 [33]
 If the judiciary's want of de facto power to enforce its judgment has any relevance, it is that the third branch of government, posing little physical threat to coordinate branches, need not hesitate to reject sweeping claims to legal immunity by those coordinate branches. See United States v. Lee, 106 U.S. (16 Otto) 196, 223, 1 S.Ct. 240, 27 L.Ed. 171 (1882)
 
 
 [34]
 See, e. g., United States ex rel. Touhy v. Ragen, 340 U.S. 462, 465-466, 472, 71 S.Ct. 416, 95 L.Ed. 417 (1951) (Frankfurter, J., concurring); Westinghouse Electric Corp. v. City of Burlington, Vermont, 122 U.S.App.D.C. 65, 351 F.2d 762 (1965); Boeing Airplane Co. v. Coggeshall, 108 U.S.App.D.C. 106, 280 F.2d 654 (1960)
 
 
 [35]
 410 U.S. 73, 93, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973)
 
 
 [36]
 See text at notes 92-97 infra
 
 
 [37]
 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)
 
 
 [38]
 In Land v. Dollar, 89 U.S.App.D.C. 38, 190 F.2d 623 (1951), vacated as moot, 344 U.S. 806, 73 S.Ct. 7, 97 L.Ed. 628 (1952), as well, it was clear that the court realized that its order countered the executive will of the President. The Land court acknowledged that the President had directed the cabinet officials to disregard the initial judicial decision. Id. at 54, 190 F.2d at 639
 
 
 [39]
 25 Fed.Cas. p. 30 (Case No. 14,692d) (1807)
 
 
 [40]
 Id. at 34. (Emphasis supplied.)
 
 
 [41]
 United States v. Burr, 25 Fed.Cas. pp. 187, 190, 191-192 (Case No. 14,694) (1807). (Emphases supplied.)
 
 
 [42]
 In 1818, several years after the Burr case, a subpoena was also issued to President James Monroe. It summoned the President to appear as a defense witness in the court martial of Dr. William Burton, naming a specific date and time. A copy of the summons is in Attorney General's Papers: Letters received from State Department, Record Group 60, National Archives Building. Attorney General Wirt advised Monroe, through Secretary of State John Quincy Adams, that a subpoena could "properly be awarded to the President of the United States," but suggested that the President indicate on the return that his official duties precluded a personal appearance at the court martial. William Wirt to John Quincy Adams, Jan 13, 1818, Records of the Office of the Judge Advocate General (Navy), Record Group 125, (Records of General Courts Martial and Courts of Inquiry, Microcopy M-272, case 282), National Archives Building. In conformance with this advice, Monroe wrote on the back of the summons that he would "be ready and willing to communicate, in the form of a deposition any information I may possess, relating to the subject matter in question." President James Monroe to George M. Dallas, Jan. 21, 1818, id. Subsequently, President Monroe did in fact submit answers to the interrogatories forwarded to him by the court. President James Monroe to George M. Dallas, Feb. 14, 1818, id
 
 
 [43]
 II Farrand, The Records of the Federal Convention of 1787, 502-503 (1967)
 44 U.S.Const., art. I, Sec. 6, p 1.
 
 
 [45]
 Myers v. United States, 272 U.S. 52, 123, 47 S.Ct. 21, 71 L.Ed. 160 (1926)
 
 
 [46]
 See, e. g., United States v. Burr, supra note 39, 25 Fed.Cas. at 34
 
 
 [47]
 Youngstown Sheet & Tube Co. v. Sawyer, supra note 37, 343 U.S. at 655, 72 S.Ct. at 880 (1952) (Jackson, J., concurring)
 48 U.S.Const., art. I, Sec. 3, p 7:
 Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of Honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.
 
 
 [49]
 On this point, too, Chief Justice Marshall was instructive:
 If, upon any principle, the president could be construed to stand exempt from the general provisions of the constitution, it would be, because his duties as chief magistrate demand his whole time for national objects. But it is apparent that this demand is not unremitting.
 United States v. Burr, supra note 39, 25 Fed.Cas. at 34.
 
 
 [50]
 Because impeachment is available against all "civil Officers of the United States," not merely against the President, U.S.Const. art. II, Sec. 4, it is difficult to understand how any immunities peculiar to the President can emanate by implication from the fact of impeachability
 
 
 [51]
 See, e. g., Marbury v. Madison, 5 U.S. (1 Cranch) 137, 165, 2 L.Ed. 60 (1803); Kendall v. United States ex rel. Stokes, 37 U.S. (12 Pet.) 524, 610, 9 L.Ed. 1181 (1838)
 
 
 [52]
 [T]he question, whether the legality of an act of the head of a department be examinable in a court of justice or not, must always depend on the nature of that act
 Marbury v. Madison, supra note 51, 5 U.S. (1 Cranch) at 165.
 The mandamus does not seek to direct or control the postmaster general in the discharge of any official duty, partaking in any respect of any executive character; but to enforce the performance of a mere ministerial act, which neither he nor the President had any authority to deny or control.
 Kendall v. United States ex rel. Stokes, supra note 51, 37 U.S. (12 Pet.) at 610. (Emphasis supplied.)
 
 
 [53]
 In this regard, the President's reliance on Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 18 L.Ed. 437 (1866), is misplaced. In that case, the State of Mississippi sought to enjoin President Johnson from enforcing the Reconstruction Acts. Though Attorney General Stanbery argued that the President was immune from judicial process, the Court declined to found its decision on this ground, choosing instead to deny the bill of injunction as an attempt to coerce a discretionary, as opposed to ministerial, act of the Executive. The Attorney General rehearsed many of the arguments made by the President in this case, claiming that the President's dignity as Chief of State placed him above the reach of routine judicial process and that the President was subject only to that law which might be fashioned in a court of impeachment. Id. at 484. We deem it significant that the Supreme Court declined to ratify these views. Compare Georgia v. Stanton, 73 U.S. (6 Wall.) 50, 18 L.Ed. 721 (1867), where the Court declined jurisdiction of a similar bill of injunction even though sub-presidential Executive Branch officials were named as defendants
 
 
 [54]
 Branzburg v. Hayes, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972). We reject the contention, pressed by counsel for the President, that the Executive's prosecutorial discretion implies an unreviewable power to withhold evidence relevant to a grand jury's criminal investigation. The federal grand jury is a constitutional fixture in its own right, legally independent of the Executive. See United States v. Johnson, 319 U.S. 503, 510, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943). A grand jury may, with the aid of judicial process, Brown v. United States, 359 U.S. 41, 49-50, 79 S.Ct. 539, 3 L.Ed.2d 609 (1959), call witnesses and demand evidence without the Executive's impetus. Hale v. Henkel, 201 U.S. 43, 60-65, 26 S.Ct. 370, 50 L.Ed. 652 (1906). If the grand jury were a legal appendage of the Executive, it could hardly serve its historic functions as a shield for the innocent and a sword against corruption in high places. In his eloquent affirmation of unfettered prosecutorial discretion in United States v. Cox, 342 F.2d 167, 189 (5th Cir.), cert. denied, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965), Judge Wisdom recognized the grand jury's independent and "plenary power to inquire, to summon and interrogate witnesses, and to present either findings and a report or an accusation in open court by presentment." As a practical, as opposed to legal matter, the Executive may, of course, cripple a grand jury investigation by denying staff assistance to the jury. And the Executive may refuse to sign an indictment, thus precluding prosecution and, presumably, effecting a permanent sealing of the grand jury minutes. United States v. Cox, supra. These choices remain open to the President. But it is he who must exercise them. The court will not assume that burden by eviscerating the grand jury's independent legal authority
 
 
 [55]
 Brief of Petitioner Nixon at 84; Reply Brief of Petitioner, Nixon at 30 n.6
 
 
 [56]
 Brief of Petitioner Nixon at 69, citing Gravel v. United States, 408 U.S. 606, 627, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972)
 
 
 [57]
 Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875); United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953); United States v. Burr, supra note 39
 
 
 [58]
 Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. 318, 324 (D.C.D.C.1966), aff'd on opinion below, 128 U.S.App.D.C. 10, 384 F.2d 979, cert. denied, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967)
 
 
 [59]
 See, e. g., id. 40 F.R.D. at 329-335; Kaiser Aluminum & Chemical Corp. v. United States, 157 F.Supp. 939, 141 Ct.Cl. 38 (1958)
 
 
 [60]
 See, e. g., United States v. Reynolds, supra note 57; Olson Rug Co. v. NLRB, 291 F.2d 655 (7th Cir. 1961); Timken Roller Bearing Co. v. United States, 38 F.R.D. 57 (N.D.Ohio 1964); United States v. Procter & Gamble Co., 25 F.R.D. 485 (D.N.J.1960); Kaiser Aluminim & Chemical Corp. v. United States, supra note 59; see also the cases cited at 8 C. Wright & A. Miller, Federal Practice & Procedure 167-173 (1970). Despite our peculiar constitutional tradition of judicial review, American law is not in fact unusual in subjecting claims of Executive privilege to court scrutiny. Indeed, no common law country follows the rule, urged by the President in this case, that mere executive assertions of privilege are conclusive on the courts. In Conway v. Rimmer, [1968] 1 All E.R. 874, the House of Lords explicitly reversed its long held view, as expressed in Duncan v. Cammell Laird & Co., [1842] 1 All E.R. 587, that executive privilege is absolute. Conway held that proper adjudication of a privilege claim may require in camera inspection of documents over which the privilege is asserted. [1968] 1 All E.R. at 888 (opinion of Lord Reid), and 896 (opinion of Lord Morris of Borth-y-Gest). Similar recognition of judicial power to scrutinize claims of privilege may be found in almost every common law jurisdiction. See, e. g., Robinson v. South Australia (No. 2), [1931] All E.R. 333 (P.C.); Gagnon v. Quebec Securities Comm'n, [1965] 50 D.L.R.2d 329 (1964); Bruce v. Waldron, [1963] Vict.L.R. 3; Corbett v. Social Security Comm'n, [1962] N.Z.L.R. 878; Amar Chand Butail v. Union of India, [1965] 1 India S.Ct. 243
 
 
 [61]
 In Environmental Protection Agency v. Mink, supra note 35, the Supreme Court relied on cases in which claims of Executive privilege were reviewed by the court, often in camera, in interpreting how the judiciary should apply the intragovernmental communication exemption to the public disclosure mandate of the Freedom of Information Act. Id. at 88 & cases cited at notes 14 & 15
 
 
 [62]
 See, e. g., 40 Op.Atty.Gen. 45, 49 (1941) (Attorney General Jackson); 100 Cong.Rec. 6621 (1954) (President Eisenhower)
 
 
 [63]
 Supra note 57, 345 U.S. at 8, 73 S.Ct. at 532
 
 
 [64]
 Id. at 9-10, 73 S.Ct. at 533
 
 
 [65]
 Id. at 6 & note 9, 73 S.Ct. 528
 
 
 [66]
 149 U.S.App.D.C. 385, 463 F.2d 788 (1971)
 
 
 [67]
 Id. at 390, 463 F.2d at 793
 
 
 [68]
 Supra note 51, 5 U.S. (1 Cranch) at 157
 
 
 [69]
 The purpose of the explicit constitutional privilege against self-incrimination, like that of Executive privilege, is defeated by too much judicial inquiry into the legitimacy of its use, see United States v. Reynolds, supra note 57, 345 U.S. at 3-9, 73 S.Ct. 528, but the courts have never held the mere invocation of the privilege to be sufficient to free the invoker from questioning. The judge must first determine whether the privilege is properly invoked. See, e. g., Hoffman v. United States, 341 U.S. 479, 486-487, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)
 
 
 [70]
 The Supreme Court has repeatedly made clear that it is for the courts to determine the reach of the Speech and Debate Clause, U.S.Const. Art. I, Sec. 6, p 1. See, e. g., Gravel v. United States, supra note 56; United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972); United States v. Johnson, supra note 54. Indeed, very close judicial review is needed to determine whether the activities concerning which questioning or prosecution is sought are:
 integral part[s] of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.
 Gravel v. United States, supra note 56, 408 U.S. at 625, 92 S.Ct. at 2627. If separation of powers doctrine countenances such a close review of assertions of an express constitutional privilege, the doctrine must also comprehend judicial scrutiny of assertions of Executive privilege, which is at most implicit in the Constitution. Gravel deals on its facts only with an assertion of privilege by an individual legislator. As collective bodies, the Houses of Congress have frequently made unilateral declarations of an absolute privilege to withhold documents in their custody from court process. See, e. g., Senate Resolution, Oct. 4, 1972, 92nd Cong., 2d Sess. These claims have never been pressed to a judicial resolution, and we have no occasion here to decide them. It is sufficient to note that they rest on a footing different from the President's claim of absolute privilege in this case. The President's claim has been previously litigated, and repudiated, in United States v. Burr, supra note 39. Further, Congress' claims draw upon two express constitutional privileges unavailable to the President, the aforementioned Speech and Debate Clause, and the Secrecy Clause in Art. I, Sec. 5, p 3. Even so, we note that Gravel states that the scope of the Speech and Debate privilege cannot be unilaterally "established by the Legislative Branch," Gravel v. United States, supra, 408 U.S. at 624 n. 15, 92 S.Ct. 2614.
 
 
 [71]
 See Myers v. United States, 272 U.S. 52, 116, 47 S.Ct. 21, 71 L.Ed. 160 (1926)
 
 
 [72]
 See Youngstown Sheet & Tube Co. v. Sawyer, supra note 37, 343 U.S. at 635, 72 S.Ct. 863 (Jackson, J., concurring)
 
 
 [73]
 The doctrine of separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy
 Myers v. United States, supra note 71, 272 U.S. at 293, 47 S.Ct. at 85. (Brandeis, J., dissenting).
 
 
 [74]
 Chief Justice Marshall wrote two opinions concerning the production of the letters. In the first of these opinions, the Chief Justice ruled that a subpoena to produce the letters could be issued to the President and that the Chief Justice himself would consider and weigh any specific objections interposed by the President that the letters contained matter "which ought not to be disclosed." United States v. Burr, supra note 39, 25 Fed.Cas. at 37; see page 710 supra. Statements of the Chief Justice in the first Burr opinion suggest that he contemplated that he would actually inspect the letters in camera
 If it contain matter not essential to the defense, and the disclosure be unpleasant to the executive, it certainly ought not to be disclosed. This is a point which will appear on the return. * * * If they contain matter interesting to the nation, the concealment of which is required by the public safety, that matter will appear upon the return.
 United States v. Burr, supra note 39, at 37. The United States Attorney Hay seems to have read the Chief Justice's first opinion to contemplate inspection by the court. As Judge Wilkey notes in his dissent, after Burr had renewed his request for the letters, Hay offered to submit them to the court for copying of "those parts which had relation to the cause." Hay further expressed his willingness to transmit the letters to Burr's counsel so that they could form their own opinions on what portions should be kept confidential from Burr and the public. Hay anticipated that differences between the opinions of Burr's counsel and himself would be arbitrated by the court. United States v. Burr, supra note 41, 25 Fed.Cas. at 190. The prosecution in the Burr case thus seems to have read Chief Justice Marshall's first opinion to support a procedure analogous to in camera inspection by Judge Sirica and Special Prosecutor Cox.
 It was only after Burr's counsel rejected Hay's position and demanded direct submission of the entire letters to Burr himself that Marshall found it necessary to issue his second opinion. In this opinion the Chief Justice addressed the remaining question of whether the President should be ordered to release the letters directly to Burr or whether the court should first inspect the documents to screen out privileged portions. Marshall made clear that before frustrating Burr's efforts to obtain the letters, the court would have to balance the opposing interests:
 The president may himself state the particular reasons which may have induced him to withhold a paper, and the court would unquestionably allow their full force to those reasons. At the same time, the court could not refuse to pay proper attention to the affidavit of the accused.
 Id. at 192.
 
 
 [75]
 See United States v. Reynolds, supra note 57
 
 
 [76]
 Soucie v. David, 145 U.S.App.D.C. 144, 158, 448 F.2d 1067, 1081 (1971) (Wilkey, J., concurring)
 
 
 [77]
 5 U.S.C. Sec. 552(b)(5) (1970); see Environmental Protection Agency v. Mink, supra note 35
 
 
 [78]
 See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, supra note 58, 40 F.R.D. at 324-325
 
 
 [79]
 E. g., Branzburg v. Hayes, supra note 54, 408 U.S. at 687-688, 92 S.Ct. 2646
 
 
 [80]
 Supra note 66, 149 U.S.App.D.C. at 391, 463 F.2d at 794. (per curiam); see Gravel v. United States, supra note 56, 408 U.S. at 627, 92 S.Ct. 2614
 
 
 [81]
 Statement by the President, May 22, 1973, quoted in Appendix to the Brief for the United States (Special Prosecutor), at 14, 24
 
 
 [82]
 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973)
 
 
 [83]
 352 U.S. 567, 575, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957)
 
 
 [84]
 Lopez v. United States, 373 U.S. 427, 437-440, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); Osborn v. United States, 385 U.S. 323, 326-331, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966)
 
 
 [85]
 Lopez v. United States, supra note 84, 373 U.S. at 439, 83 S.Ct. at 1388
 
 
 [86]
 Where, as here, a conversation attended by the President, Mr. Dean and Mr. Haldeman has been the subject of divergent accounts by Mr. Dean and by Mr. Haldeman, without any restriction by the President on their testifying on the ground of confidentiality, there is no objection to presentation by the tape recorder of that part of the conversation that relates to Watergate, any more than to testimony on this point by another witness who had perfect auditory memory
 
 
 [87]
 In re Subpoena to Nixon, supra note 7, 360 F.Supp. at 21-22
 
 
 [88]
 The Memorandum and replies of counsel are set forth in Appendix I, infra
 
 
 [89]
 Brief of Petitioner Nixon at 69
 
 
 [90]
 Id. at 41-43
 
 
 [91]
 Id. at 61
 
 
 [92]
 Supra note 35, 410 U.S. at 92, 93 S.Ct. at 838
 
 
 [93]
 Id. at 93, 93 S.Ct. at 839
 
 
 [94]
 Id
 
 
 [95]
 Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, supra note 58, 40 F.R.D. at 331
 
 
 [96]
 Supra note 35, 410 U.S. at 93, 93 S.Ct. 827
 
 
 [97]
 Id. at 88, 93 S.Ct. at 836, citing United States v. Cotton Valley Comm., 9 F.R.D. 719, 720 (W.D.La.1949), aff'd by equally divided court, 339 U.S. 940, 70 S.Ct. 793, 94 L.Ed. 1356 (1950)
 
 
 [98]
 157 U.S.App.D.C. ____, 484 F.2d 820 (1973)
 
 
 [99]
 See id. at ____, 484 F.2d at 828
 
 
 [100]
 Since the subpoenaed recordings will already have been submitted to the District Court, the opportunity to test the court's ruling in contempt proceedings would be foreclosed. And any ruling adverse to the Special Prosecutor would clearly be a pretrial "decision or order . . . suppressing or excluding evidence . . . in a criminal proceeding . . .." Thus the District Court's rulings on particularized claims would be appealable by the President as final judgments under 28 U.S.C. Sec. 1291 (1970), and by the Special Prosecutor under 18 U.S.C. Sec. 3731 (1970). See United States v. Ryan, 402 U.S. 530, 533, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971); Perlman v. United States, 247 U.S. 7, 12-13, 38 S.Ct. 417, 62 L.Ed. 950 (1918); United States v. Calandra, 455 F.2d 750, 751-753 (6th Cir. 1972)
 
 
 [101]
 Judge Wilkey, in dissent, adheres to the abstract in his discussion of who has the right to decide; he makes no reference to the facts before us framing that issue. John Marshall addressed it in the context of President Jefferson's decision to reveal the contents of a private letter to the extent of characterizing it, in a message to Congress, as containing overwhelming evidence of Burr's treason. So here, we must deal with that issue not in a void but against the background of a decision by the President, made and announced before the existence of the tapes was publicly known, to permit participants in private conversations with him to testify publicly as to what was said about Watergate and its aftermath. That decision-and the resulting testimony containing conflicts as to both fact and inference-has made it possible for the Special Prosecutor to make a powerful showing of the relevance and importance of the tapes to the grand jury's discharge of its responsibilities. What the courts are now called upon primarily to decide, as distinct from what the President has already decided with respect to the relative importance of preserving the confidentiality of these particular conversations, is how to reconcile the need of the United States, by its grand jury, with the legitimate interest of the President in not disclosing those portions of the tapes that may deal with unrelated matters
 
 
 [102]
 Brief of Petitioner Nixon at 94
 
 
 *
 It is interesting that Haldeman, who had reviewed recordings of other meetings, did not review the recording of this meeting in view of the serious nature of the allegations by Dean
 
 
 **
 New York Times, June 21, 1973, p. 28 (notes of Minority Counsel of Senate Select Committee of oral briefing by Counsel to the President)
 
 
 [1]
 Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)
 
 
 [2]
 Id. at 594-596, 72 S.Ct. at 889-890 (Frankfurter, J., concurring)
 
 
 [3]
 United States v. Arredondo, 31 U.S. (6 Pet.) 691, 714, 8 L.Ed. 540 (1832)
 
 
 [4]
 Inland Waterways v. Young, 309 U.S. 517, 525, 60 S.Ct. 646, 651, 84 L.Ed. 901 (1940)
 
 
 [5]
 Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 418-419, 5 L.Ed. 257 (1821); Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 350, 4 L.Ed. 97 (1816). Martin v. Hunter's Lessee, supra, established the power of the Supreme Court to review state court decisions in civil cases. Later, in the decision upholding the Court's power to review state criminal decisions, Chief Justice Marshall pointedly remarked:
 This concurrence of statesmen, of legislators and judges, in the same construction of the Constitution, may justly inspire some confidence in that construction.
 Cohens v. Virginia, supra, 19 U.S. (6 Wheat.) at 419.
 Other important constitutional decisions evidence Supreme Court reliance upon custom and usage. Cooley v. Board of Wardens, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851), involved the constitutionality of a state law which required vessels to take a pilot in certain waters. In finding that the law did not violate the Constitution, the Court relied upon the existence of such state laws since the adoption of the Constitution and the fact that "similar laws have existed and been practiced in the states since the adoption of the federal Constitution," and that Congress in its legislative acts had recognized the existence of such laws. This contemporaneous construction was held to be entitled to great weight. Id. at 315.
 In Stuart v. Laird, 5 U.S. (1 Cranch) 299, 2 L.Ed. 115 (1803), the Court relied upon contemporaneous construction of the Constitution, followed by practice and acquiescence, in affirming Congress' power to authorize Supreme Court Justices to sit as circuit judges without receiving additional commissions. This usage was held to be of the "most forcible nature" and "too strong and obstinate to be shaken or controlled." Id. at 309.
 
 
 [6]
 United States v. Midwest Oil Co., 236 U.S. 459, 472-473, 35 S.Ct. 309, 313, 59 L.Ed. 673 (1915)
 
 
 [7]
 See pp. 737-738 infra
 
 
 [8]
 N. Y. Times, Sept. 3, 1948, at 5. The Truman Memorandum consists of 102 pages and the original now rests in the Harry S. Truman Library at Independence, Missouri
 
 
 [9]
 Resume and Conclusions
 A bird's-eye view of the refusals by seventeen of our Presidents, and thier heads of departments, to comply with congressional requests for information and papers from the Executive, beginning with 1796 to the present time, follows*:
 President Date Type of Information Refused
------------ ---- -----------------------------------------------------------
George 1796 Instruction to U.S. Minister concerning Jay Treaty.
 Washington
Thomas 1807 Confidential information and letters relating to Burr's
 Jefferson conspiracy.
James Monroe 1825 Documents relating to conduct of naval officers.
Andrew 1833 Copy of paper read by President to heads of departments
 Jackson relating to removal of bank deposits.
 1835 Copies of charges against removed public official.
 List of all appointments made without Senate's consent,
 since 1829, and those receiving salaries, without holding
 office.
John Tyler 1842 Names of Members of 26th and 27th Congresses who applied
 for office.
 1843 Report to War Department dealing with alleged frauds
 practiced on Indians, and Col. Hitchcock's views of
 personal characters of Indian delegates.
James K. 1846 Evidence of payments made through State Department, on
 Polk President's certificates, by prior administration.
Millard 1852 Official information concerning proposition made by King of
 Fillmore Sandwich Islands to transfer islands to U.S.
James 1860 Message of Protest to House against Resolution to
 Buchanan investigate attempts by Executive to influence
 legislation.
Abraham 1861 Dispatches of Major Anderson to the War Department
 Lincoln concerning defense of Fort Sumter.
Ulysses S. 1876 Information concerning executive acts performed away from
 Grant Capitol.
Rutherford 1877 Secretary of Treasury refused to answer questions and to
 B. Hayes produce papers concerning reasons for nomination of
 Theodore Roosevelt as Collector of Port of New York.
Grover 1886 Documents relating to suspension and removal of Federal
 Cleveland officials.
Theodore 1909 Attorney General's reasons for failure to prosecute U.S.
 Roosevelt Steel Corporation.
 Documents of Bureau of Corporations, Department of
 Commerce.
Calvin 1924 List of companies in which Secretary of Treasury Mellon was
 Coolidge interested.
Herbert 1930 Telegrams and letters leading up to London Naval Treaty.
 Hoover
 1932 Testimony and documents concerning investigation made by
 Treasury Department.
Franklin D. 1941 Federal Bureau of Investigation reports.
 Roosevelt
 1943 Director, Bureau of the Budget, refused to testify and to
 produce files.
 1943 Chairman, Federal Communications Commission, and Board of
 War Communications refused records.
 1943 General Counsel, Federal Communications Commission, refused
 to produce records.
 1943 Secretaries of War and Navy refused to furnish documents,
 and permission for Army and Naval officers to testify.
 1944 J. Edgar Hoover refused to give testimony and to produce
 President's directive.
President 1945 Issued directions to heads of executive departments to
 Truman permit officers and employees to give information to
 Pearl Harbor Committee.
 1945 President's directive did not include any files or written
 material.
 1947 Civil Service Commission records concerning applicants for
 positions.
 Truman Memonandum at 44a, b, c (1948).
 
 
 *
 In the bird's-eye picture, reference is made to the refusals of Presidents Monroe, Fillmore, Lincoln, and Hayes[;] Monroe's refusal may be found in a message dated January 10, 1825, 2 Richardson, Messages and Papers of Presidents, p. 278' [sic] Fillmore's in 5 Richardson, p. 159; Lincoln's in 6 Richardson, p. 12, and the refusal in Hayes' administration is dealt with in 17 Cong.Rec. 2332 and 2618
 
 
 [10]
 3 Annals of Congress 493 (1972)
 
 
 [11]
 1 Writings of Thomas Jefferson 303-04 (1905)
 
 
 [12]
 Brinkley, President and Congress 441 (1947), in Truman Memorandum at 6
 
 
 [13]
 1 Richardson, "Messages and Papers of the Presidents" 412 (1807); in Truman Memorandum at 8
 
 
 [14]
 Truman Memorandum at 9
 
 
 [15]
 C. Warren, Presidential Declaration of Independence, 10 B.U.L.Rev. 11, 12 (1930); 13 Cong.Deb. Part 2, App. at 202 (1837)
 
 
 [16]
 3 Hind's Precedents 181 (1907)
 
 
 [17]
 Id. at 182
 
 
 [18]
 IV Richardson, supra note 13, at 433
 
 
 [19]
 Id., Vol. V, at 618-19
 
 
 [20]
 Id., Vol. VII, at 362
 
 
 [21]
 See Senate Miscellaneous Documents, Vol. 7, 52nd Cong., 2d Sess. 232-72; Truman Memorandum at 21
 
 
 [22]
 Grover Cleveland, Presidential Problems 63-64 (1904)
 
 
 [23]
 43 Cong.Rec. 527-28 (1909)
 
 
 [24]
 65 Cong.Rec. 6087, 6108 (1924)
 
 
 [25]
 72 Cong.Rec. 12029 (1930)
 
 
 [26]
 40 Ops.Atty.Gen. 46 (1941)
 
 
 [27]
 Truman Memorandum at 33
 
 
 [28]
 Letter of January 22, 1944, Francis Biddle, Attorney General
 
 
 [29]
 Truman Memorandum at 39-40
 
 
 [30]
 N.Y. Times, May 18, 1954, at 24 (Attorney General Brownell's Memorandum)
 
 
 [31]
 N.Y. Times, May 18, 1954, at 1, 24. An extensive memorandum by Attorney General Herbert Brownell recites numerous instances where outstanding Presidents had refused congressional demands for confidential information and papers. These included Presidents Washington, Jefferson, Jackson, Tyler, Buchanan, Grant, Cleveland, Theodore Roosevelt, Coolidge, Hoover, Franklin D. Roosevelt and Truman. N.Y. Times, May 18, 1954, at 24
 
 
 [32]
 The Act of Jan. 24, 1857 provided:
 CHAP. XIX.-An Act more effectually to enforce the Attendance of Witnesses on the Summons of either House of Congress, and to compel them to discover Testimony.
 Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That any person summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter before either House, or any committee of either House of Congress, who shall wilfully make default, or who, appearing, shall refuse to answer any question pertinent to the matter of inquiry in consideration before the House or committee by which he shall be examined, shall in addition to the pains and penalties now existing, be liable to indictment as and for a misdemeanor, in any court of the United States having jurisdiction thereof, and on conviction, shall pay a fine not exceeding one thousand dollars and not less than one hundred dollars, and suffer imprisonment in the common jail not less than one month nor more than twelve months.
 SEC. 3. And be it further enacted, That when a witness shall fail to testify, as provided in the previous sections of this act, and the facts shall be reported to the House, it shall be the duty of the Speaker of the House or the President of the Senate to certify the fact under the seal of the House or Senate to the district attorney for the District of Columbia, whose duty it shall be to bring the matter before the grand jury for their action.
 Approved, January 24, 1857.
 
 
 [11]
 Stat. 155
 
 
 [33]
 See Jurney v. McCracken, 294 U.S. 125, 151, 55 S.Ct. 375, 79 L.Ed. 802 (1935). 2 U.S.C. Sec. 192 (1970) provides the present authority:
 Sec. 192. Refusal of witness to testify or produce papers. Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months. (R.S. Sec. 102; June 22, 1938, ch. 594, 52 Stat. 942.)
 
 
 [34]
 103 U.S. 168, 26 L.Ed. 377 (1880)
 
 
 [35]
 Id. at 190
 
 
 [36]
 3 Hinds' Precedents Sec. 2663, at 1112 (1907)
 
 
 [37]
 Id
 
 
 [38]
 Id. Sec. 2663, at 1113
 
 
 [39]
 Id. at 1112-14
 
 
 [40]
 14 Cong.Rec. 1525 (1876)
 
 
 [41]
 6 Cannon's Precedents Sec. 586, at 825 (1936)
 
 
 [42]
 159 U.S.App.D.C. -, 488 F.2d 1252 (1973)
 
 
 [43]
 116 Cong.Rec. 36481 (1970) (emphasis added)
 
 
 [44]
 Transcript of testimony of Julien G. Sourwine, Nov. 18, 1970, at 16, United States Servicemen's Fund v. Eastland, Civil Action No. 1474-70 (D.D.C., Oct. 21, 1971)
 
 
 [45]
 Id
 
 
 [46]
 Id
 
 
 [47]
 New York Times v. United States, 403 U.S. 713, 752 n. 3, 91 S.Ct. 2140, 2160, 29 L.Ed.2d 822 (1971) (Burger, C. J., dissenting)
 
 
 [48]
 5 U.S.C. Sec. 552(b), (c) (1970)
 
 
 [49]
 Soucie v. David, 145 U.S.App.D.C. 144, 157, 448 F.2d 1067, 1080 (1971) (Wilkey, J., concurring). Writing for the court in Soucie, Chief Judge Bazelon recognized that disclosure of information under the Freedom of Information Act was not to harm specific governmental interests:
 The touchstone of any proceedings under the Act must be the clear legislative intent to assure public access to all governmental records whose disclosure would not significantly harm specific governmental interests.
 Soucie v. David, supra at 157, 448 F.2d at 1080.
 
 
 [50]
 Brief for Petitioner at 32-33
 
 
 [51]
 14 F.R.D. 335 (1953)
 
 
 [52]
 Id. at 336
 
 
 [53]
 It is an interesting footnote to history that the Justice Department, headed by then Attorney General John N. Mitchell, furnished the investigatory material in its possession to Chief Justice Earl Warren but resisted congressional demands for full disclosure of its information in the Fortas controversy. N. Y. Times, May 18, 1969, at 1, col. 2
 
 
 [54]
 N.Y. Times, May 18, 1969, at 1, col. 3 (emphasis added)
 
 
 [55]
 Per Curiam opinion at 717
 
 
 [56]
 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953)
 
 
 [57]
 Id. at 11, 73 S.Ct. at 533
 
 
 [58]
 Id
 
 
 [59]
 See, e. g., EPA v. Mink, 410 U.S. 73, 87, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); New York Times Co. v. United States, 403 U.S. 713, 752 n. 3, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Burger, C. J., dissenting); Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena, 40 F.R.D. 318, 324-326 (D.D.C.1966), aff'd on the opinion below, 128 U.S.App.D.C. 10, 384 F.2d 979, cert. denied, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967); 5 U.S.C. Sec. 552(b)(5) (1970) (Freedom of Information Act); Bishop, The Executive's Right of Privacy: An Unresolved Constitutional Question, 66 Yale L.J. 477, 487 (1957)
 
 
 [60]
 Per Curiam opinion at 717, quoting Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 385, 391, 463 F.2d 788, 794 (1971)
 
 
 [61]
 14 U.S. (1 Wheat.) 304, 344-345, 4 L.Ed. 97 (1816). See also Bishop, supra note 59, at 488
 The plain and short answer to this is that neither can there be a menace to constitutional government by an executive which has to go to Congress for every cent it spends, which has no power by itself to raise and maintain armed forces and which cannot jail its citizens except under a law passed by Congress and after proceedings presided over by an independent judiciary. These are the factors that make the essential difference between an American President and Big Brother . . . .
 Id.
 EPA v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), involved nine documents whose production was sought under the Freedom of Information Act of 1966. 5 U.S.C. Sec. 552 (1970). Six of those documents were held absolutely privileged and were exempt even from in camera inspection under Exemption 1 of the Act simply upon their classification by Executive order as military or state secrets.
 Thus the vesting of absolute discretion in the President is nothing new. The Congress had sufficient faith in the Presidency to do so under Exemption 1:
 [The legislative history] makes wholly untenable any claim that the Act intended to subject the soundness of executive security classifications to judicial review at the insistence of any objecting citizen. It also negates the proposition that Exemption 1 authorizes or permits in camera inspection of a contested document bearing a single classification so that the court may separate the secret from the supposedly nonsecret and order disclosure of the latter.
 410 U.S. at 84, 93 S.Ct. at 834. Indeed, that faith was redeemed when the President instituted new procedures more consistent with the policy underlying the FOIA to insure that only specific documents or portions thereof were classified Secret or Top Secret. Id. at 102-103, 93 S.Ct. at 843-844 (Brennan, J., dissenting).
 The three documents not within Exemption 1 apparently were not even direct communications to the President, as is the case here, but were actually transmitted to a Mr. Irwin, Chairman of the "Under Secretaries Committee." Id. at 76 n.3, 93 S.Ct. at 831 n.3. Mink also held that the deliberative portions of the documents, as distinguished from the purely factual portions, were privileged and that if the privileged were inextricably intermixed with the unprivileged materials, then neither was to be produced. Id. at 91-94, 93 S.Ct. at 838-839.
 
 
 [62]
 Pub.L. No. 373, 69 Stat. 695 (Aug. 12, 1955) (now 44 U.S.C. Secs. 2101, 2107, 2108)
 
 
 [63]
 44 U.S.C. Sec. 2101 (1970)
 
 
 [64]
 Id. Sec. 2107(1)
 
 
 [65]
 Letter from President Eisenhower to Administrator of General Services, April 13, 1960; Agreement of February 25, 1965 between Mrs. Jacqueline B. Kennedy and the United States; Letter from President Johnson to the Administrator of General Services, August 13, 1965
 
 
 [66]
 See e. g., Nader v. Butz, 60 F.R.D. 381 (D.D.C.1973), appeal docketed, No. 73-1935, D.C.Cir., Aug. 15, 1973
 
 
 [67]
 See pp. 738-742 supra
 Concurring in Youngstown Sheet & Tube Co., Justice Frankfurter opined:
 It ought to be, but apparently is not, a matter of common understanding that clashes between different branches of the government should be avoided if a legal ground of less explosive potentialities is properly available. Constitutional adjudications are apt by exposing differences to exacerbate them.
 Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 595, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring). This was the result in the recent Pentagon Papers case. New York Times v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). There both sides lost. The newspaper lost in its attempt to have a wider privilege upheld for the press, and the Government lost in its attempt to block the publication of most of the papers. If the President's claim here is denied, the Congress and the Judiciary may find that such precedent will be used as the authority for each of them at the behest of the other to lose substantial portions of their presently asserted independence.
 
 
 [68]
 E. g., Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 385, 463 F.2d 788 (1971); Kaiser Aluminum & Chemical Corp. v. United States, 157 F.Supp. 939, 141 Ct.Cl. 38 (1958); see 8 Wright & Miller, Federal Practice and Procedure Sec. 2019, at 167-75 (1970)
 
 
 [69]
 E. g., Kaiser Aluminum & Chemical Corp. v. United States, 157 F.Supp. 939, 947, 141 Ct.Cl. 38 (1958); see Proposed Fed. Rules of Evidence, Rule 509, Comment (a)(2) (Feb. 1973)
 
 
 [70]
 See generally Kendall v. United States, 37 U.S. (12 Pet.) 524, 610, 9 L.Ed. 1181 (1838)
 Distinguishing the Presidency from lesser executive agencies does not establish a "Fourth Branch" of government. This distinction merely recognizes the practical realities of the government's operation. Our "living Constitution" and the general separation of powers concept it embodies do not mandate a decision which blindly applies the same privilege to the entire executive branch. It is unnecessary at this time to decide whether the absolute privilege should extend beyond the President to protect cabinet officers and other high executive officials.
 
 
 [71]
 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972)
 
 
 [72]
 Id. at 627, 92 S.Ct. at 2628; see United States v. Doe, 455 F.2d 753, 760-761 (1st Cir. 1972), vacated & remanded sub nom. Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972)
 
 
 [73]
 408 U.S. at 627, 92 S.Ct. at 2628
 
 
 [74]
 See Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949)
 
 
 [75]
 See notes 68-69 supra and accompanying text
 
 
 [76]
 The official immunity doctrine . . . confers immunity on government officials of suitable rank for the reason that "officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties-suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government."
 Doe v. McMillan, 412 U.S. 306, 318, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973), quoting Barr v. Matteo, 360 U.S. 564, 571, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).
 
 
 [77]
 25 Fed.Cas. p. 30 (No. 14,692d) (Marshall, Circuit Justice, 1807); id. at 187 (No. 14,694)
 
 
 [78]
 The Per Curiam opinion states, "We think the Burr case makes clear that application of Executive privilege depends on a weighing of the public interest protected by the privilege against the public interests that would be served by disclosure in a particular case." Per Curiam opinion at 716
 
 
 [79]
 25 Fed. Cas. at 36 (No. 14,692d)
 
 
 [80]
 25 Fed.Cas. at 191, 192 (No. 14,694)
 Other important decisions also recognize the strength of assertions of privilege by Presidents and cabinet officers. In United States v. Cooper, a prosecution charging the publication of a libel against the President, Justice Chase, a colleague of Chief Justice Marshall, "refused to permit a subpoena to issue directed to the president of the United States." 25 Fed.Cas. 631, 633 (No. 14,865) (Chase, Circuit Justice, 1800).
 Later, during the trial in Marbury v. Madison, when a question arose as to whether the Attorney General, who had been acting as Secretary of State during the period relevant to the trial, should answer as to facts which came to his knowledge through his official capacity, Chief Justice Marshall stated:
 There was nothing confidential required to be disclosed. If there had been he was not obliged to answer it; and if he thought that any thing was communicated to him in confidence he was not bound to disclose it.
 5 U.S. (1 Cranch) 137, 144, 2 L.Ed. 60 (1803).
 
 
 [81]
 It does not even appear to the court that the president does object to the production of any part of this letter. The objection, and the reasons in support of the objection, proceed from the attorney himself, and are not understood to emanate from the president
 
 
 [25]
 Fed.Cas. at 192 (No. 14,694)
 
 
 [82]
 Id. at 193
 
 
 [83]
 The incident had other overtones of interest to historians, some of whom appear to have different versions. See 3 Beveridge, The Life of John Marshall 518-22 (1919); Rossiter, The American Presidency 70 (1956); Berger, Executive Privilege v. Congressional Inquiry, 12 U.C.L.A.L.Rev. 1043, 1107 (1965)
 The case presently under discussion was the misdemeanor trial of Aaron Burr. There are conflicting claims as to whether President Jefferson ever complied with a subpoena in the earlier treason case against Burr. Professor Corwin states that "Jefferson when President [refused] to respond to Chief Justice Marshall's subpoena in Aaron Burr's trial for treason." Corwin, The President-Office and Powers, 1787-1957, at 113 (1957).
 84 U.S.Const. amend. VI.
 The eighth amendment [sic] to the constitution gives to the accused, "in all criminal prosecutions, a right to a speedy and public trial, and to compulsory process for obtaining witnesses in his favor."
 
 
 [25]
 Fed.Cas. at 33 (No. 14,692d). This right includes the right to compel production of papers in a witness' possession. Id. at 34
 
 
 [85]
 Chief Justice Marshall distinguished the power to issue a subpoena from the power to compel obedience to it:
 If, then, as is admitted by the counsel for the United States, a subpoena may issue to the president, the accused is entitled to it of course; and whatever difference may exist with respect to the power to compel the same obedience to the process, as if it had been directed to a private citizen, there exists no difference with respect to the right to obtain it. The guard, furnished to this high officer, to protect him from being harassed by vexatious and unnecessary subpoenas, is to be looked for in the conduct of a court after those subpoenas have issued; not in any circumstance which is to precede their being issued.
 
 
 [25]
 Fed.Cas. at 34 (No. 14,692d). This passage reflects Marshall's understanding that the mere issuance of a subpoena to a person does not necessarily mean that the issuance is proper or that the individual to whom it is directed is required to comply in all circumstances. However, the "guard" to which Marshall refers in the quoted passage is never definitively explained in the opinion
 
 
 [86]
 25 Fed.Cas. at 192 (No. 14,694)
 
 
 [87]
 Perhaps the court ought to consider the reasons which would induce the president to refuse to exhibit such a letter as conclusive on it, unless such letter could be shown to be absolutely necessary in the defense. The president may himself state the particular reasons which may have induced him to withhold a paper, and the court would unquestionably allow their full force to those reasons. At the same time, the court could not refuse to pay proper attention to the affidavit of the accused. But on objections being made by the president to the production of a paper, the court would not proceed further in the case without such an affidavit as would clearly shew the paper to be essential to the justice of the case. On the present occasion the court would willingly hear further testimony on the materiality of the paper required, but that is not offered
 Id.
 
 
 [88]
 Branzburg v. Hayes, 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972)
 It can be argued that the fifth amendment guarantee of indictment by a grand jury presents considerations of fairness that are comparable to the sixth amendment right involved in the Burr case. The function of a grand jury is not only to indict the guilty, but also to shield innocent persons from prosecution, id. at 686-687, 92 S.Ct. at 2659, and the inability of a grand jury to obtain privileged information might result in the indictment of innocent persons. But in my opinion the inherent strength of the grand jury process affords sufficient protection against indictment of innocent persons where the grand jury believes that exculpatory evidence has been wrongfully withheld.
 
 
 [89]
 Under certain circumstances, the Government's unwillingness to disclose relevant evidence may result in dismissal of the indictment. See, e. g., Alderman v. United States, 394 U.S. 165, 184, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (illegal electronic surveillance); Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (favorable and material evidence); Roviaro v. United States, 353 U.S. 53, 61, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) (identity of material witness); 18 U.S.C. Sec. 3500 (1970) (Jencks Act). Although the Chief Executive ordinarily retains ultimate control over criminal prosecutions by the United States, a Special Prosecutor has been appointed to conduct the prosecutions related to this case. This unique division of authority within the executive branch may distinguish the cases cited above. See generally United States v. Eley, 335 F.Supp. 353, 358 (N.D.Ga. 1972). Since the issue is not squarely presented in the present case, I express no view on its proper resolution
 
 
 [90]
 James Wilson was an advocate of a strong executive. Early in the Constitutional Convention on June 1, 1787, "Mr. Wilson moved that the Executive consist of a single person. . . . Mr. Wilson preferred a single magistrate, as giving, most energy, dispatch and responsibility to the office." 1 Farrand, Records of the Federal Convention 67 (1966). He was a member of the Continental Congress, a signer of the Declaration of Independence, and an associate justice of the United States Supreme Court, appointed by Washington in 1789
 As a constructive statesman Wilson had no superior in the Federal Convention of 1787. He favored the independence of the executive, legislative and judicial departments, the supremacy of the Federal Government over the State Governments, and the election of senators as well as representatives by the people, and was opposed to the election of the President or the judges by Congress. His political philosophy was based upon implicit confidence in the people, and he strove for such provisions as he thought would best guarantee a government by the people. Together with Gouverneur Morris he wrote the final draft of the Constitution and afterwards pronounced it "the best form of government which has ever been offered to the world." In the Pennsylvania ratification convention (November 21 to December 15, 1787) he was the constitution's principal defender.
 
 
 [23]
 Encyclopedia Britannica 632 (1954)
 91 U.S.Const. art. I, Sec. 7.
 
 
 [92]
 Id., art. II, Sec. 2
 
 
 [93]
 Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)
 
 
 [94]
 Indeed, Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), stands for nothing more than this. There, the seizure of the steel mills constituted the "final action" which the Supreme Court held unconstitutional and ordered undone. The Court, however, did not inquire into the decisional process or the wisdom of the decision in terms of military necessity-it simply held that the act of seizure was unconstitutional. We fully agree that this was a legitimate check on an unconstitutional final action
 
 
 [95]
 Levine v. United States, 362 U.S. 610, 617, 80 S.Ct. 1038, 1043, 4 L.Ed.2d 989 (1960)
 A grand jury is clothed with great independence in many areas, but it remains an appendage of the court, powerless to perform its investigative function without the court's aid, because powerless itself to compel the testimony of witnesses. It is the court's process which summons the witness to attend and give testimony, and it is the court which must compel a witness to testify if, after appearing, he refuses to do so.
 Brown v. United States, 359 U.S. 41, 49, 79 S.Ct. 539, 546, 3 L.Ed.2d 609 (1959).
 
 
 [96]
 See note 109 infra. See generally notes 109-112 infra and accompanying text
 
 
 [97]
 See note 94, supra. The fact that the final decision to prosecute or not to prosecute is not ministerial, but purely discretionary and thus not subject to judicial review is, at the least, irrelevant, and at the most, a factor that further strengthens the separation of powers argument in this particular case
 
 
 [98]
 In re Grand Jury Subpoena Duces Tecum issued to Richard Nixon, etc., 360 F.Supp. 1, at 11 (D.C.D.C., 1973)
 
 
 [99]
 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953)
 
 
 [100]
 Id. at 7-11, 73 S.Ct. at 531-534
 
 
 [101]
 The courts frequently have applied the Reynolds procedures to the Government's claims of privilege. E. g., Carter v. Carlson, 56 F.R.D. 9, 10 (D.D.C.1972); Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. 318, 326-327 n.33 (D.D.C.1966), aff'd on the opinion below, 128 U.S.App.D.C. 10, 384 F.2d 979, cert. denied, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967)
 
 
 [102]
 345 U.S. at 7-8, 73 S.Ct. at 532
 
 
 [103]
 On May 22, 1973, the President stated: Considering the number of persons involved in this case whose testimony might be subject to a claim of Executive privilege, I recognize that a clear definition of that claim has become central to the effort to arrive at the truth. Accordingly, Executive privilege will not be invoked as to any testimony concerning possible criminal conduct or discussions of possible criminal conduct, in the matters presently under investigation including the Watergate affair and the alleged cover-up
 
 
 [104]
 Letter from President Nixon to Chief Judge Sirica, July 25, 1973:
 THE WHITE HOUSE
 WASHINGTON
 July 25, 1973
 Dear Judge Sirica:
 White House Counsel have received on my behalf a subpoena duces tecum issued out of the United States District Court for the District of Columbia on July 23rd at the request of Archibald Cox. The subpoena calls for me to produce for a Grand Jury certain tape recordings as well as certain specified documents. With the utmost respect for the court of which you are Chief Judge, and for the branch of government of which it is a part, I must decline to obey the command of that subpoena. In doing so I follow the example of a long line of my predecessors as President of the United States who have consistently adhered to the position that the President is not subject to compulsory process from the courts.
 The independence of the three branches of our government is at the very heart of our Constitutional system. It would be wholly inadmissible for the President to seek to compel some particular action by the courts. It is equally inadmissible for the courts to seek to compel some particular action from the President.
 That the President is not subject to compulsory process from the other branches of government does not mean, of course, that all information in the custody of the President must forever remain unavailable to the courts. Like all of my predecessors, I have always made relevant material available to the courts except in those rare instances when to do so would be inconsistent with the public interest. The principle that guides my actions in this regard was well stated by Attorney General Speed in 1865:
 Upon principles of public policy there are some kinds of evidence which the law excludes or dispenses with. * * * The offical transactions between the heads of departments of the Government and their subordinate officers are, in general, treated as "privileged communications." The President of the United States, the heads of the great departments of the Government, and the Governors of the several States, it has been decided, are not bound to produce papers or disclose information communicated to them where, in their own judgment, the disclosures would, on public consideration, be inexpedient. These are familiar rules laid down by every author on the law of evidence.
 A similar principle has been stated by many other Attorneys General, it has been recognized by the courts, and it has been acted upon by many Presidents.
 In the light of that principle, I am voluntarily transmitting for the use of the Grand Jury the memorandum from W. Richard Howard to Bruce Kehrli in which they are interested as well as the described memoranda from Gordon Strachan to H. R. Haldeman. I have concluded, however, that it would be inconsistent with the public interest and with the Constitutional position of the Presidency to make available recordings of meetings and telephone conversations in which I was a participant and I must respectfully decline to do so.
 Sincerely,
 /s/ R ICHARD N IXON
 
 
 [105]
 345 U.S. at 8, 73 S.Ct. at 532
 
 
 [106]
 Id. at 10, 73 S.Ct. at 533
 
 
 [107]
 See notes 71-89 supra and accompanying text
 
 
 [108]
 345 U.S. at 11, 73 S.Ct. at 533 (emphasis added)
 
 
 [109]
 United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15, 47 S.Ct. 1, 71 L.Ed. 131 (1926); see United States v. Crusell, 81 U.S. (14 Wall.) 1, 4, 20 L.Ed. 821 (1872); cf. NLRB v. Shawnee Industries, Inc., 333 F.2d 221, 225 (10th Cir. 1964); United States v. Washington, 233 F.2d 811, 816 (9th Cir. 1956)
 
 
 [110]
 United States v. Burr, 25 Fed.Cas. 187, 192 (No. 14,694) (Marshall, Circuit Justice, 1807)
 111 U.S.Const. art. II, Sec. 3.
 
 
 [112]
 The fact that some participants in the conversations were not Government officials does not divest the conversations of their official character. A President must be free to receive advice from both within and without the Government. Soucie v. David, 145 U.S.App.D.C. 144, 155 n. 44, 448 F.2d 1067, 1078 n. 44 (1971)
 
 
 [113]
 345 U.S. at 10-11, 73 S.Ct. at 533
 
 
 [114]
 Id. at 8, 73 S.Ct. at 532
 
 
 [115]
 Id
 
 
 [116]
 Supplemental Brief of the United States at 19-30
 
 
 [117]
 289 U.S. at 15, 53 S.Ct. 465
 
 
 [118]
 Brief of Petitioner at 20-21
 
 
 [119]
 For example, if only one adviser had conspired with the President to obstruct justice, it would be necessary to show presidential involvement to prosecute that adviser, since conspiracy requires at least two conspirators. Rogers v. United States, 340 U.S. 367, 375, 71 S.Ct. 438, 95 L.Ed. 344 (1951); United States v. Thomas, 468 F.2d 422, 424 (10th Cir. 1972); see 18 U.S.C. Sec. 371 (1970)
 The fact that an incumbent President may not be prosecuted because of the Impeachment Clause, however, might not preclude criminal prosecution of any co-conspirators. Cf. Rogers v. United States, supra; Feldstein v. United States, 429 F.2d 1092 (9th Cir.), cert. denied, 400 U.S. 920, 91 S.Ct. 174, 27 L.Ed.2d 159 (1970); Cross v. United States, 392 F.2d 360 (8th Cir. 1968).
 
 
 [120]
 [E]xecutive privilege will not be invoked as to any testimony concerning possible criminal conduct or discussions of possible criminal conduct, in matters presently under investigation, including the Watergate affair and the alleged cover-up
 Brief of United States, app. at 24 (emphasis added).
 
 
 [121]
 Supplemental Brief of United States at 33
 
 
 [122]
 See notes 99-115 supra and accompanying text
 
 
 [123]
 Counsel for the President argue:
 Indeed, the short answer to any claim of waiver with regard to the materials now sought may be found in United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). In that case the United States refused to produce an Air Force investigation report of an airplane crash as well as written statements by the survivors of the crash. It offered to allow the survivors to give depositions and to testify as to all matters except those of a "classified nature." The Supreme Court sustained the claim of privilege with regard to the documents sought. The offer to allow the witnesses to testify, far from being a waiver of privilege as to the documents, was expressly relied on by the Supreme Court as a reason for upholding the claim of privilege. 345 U.S. at 11, 73 S.Ct. 528.
 Brief in Opposition in the District Court at 20.
 The military secrets privilege asserted in Reynolds applied only to classified, non-privileged matter and thus the offer could not effect a waiver as to classified, privileged matter. The more interesting point, however, is that Reynolds held the entire document privileged, apparently recognizing the distinction between selective testimony and production of the document itself, and refused even to permit in camera inspection.
 
 
 [124]
 Indeed, Machin v. Zuckert, 114 U.S.App.D.C. 335, 316 F.2d 336, cert. denied, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963), extends beyond the limits of the suggested hypothetical. There, a private litigant, against a claim of executive privilege, sought an investigative report of an aircraft accident. He already had been permitted to see it briefly, although he could not copy it or make notes from it. In addition, the Secretary of the Air Force offered to provide a list of the names of witnesses and sent a "releasable summary" of the report to the litigant. Id. at 336, 337, 316 F.2d 336. There was never any speculation in the Machin decision that waiver of privilege resulted from such actions
 
 
 [125]
 Brief of Petitioner at 61
 
 
 [126]
 The Per Curiam opinion at 718 quotes Lopez v. United States, 373 U.S. 427, 439, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), for the proposition that "[t]here is no 'constitutional right to rely on possible flaws in the [witness's] memory. * * * [N]o other argument can justify excluding an accurate version of a conversation that the [witness] could testify to from memory."' While this language nicely phrases their point, Lopez is unpersuasive in the context of this case. Lopez involved an Internal Revenue Agent who on the invitation of the defendant discussed defendant's tax return with him, during the course of which an attempt was made to bribe the agent. The agent then testified to this bribe at trial and the recordings of their conversations were introduced as corroborative evidence. The Court held that since the conduct of the conversations themselves did not violate the fourth amendment, neither did the "surreptitious seizure" of the conversations by recording them. Thus Lopez simply involved a question of the admissibility of certain corroborative evidence against a fourth amendment objection. Whether certain evidence is admissible and whether such evidence is in the first instance privileged and thus not subject to compulsory process are two different questions. A criminal confession is admissible but it may not be compelled absent waiver. Thus the question in the last analysis depends upon whether the President has waived his privilege and I conclude that he has not, principally on the policy grounds discussed at pp. 760-761 of this opinion
 
 
 [127]
 Of course, military and state secrets are only the most celebrated of these instances
 
 
 [128]
 On this point, Professor Alexander Bikel is persuasive:
 Again, the issue is not whether the President has waived his privilege to keep the tapes secret. To the extent that it exists and with respect to matter that it covers, I do not see how the privilege can be waived. Naturally, if a document or a tape is no longer confidential because it has been made public, it would be nonsense to claim that it is privileged, and nobody would trouble to subpoena it either, since it would be available.
 But nature and reason of the privilege are rather to repose in the President and in him alone the subjective judgment whether to maintain privacy or release information-and which, and how much, and when, and to whom. Far from being waived, the privilege, it seems to me, is as much exercised when information is released as when it is withheld.
 Bickel, Wretched Tapes (cont., N.Y. Times, August 15, 1973, at 33.
 
 
 [129]
 This would accord with President Jefferson's action in the Burr case, supra note 82 and accompanying text, and with the following colloquy between Judge Wilkey and Professor Wright (Counsel for the President) at oral argument before this court:
 JUDGE WILKEY: * * *
 You recall, of course, that President Jefferson took the document, the Wilkinson letter, called for by the subpoena. He then deleted from the document those matters which he felt that needed to be confidential, shall we say secrets of State, and then with the deleted version sent an affidavit to the Prosecutor for lodging in the court as to what in summary, without revealing any secrets, the President had deleted and why. And then the exerpted [sic] letter was given with the affidavit to the court in answer to the subpoena.
 President Jefferson never furnished the full letter.
 MR. WRIGHT: That's right.
 JUDGE WILKEY: Now, why should not the President here exercise his privilege in regard to the tapes, deleting State secrets in the same way, but forwarding everything else, in the same way as President Jefferson?
 [L]et's add to that not only State secrets, but other matters of confidentiality, which neither of the parties concerned nor the public have any right to know, that would be dangerous to know at this time, in the President's own judgment.
 And then why should he not send the rest of it for such use as the Prosecutor in [sic] the defense and the trial judge may deem relevant?
 MR. WRIGHT: That would seem to me not an untenable possibility.
 Transcript of Proceedings, Sept. 11, 1973, at 102-03.
 
 
 [130]
 The foregoing opinion was amended after it issued to add the following:
 On October 12, 1973, the day this opinion issued, the New York Times published a letter of the Honorable Burton K. Wheeler, former distinguished United States Senator from Montana and nominee in 1924 for Vice President on the Progressive Party ticket with Senator LaFollette. Senator Wheeler had been requested by a number of Democratic and Republican Senators to lead the opposition to the bill to pack the Supreme Court. (S.1392, 75th Cong.) In his letter to the New York Times he wrote that he considered it necessary to deny charges that the Supreme Court was delinquent in its consideration of cases and discussed with Justice Brandeis the possibility that he and Chief Justice Hughes testify before the Senate Committee on the Judiciary. Justice Brandeis "responded that under no circumstances would he testify or recommend that the Chief Justice testify" because "it just would not be the right thing to do. It Might establish an unfortunate precedent." Chief Justice Hughes considered that the Court-packing plan "would destroy the Court as an institution" but even in the face of this dire threat, he refused to testify but did write a letter denying the charge of Court delinquency. Senator Wheeler's letter further stated: "[I]f [the Supreme Court] holds that Congress, in other than an impeachment proceeding can obtain the records of Presidential conferences, [it] will set a precedent for Congress to obtain records or other evidence of Court deliberations. . . . Pursuit of the tapes may result in a precedent-setting decision by the Supreme Court which will ill serve the future of democracy and our form of government."
 For a more complete report of the defeat of President Roosevelt's plan to pack the Supreme Court, see the chapter entitled "Saving the Supreme Court" in Yankee from the West, Burton K. Wheeler with Paul F. Healy, pp. 319-340 (Doubleday & Co. 1962).
 Per Curiam
 
 
 *
 For the convenience of the reader, an outline of this dissenting opinion is herewith appended
 
 
 I
 The Dual Origin of the Privilege Asserted
 
 
 A
 The Common Sense-Common Law, Statutory Origin of Privilege
 
 
 [1]
 Historically
 
 
 [2]
 Litigation in Which the Government is a Party
 
 
 [3]
 Individual Inquiry of a Governmental Official or Agency
 
 
 [4]
 The First Amendment
 
 
 [5]
 The Chief Executive
 B. Separation of Powers-The Tripartite Privilege
 
 
 [1]
 Judicial versus Executive
 
 
 [2]
 Legislative versus Executive
 
 
 [3]
 Judicial versus Legislative
 
 
 [4]
 Who Decides?
 II. Development of the Tripartite Privilege with Reference to Executive Documents
 A. The Legislative Decision of 1789
 B. Congressional Demands for Executive Papers
 C. Judicial Demands for Executive Papers-The Trials of Aaron Burr
 III. Relationship of the Grand Jury to the Judiciary and to the Executive
 A. Background
 B. Relationship of the Grand Jury to the Judiciary
 IV. Amenability of the President to Judicial Process-An Illusory Issue in the Instant Case
 V. Application of the Constitutional Tripartite Privilege
 A. Procedures and Practicalities-Statutes and the Constitution
 
 
 [1]
 The Authorities
 
 
 [2]
 Pragmatic Considerations
 B. A Healthy Tension
 
 
 **
 Judge MacKinnon has stated his general concurrence in the result reached in this dissent and that differences in the two dissenting opinions are mainly matters of emphasis. That is my position also in regard to Judge MacKinnon's dissent. Given the compressed time frame in which we must write, it has seemed better to write separate opinions rather than to seek specific concurrent language on the important and delicate matters at issue here
 
 
 [1]
 See Part II.C. infra, for the full discussion of the trials of Aaron Burr in 1807. President Jefferson was prepared to instruct the U.S. marshal, an employee then and now of the Executive Branch, not to serve any such order on the President. 9 P. Ford, The Writings of Thomas Jefferson 62 (1898) [hereinafter Writings of Jefferson]. See note 118 infra
 
 
 [2]
 Id. at 57 (emphasis supplied). It is significant that President Jefferson had twice earlier in writing Hay, on 2 June and 12 June, cited the Constitutional separation of powers as the ground for his privilege. Id. at 53, 55
 
 
 [3]
 Rogers, The Right to Know Government Business From the Viewpoint of the Government Official, 40 Marq.L.Rev. 83, 89 (1956). See generally Bishop, The Executive's Right of Privacy: An Unresolved Constitutional Question, 66 Yale L.J. 477 (1957); Kramer and Marcuse, Executive Privilege-A Study of the Period 1953-1960, 29 Geo.Wash.L.Rev. 623 (1961); Hardin, Executive Privilege in the Federal Courts, 71 Yale L.J. 879 (1962)
 
 
 [4]
 1 Farrand, Records of the Federal Convention of 1787, at 15 (rev.ed.1966) [hereinafter Farrand]
 
 
 [5]
 Gladstone, Kin Beyond the Sea (in the North American Review, September 1878)
 
 
 [6]
 2 Farrand 648
 
 
 [7]
 3 Farrand 497. Although by resolution of Congress in 1818 (3 Stat. 475) the Journal of the Convention, the bare record of motions and votes, but not the speeches of the delegates, was made public, it was not until 1840, four years after Madison's death, that his Notes of the Convention were made public. 1 Farrand XV
 
 
 [8]
 3 Farrand 479
 
 
 [9]
 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119
 
 
 [10]
 Id. at 87, 93 S.Ct. at 836. Mr. Justice Reed was sitting by designation in the Court of Claims in Kaiser Aluminum and Chemical Corp. v. United States, 157 F.Supp. 939, 946, 141 Ct.Cl. 38 (1958)
 
 
 [11]
 157 F.Supp. at 944 (emphasis added)
 
 
 [12]
 5 U.S.C. Sec. 552 (1970)
 
 
 [13]
 Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena, 40 F.R.D. 318, 324-325 (D.C.D.C.1966), aff'd on the opinion below, 128 U.S.App.D.C. 10, 384 F.2d 979, cert. denied, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967)
 
 
 [14]
 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953)
 
 
 [15]
 Id. at 9-10, 73 S.Ct. at 533
 
 
 [16]
 Id. at 9, 73 S.Ct. 528
 
 
 [17]
 Id. at 11, 73 S.Ct. at 533. See Hardin, supra note 3, at 892-895, for a well-reasoned critique of the rationale of Reynolds
 
 
 [18]
 The Jencks Act is codified at 18 U.S.C. Sec. 3500(d) (1970)
 
 
 [19]
 Among those commonly referred to as "housekeeping statutes" are Rev.Stat. 161 (1878), now codified at 5 U.S.C. Sec. 301 (1970), revised in 1958, and the Administrative Procedure Act, 60 Stat. 237 (1946) (now codified in scattered sections of 5 U.S.C.), which was revised by the addition of the Freedom of Information Act, 5 U.S.C. Sec. 552 (1970). Revisions of both statutes were made to prevent citation as authority for withholding information from Congress and the public
 
 
 [20]
 5 U.S.C. Sec. 552 (1970)
 
 
 [21]
 Vaughn v. Rosen, 157 U.S.App.D.C. ___, 484 F.2d 820 (1973); Cuneo v. Schlesinger, 157 U.S.App.D.C. ___, 484 F.2d 1086 (1973); Soucie v. David, 145 U.S.App.D.C. 144, 448 F.2d 1067 (1971)
 
 
 [22]
 "There are serious weaknesses in the assumption, popular among liberals who happen at the moment not to be thinking about Senator McCarthy, that public policy ought to draw a sharp distinction between 'military and diplomatic secrets' on the one hand and all other types of official information on the other, giving Congress free access to the latter. In the first place, the line is by no means easy to draw, even when the best of faith is used . . . . More fundamentally, however, the executive's interest in the privacy of certain other types of information is not less than its interest in preserving its military and diplomatic secrets. One obvious example is the data, derogatory or otherwise, in the security files of individuals. Another, perhaps still more important, is the record of deliberations incidental to the making of policy decisions." Bishop, supra note 3, at 488
 
 
 [23]
 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)
 
 
 [24]
 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)
 
 
 [25]
 We were informed by counsel at oral argument that in the court-martial of Dr. William Burton a subpoena was issued to President Monroe for the President's testimony. It was complied with by a deposition. No documents were involved. See Per Curiam, supra at 710 n. 42
 
 
 [26]
 Special Prosecutor's Supplemental Brief at 22
 
 
 [27]
 President's Reply Brief at 37, quoting from Professor Charles Black's letter to the Washington Post, 12 September 1973
 
 
 [28]
 Myers v. United States, 272 U.S. 52, 116, 47 S.Ct. 21, 25, 71 L.Ed. 160 (1926)
 
 
 [29]
 Humphrey's Executor v. United States, 295 U.S. 602, 629-630, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935)
 
 
 [30]
 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)
 
 
 [31]
 See note 25 supra. "There seems to be no case which presents the question of whether a court would attempt to compel actual production of information in the possession of the executive." Bishop, supra note 3, at 482 n. 19
 
 
 [32]
 Discussed in detail in text accompanying notes 75-77 infra
 
 
 [33]
 The effect of a Congressional subpoena is described in Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957):
 It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation. This, of course, assumes that the constitutional rights of witnesses will be respected by the Congress as they are in a court of justice. 354 U.S. at 187-188, 77 S.Ct. at 1179.
 The primary limitation on the Congressional subpoena power is that its exercise must relate to a valid legislative function. Usually, Congressional committees issue subpoenas pursuant to some investigation. The limits on Congress' investigative powers were described by this court in Shelton v. United States, 131 U.S.App.D.C. 315, 319-320, 404 F.2d 1292, 1296-1297 (1968).
 
 
 [34]
 2 U.S.C. Sec. 192 (1970)
 
 
 [35]
 2 U.S.C. Sec. 194 (1970)
 
 
 [36]
 Jurney v. MacCracken, 294 U.S. 125, 151, 55 S.Ct. 375, 79 L.Ed. 802 (1935)
 
 
 [37]
 Id. at 148, 55 S.Ct. at 378. For a discussion of Congress' contempt power, see id. at 147-150, 55 S.Ct. 375. See also Emspak v. United States, 91 U.S.App.D.C. 378, 381, 203 F.2d 54, 57 (1953)
 
 
 [38]
 Jurney v. MacCracken, 294 U.S. at 149-150, 55 S.Ct. at 379
 
 
 [39]
 Bishop, supra note 3, at 484-85 (emphasis supplied)
 
 
 [40]
 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972)
 
 
 [41]
 118 Cong.Rec. S.16,766, 92nd Cong., 2d Sess. (emphasis supplied)
 
 
 [42]
 The President has also permitted two subpoenaed documents to be furnished
 
 
 [43]
 CM 426402, 1 Military L. Rep. 2077 (ACMR, 16 Feb. 1973); 116 Cong.Rec. 37,652 (17 Nov. 1970)
 
 
 [44]
 205 F.Supp. 710 (S.D.Fla.), cert. denied sub nom. Hoffa v. Lieb, 371 U.S. 892, 83 S.Ct. 188, 9 L.Ed.2d 125 (1962); 108 Cong.Rec. 3626, 3627 (1962)
 
 
 [45]
 See 3 Hinds' Precedents of the House of Representatives Sec. 2661, 7 March 1876; Sec. 2662, 21 March 1876; Sec. 2663, 22 April 1879; Sec. 2664, 9 February 1886 (1907); Soucie v. David, 145 U.S.App.D.C. 144, 159 n. 4, 448 F.2d 1067, 1082 n. 4 (1971) (Wilkey, J., concurring)
 My colleagues rely upon Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), for the assertion that "[w]henever a privilege is asserted, even one expressed in the Constitution, such as the Speech and Debate privilege, it is the courts that determine the validity of the assertion and the scope of the privilege." (Per Curiam, supra at 714.) Gravel was a far different question. First, there was never any issue as to Who Decides the scope of the privilege; Senator Gravel himself invoked the jurisdiction of the courts.
 Second, the issue to be determined was "whether the activities concerning which questioning or prosecution is sought are: 'integral part[s] of the deliberative and communicative processes by which Members participate in committee, and House proceedings . . ."' (Per Curiam, supra at 715 n. 70), i. e., the nature of the actions involved. This is reminiscent of the factual categorizing to be done in Environmental Protection Agency v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), Vaughn v. Rosen, 157 U.S.App.D.C. ____, 484 F.2d 820 (1973), Cuneo v. Schlesinger, 157 U.S.App.D.C. ____, 484 F.2d 1086 (1973), all discussed in text accompanying notes 167-175 infra. Once the nature of the action or category of information is determined, the applicable rule of law is clear. The vital question here is Who Decides this.
 Thirdly, even if Gravel had involved questions of a demand for documents similar to the case at bar, and the Senator himself had not invoked the aid of the courts, yet the basic distinction of Gravel from the case at bar may be that, even though Senator Gravel was protected by the specific Constitutional privilege of the Speech and Debate Clause applicable only to the Congess, yet Gravel is only a single member, not the whole independent Branch of Government, as is the President. If we were dealing with a grand jury demand for the records of the Senate as a whole resisted by the Senate as a whole, far different considerations would come into play.
 
 
 [46]
 New York Times, 14 November 1953, p. 9
 
 
 [47]
 Committee on Armed Services, U.S. Senate Military Cold War Escalation and Speech Review Policies, 87th Cong., 2d Sess. 512 (1962) (emphasis supplied)
 
 
 [48]
 See generally Myers v. United States, 272 U.S. 52, 111-136, 47 S.Ct. 21, 71 L.Ed. 160 (1926); Wolkinson, Demands of Congressional Committees for Executive Papers (Part III), 10 Fed.Bar.J. 319, 328-30 (1949)
 
 
 [49]
 The resolution of the Continental Congress is printed at 1 Stat. 28-29 (1789)
 
 
 [50]
 The resolution provided that
 the books, records, and other papers of the United States, that relate to this department, be committed to his custody, to which, and all other papers of his office, any member of Congress shall have access: Provided, That no copy shall be taken of matters of a secret nature, without the special leave of Congress.
 Id. at 28.
 
 
 [51]
 Other provisions of the resolution which indicate the relationship between the Congress and the Department include sections requiring the Secretary to "report on all cases expressly referred to him for that purpose by Congress, and on all others touching his department, in which he may conceive it necessary," requiring him to "answer to such inquiries respecting his department as may be put from the chair by order of Congress," etc. Ibid
 
 
 [52]
 Section 1 of the Act provides:
 That there shall be an Executive department, to be denominated the Department of Foreign Affairs, and that there shall be a principal officer therein, to be called the Secretary for the Department of Foreign Affairs, who shall perform and execute such duties as shall from time to time be enjoined on or intrusted to him by the President of the United States, agreeable to the Constitution, . . . respecting foreign affairs . . .; and furthermore, that the said principal officer shall conduct the business of the said department in such manner as the President of the United States shall from time to time order or instruct.
 Act of 27 July 1789, ch. 4, Sec. 1, 1 Stat. 28.
 
 
 [53]
 The full text of Section 2 is:
 That there shall be in the said department, an inferior officer, to be appointed by the said principal officer, and to be employed therein as he shall deem proper, and to be called the chief Clerk in the Department of Foreign Affairs, and who, whenever the said principal officer shall be removed from office by the President of the United States, or in any other case of vacancy, shall during such vacancy have the charge and custody of all records, books and papers appertaining to the said department.
 Act of 27 July 1789, ch. 4, Sec. 2, 1 Stat. 28.
 
 
 [54]
 Wolkinson, supra note 48, at 329-30
 
 
 [55]
 See Wolkinson, supra note 48, at 330
 
 
 [56]
 1 Annals of Congress 385 (1789)
 
 
 [57]
 The discussion ran from 19 May 1789 to 24 June 1789. See 1 Annals 385-614
 
 
 [58]
 The Congress after the Civil War attempted to do just that with the Tenure of Office Act, Act of 2 March 1867, 14 Stat. 430, ch. 154, which was eventually held invalid "in so far as it attempted to prevent the President from removing executive officers who had been appointed by him by and with the advice and consent of the Senate." Myers v. United States, 272 U.S. 52, 176, 47 S.Ct. 21, 45, 71 L.Ed. 160 (1926)
 
 
 [59]
 1 Annals 525-527
 
 
 [60]
 See 1 Annals 601-603
 
 
 [61]
 Id. at 604
 
 
 [62]
 Id. at 608
 
 
 [63]
 Myers v. United States, 272 U.S. 52, 115, 47 S.Ct. 21, 25, 71 L.Ed. 160 (1926)
 
 
 [64]
 1 Annals 614. See Myers v. United States, 272 U.S. 52, 114, 47 S.Ct. 21, 71 L.Ed. 160 (1926)
 
 
 [65]
 5 J. Marshall, The Life of George Washington 200 (1807)
 
 
 [66]
 Ibid
 
 
 [67]
 Id. at 201
 
 
 [68]
 Id. at 204
 
 
 [69]
 Id. at 205
 
 
 [70]
 1 Stat. 49 (1789). Brief debate occurred at 1 Annals 615
 
 
 [71]
 As William P. Rogers wrote when he was Attorney General, the Legislative decision of 1789
 established the principle that the reasonable construction of the Constitution must be that the three branches of the Federal Government should be kept separate in all cases in which they were not expressly blended, and that no legislation should be enacted by the Congress which would tend to obscure the dividing lines between the three great branches or cast doubt upon the prerogatives properly belonging by the Constitution to any one.
 Letter from Attorney General William P. Rogers to Senator Thomas C. Hennings, Jr., 13 March 1958, in Hearing on S. 921 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 85th Cong., 2nd Sess., pt. 1, at 53 (1958).
 
 
 [72]
 E. Corwin, The President: Office and Powers, 1787-1957, at 113 (4th rev. ed. 1957). For examples of Congressional recognition of Executive privilege see Kramer & Marcuse, supra note 3, at 900-02
 
 
 [73]
 Bishop, supra note 3, at 486
 
 
 [74]
 It has prevailed without any attempt by Congress to secure adjudication of its claim versus the Executive. Nothing so illustrates the extent to which heat may have replaced light in the appraisal of this entire Watergate affair than the fact that the United States Senate has reversed the strategy of 184 years, and put the question of its right to obtain papers from the Executive into the hands of the Judiciary to determine. Reciprocally, of course, this means that the Executive at some future date would be able to put the same "logically indistinguishable" issue for the Judiciary to determine in regard to access to Congressional papers. No longer would the Senate be able to withstand the demands of a prosecutor, operating through the process of a court just as in the case at bar, for the records of Senate committees, which were denied by resolution of the Senate in the case of United States v. Brewster and many others. See notes 40-45 supra and accompanying text
 
 
 [75]
 Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 85th Cong., 2d Sess., The Power of the President to Withhold Information from the Congress, Memorandums of the Attorney General 4 (Comm. Print 1958) [hereinafter Power of the President], quoting from 3 Annals of Congress 493
 
 
 [76]
 1 Writings of Jefferson, supra note 1, at 189-90 (emphasis supplied)
 
 
 [77]
 5 J. Marshall, supra note 65, at 658
 
 
 [78]
 Power of the President, supra note 75, at 7, quoting from 1 Richardson's Messages and Papers of the President 133
 
 
 [79]
 3 Hinds' Precedents of the House of Representatives 181 (1907) (emphasis supplied)
 
 
 [80]
 Id. at 182
 
 
 [81]
 Power of the President, supra note 75, at 15-16
 
 
 [82]
 43 Cong.Rec. 527-28 (1909 (emphasis supplied)
 
 
 [83]
 Power of the President, supra note 75, at 23-24, quoting from Hearings of the House Select Comm. to Investigate the Federal Communications Commn., 78th Cong., vol. 2, at 2338-39 (1949) (emphasis supplied)
 
 
 [84]
 Letter from Dwight D. Eisenhower to the Secretary of Defense, 17 May 1954, reproduced in Power of the President, supra note 75, at 73-74
 
 
 [85]
 Bishop, supra note 3, at 485
 
 
 [86]
 United States v. Burr, 25 Fed.Cas. 30 (No. 14692d) (C.C.D.Va.1807)
 
 
 [87]
 The United States Chief Justice and a District Judge Griffin comprised the court hearing the case. District Judge Griffin appears to have made few recorded comments
 
 
 [88]
 Also at issue was the question whether the President could be compelled to testify in person, but this was not decided either
 
 
 [89]
 See 3 A. Beveridge, The Life of John Marshall 433 (1919)
 
 
 [90]
 25 Fed.Cas. at 31
 
 
 [91]
 Id. at 36
 
 
 [92]
 3 A. Beveridge, supra note 89, at 341
 
 
 [93]
 25 Fed.Cas. at 31. MacRae, one of the prosecutors assisting Hay, argued on 10 June 1807 that a subpoena might issue against the President as any other, but that he was not bound to disclose "confidential communications." Marshall himself had ruled on that very point in Marbury v. Madison, 5 U.S. (1 Cranch) 137, at 143-145, 2 L.Ed. 60, when he had so advised Attorney General Lincoln. 3 A. Beveridge, supra note 89, at 437-38; E. Corwin, supra note 72, at 111-12
 
 
 [94]
 9 Writings of Jefferson, supra note 1, at 44 (emphasis supplied)
 
 
 [95]
 25 Fed.Cas. at 31
 
 
 [96]
 Id. at 34
 
 
 [97]
 Ibid. Marshall wrote,
 In the provisions of the constitution, and of the statute, which give to the accused a right to the compulsory process of the court, there is no exception whatever.
 
 
 [98]
 Ibid
 
 
 [99]
 Ibid
 
 
 [100]
 Id. at 37
 
 
 [101]
 Ibid
 
 
 [102]
 "If it contain matter not essential to the defence, and the disclosure be unpleasant to the executive, it certainly ought not to be disclosed. This is a point which will appear on the return. . . . If they contain matter interesting to the nation, the concealment of which is required by the public safety, the matter will appear upon the return. If they do not, and are material, they may be exhibited." Ibid
 
 
 [103]
 Ibid
 
 
 [104]
 The closest which Marshall came to recognizing any separation of powers issue was at the end of his opinion allowing the issuance of the subpoena for the 21 October letter. 25 Fed.Cas. at 37. Here Marshall discussed the problem of disrespect for the President which might be thought to arise from the decision. Marshall simply stated that his respect for the President was as great as it could be, given his duties on the Court. Even here, however, he did not deal directly with any Constitutional principle of the independence of Executive and Judiciary
 
 
 [105]
 9 Writings of Jefferson, supra note 1, at 60 (emphasis original)
 
 
 [106]
 Both Jefferson and Marshall received their formal legal training under George Wythe. Jefferson studied for five years in Wythe's law office and was admitted to the bar in 1767. 12 Encyclopedia Britannica 985 (1968). Marshall, on the other hand, simply attended a short series of lectures given by Wythe at William and Mary College in 1780, and he was licensed to practice in August 1780. 14 Encyclopedia Britannica 959 (1968)
 
 
 [107]
 9 Writings of Jefferson, supra note 1, at 53 (emphasis supplied)
 
 
 [108]
 United States v. Burr, 25 Fed.Cas. 187 (No. 14694) (C.C.D.Va.1807)
 
 
 [109]
 Id. at 189
 
 
 [110]
 President Jefferson had written on 23 June 1807 to Hay, indicating that Wilkinson probably had copies of his letters, and that the General had expressed a willingness to furnish them to the court. 9 Writings of Jefferson, supra note 1, at 61
 
 
 [111]
 25 Fed.Cas. at 189
 
 
 [112]
 Id. at 190
 
 
 [113]
 Ibid
 
 
 [114]
 Ibid
 
 
 [115]
 Jefferson's letter to Hay of 12 June 1807 had so indicated. See text accompanying note 94 supra
 
 
 [116]
 Letter of President Jefferson to Hay of 17 June 1807, in 9 Writings of Jefferson, supra note 1, at 57
 
 
 [117]
 Id. at 56
 
 
 [118]
 Draft letter of President Jefferson to Hay in 9 Writings of Jefferson, supra note 1, at 62. Ford, and others, are not sure if this letter was ever received by Hay. Nonetheless, the draft is important as an expression of Jefferson's views:
 That Burr & his counsel should wish to . . . convert his Trial into a contest between the judiciary & Exve Authorities was to be expected. But that the Ch. Justice should lend himself to it, and take the first step to bring it on, was not expected. Nor can it be now believed that his prudence or good sense will permit him to press it. But should he contrary to expectation, proceed to issue any process which should involve any act of force to be committed on the persons of the Exve or heads of depmts, I must desire you to give me instant notice, & by express if you find that can be quicker done than by post; and that moreover you will advise the marshall on his conduct, as he will be critically placed between us. His safest way will be to take no part in the exercise of any act of force ordered in this case. The powers given to the Exve by the constn are sufficient to protect the other branches from Judiciary usurpation of preeminence, & every individual also from judiciary vengeance, and the marshal may be assured of its effective exercise to cover him. I hope however that the discretion of the C. J. will suffer this question to lie over for the present, and at the ensuing session of the legislature he may have means provided for giving to individuals the benefit of the testimony of the Exve functionaries in proper cases, without breaking up the government.
 See note 1 supra.
 
 
 [119]
 25 Fed.Cas. at 190
 
 
 [120]
 The record of the case reveals no further action taken concerning the 21 October letter. Nor do the histories which we have consulted indicate whether Burr ever received a full copy of the letter
 
 
 [121]
 See text accompanying note 94 supra. President Jefferson later wrote Hay on 7 September 1807 on this subject:
 I received, late last night, your favor of the day before, and now re-enclose you the subpoena. As I do not believe that the district courts have a power of commanding the executive government to abandon superior duties & attend on them, at whatever distance, I am unwilling, by any notice of the subpoena, to set a precedent which might sanction a proceeding so preposterous. I enclose you, therefore, a letter, public & for the court, covering substantially all they ought to desire. If the papers which were enclosed in Wilkinson's letter may, in your judgment, be communicated without injury, you will be pleased to communicate them. I return you the original letter.
 
 
 [9]
 Writings of Jefferson, supra note 1, at 63. This letter was thought by Beveridge to indicate that the President had received a second subpoena. 3 A. Beveridge, supra note 89, at 522. The record of the case does not show that another subpoena was issued to Jefferson himself
 
 
 [122]
 25 Fed.Cas. at 190
 
 
 [123]
 Id. at 191
 
 
 [124]
 Id. at 192
 
 
 [125]
 Marbury v. Madison, 5 U.S. (1 Cranch) 137, 144-145, 2 L.Ed. 60 (1803)
 
 
 [126]
 Marshall wrote,
 I cannot precisely lay down any general rule for such a case. Perhaps the court ought to consider the reasons which would induce the president to refuse to exhibit such a letter as conclusive on it, unless such letter could be shown to be absolutely necessary in the defence. The president may himself state the particular reasons which may have induced him to withhold a paper, and the court would unquestionably allow their full force to those reasons. At the same time, the court could not refuse to pay proper attention to the affidavit of the accused. But on objections being made by the president to the production of a paper, the court would not proceed further in the case without such an affidavit as would clearly shew the paper to be essential to the justice of the case. . . . In no case of this kind would a court be required to proceed against the president as against an ordinary individual. (Emphasis supplied.)
 
 
 [25]
 Fed.Cas. at 192
 
 
 [127]
 Ibid. (emphasis supplied)
 This is as far as my colleagues discuss the Burr trials (Per Curiam, supra at 716 n. 74). They rest with Marshall's language re the United States Attorney's assertion of privilege; they do not discuss President Jefferson's final assertion of 7 September 1807-and neither did Marshall.
 
 
 [128]
 Id. at 193 (emphasis supplied)
 
 
 [129]
 9 Writings of Jefferson, supra note 1, at 64 (emphasis supplied)
 
 
 [130]
 25 Fed.Cas. at 201
 
 
 [131]
 Professor Paul Hardin summarizes the Burr case in his article on Executive privilege by stating:
 Chief Justice Marshall, sitting as trial judge in the trial of Aaron Burr, subpoenaed information in the hands of President Jefferson. Marshall asserted the power of the court to subpoena the President, examine him as a witness, and require him to produce "any paper in his possession," but later in the same opinion seemed to recognize a restricted legitimate area in which executive discretion might operate. For his part Jefferson avowed that he had the absolute power to withhold documents sought by subpoena, but his eventual cooperation avoided a decisive conflict. This entire paper footnotes the proposition that the Burr trial did not provide a final answer to the vexing questions of executive privilege. The case did provide, however, a remarkable example of executive cooperation, considering Jefferson's personal feelings toward Burr, his distaste for the judiciary, and his firm belief that he could resist disclosure if he chose to do so.
 Hardin, supra note 3, at 899-890 (citations omitted).
 
 
 [132]
 Special Prosecutor's Memorandum in Support at 44, In re Subpoena to Nixon, 360 F.Supp. 1 (D.C.D.C.1973)
 
 
 [133]
 Ibid
 
 
 [134]
 In re Subpoena to Nixon, 360 F.Supp. 1, 9 (D.C.D.C.1973)
 
 
 [135]
 Costello v. United States, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956)
 
 
 [136]
 A clear distinction between the grand and petit jury did not develop until the fourteenth century. See notes 140-141 infra and accompanying text
 
 
 [137]
 1 F. Pollock and F. Maitland, History of English Law 138 (2d ed. 1923)
 
 
 [138]
 1 W. Holdsworth, History of English Law 313-14 (6th rev. ed. 1938)
 
 
 [139]
 Id. at 314. (Emphasis supplied.)
 
 
 [140]
 Id. at 322
 
 
 [141]
 Ibid
 
 
 [142]
 8 Howell's State Trials 751
 
 
 [143]
 This provision has been held not to apply to the states through the due process clause of the Fourteenth Amendment. Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 292, 28 L.Ed. 232 (1884)
 
 
 [144]
 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962)
 
 
 [145]
 See generally Note, The Grand Jury as an Investigatory Body, 74 Harv.L.Rev. 590 (1961); Note, The Grand Jury-Its Investigatory Powers and Limitations, 37 Minn.L.Rev. 586 (1953)
 The Supreme Court described the inquisitorial function of the grand jury in Blair v. United States, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919):
 [The grand jury] is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime.
 See also Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906).
 
 
 [146]
 United States v. Smyth, 104 F.Supp. 283, 295 (N.D.Cal.1952)
 
 
 [147]
 Levine v. United States, 362 U.S. 610, 617, 80 S.Ct. 1038, 1043, 4 L.Ed.2d 989 (1960)
 
 
 [148]
 287 F. 219, 225 (N.D.Ohio 1922). See also Branzburg v. Hayes, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972) ("the powers of the grand jury are not unlimited and are subject to the supervision of the judge."); Brown v. United States, 359 U.S. 41, 49, 79 S.Ct. 539, 3 L.Ed.2d 609 (1959) ("A grand jury is clothed with great independence in many areas, but it remains an appendage of the court . . .."); Hammond v. Brown, 323 F.Supp. 326, 344-345 (N.D.Ohio), aff'd, 450 F.2d 480 (6th Cir. 1971); United States v. Smyth, 104 F.Supp. 283 (N.D.Cal.1952); 1 L.Orfield, Criminal Procedure Under the Federal Rules 475 (1966)
 
 
 [149]
 United States v. United States District Court, 238 F.2d 713, 722 (4th Cir. 1956), cert. denied, 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957). But note that the court can prevent indictment by summary discharge. United States v. Smyth, 104 F.Supp. 283, 292 (N.D.Cal.1952)
 
 
 [150]
 See generally United States v. Smyth, 104 F.Supp. 283, 289, 292, 293; 1 L.Orfield, supra note 148, at 476-77
 
 
 [151]
 Fed.R.Crim.P. 6(a). However, "the tenure and powers of a grand jury are not affected by the beginning or expiration of a term of court." Fed.R.Crim.P. 6(g)
 
 
 [152]
 Fed.R.Crim.P. 6(g); United States v. Smyth, 104 F.Supp. 283, 292 (N.D.Cal.1952)
 
 
 [153]
 In re United Electrical, Radio & Machine Workers of America, 111 F.Supp. 858, 864 (S.D.N.Y.1953); 1 L. Orfield, supra note 148, at 472, 483
 
 
 [154]
 Brown v. United States, 359 U.S. 41, 49, 79 S.Ct. 539, 3 L.Ed.2d 609 (1959). Apparently, however, the court has no discretion to refuse the grand jury process on the ground that the evidence sought is immaterial to its investigation. United States v. United States District Court, 238 F.2d 713 (4th Cir. 1956), cert. denied, 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957)
 
 
 [155]
 Fed.R.Crim.P. 17(c)
 
 
 [156]
 United States v. Smyth, 104 F.Supp. 292 (N.D.Cal.1952). For examples of instructions to grand juries see Charge to the Grand Jury, 12 F.R.D. 495 (N.D.Cal.1952); Charge to the Grand Jury, 30 Fed.Cas. 992, No. 18,255 (C.C.D.Cal.1872) (Field, J.)
 
 
 [157]
 See notes 142-44 supra and accompanying text
 
 
 [158]
 United States v. Smyth, 104 F.Supp. 283, 294 (N.D.Cal.1952). See generally Note, 37 Minn.L.Rev., supra note 145, at 599-600
 
 
 [159]
 United States v. Cox, 342 F.2d 167 (5th Cir.), cert. denied, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965), is not to the contrary. In Cox the court reversed a contempt order against a United States Attorney who had refused to sign an indictment tendered by a grand jury despite an order by the supervising court that he do so. A majority of the appeals court held that the prosecutor must help the grand jury draw up the indictment papers, but that he need not give the indictment effect by signing it. The four dissenting judges argued that signing the indictment was a mere ministerial function of the United States Attorney, whose only vehicle for termination of a prosecution is a motion to dismiss the indictment under Fed.R.Crim.P. 48(a). Thus, Cox does establish that the Executive branch has complete control over the indictment process; the prosecutor can prevent the grand jury from returning an effective indictment by refusing to sign the indictment papers as required by Fed.R.Crim.P. 7(c)
 However, Cox is relevant only to the accusatorial function of the grand jury. As Judge Wisdom pointed out in his concurring opinion:
 The decision of the majority does not affect the inquisitorial power of the grand jury. No one questions the jury's plenary power to inquire, to summon and interrogate witnesses, and to present either findings and a report or an accusation in open court by presentment.
 342 F.2d at 189. Judge Wisdom's distinction between the grand jury's "presentment" function, see notes 145-46 supra and accompanying text, and its "indictment" function is supported by the cases. In In re Miller, 17 Fed.Cas. 295, No. 9,552 (C.C.Ind.1878), the President ordered the district attorney to terminate an embezzlement prosecution under investigation by the grand jury. The supervising court instructed the jury as follows:
 If you believe the president's instructions to the district attorney were intended to prevent you from making the fullest investigation into the matter now before you, and from returning an indictment against the accused if the evidence should warrant it, you should be inspired with additional determination to do your duty. The moment the executive is allowed to control the action of the courts in the administration of criminal justice their independence is gone.
 In Sullivan v. United States, 348 U.S. 170, 75 S.Ct. 182, 99 L.Ed. 210 (1954), the Court held that an Executive Order fixing responsibility for bringing tax law prosecutions with the Attorney General's office could not affect the power of the grand jury to investigate, even on the basis of evidence presented by the United States Attorney without the Attorney General's approval. These cases illustrate that the Executive cannot control the scope and nature of a grand jury's investigation, even if the Executive has no intention of going forward with any indictment returned by the grand jury as a result of its inquiries.
 
 
 [160]
 323 F.Supp. 326, 344-345 (N.D.Ohio), aff'd, 450 F.2d 480 (6th Cir. 1971)
 
 
 [161]
 In 1818 a subpoena was issued to President James Monroe, but it summoned him merely to appear personally, not to produce any documents. The subpoena was satisfied when the President answered the court's interrogatories. See Per Curiam, supra at 710 n. 42; supra note 25. In United States v. Cooper, 25 Fed.Cas. 631 (No. 14,865, C.C.D.Pa. 1800), Justice Chase refused to permit "a subpoena to issue directed to the president of the United States." 25 Fed.Cas. at 633. No reasons for his refusal are recorded. In a related case, No. 14,861, Justice Chase stated:
 The constitution gives to every man, charged with an offense, the benefit of compulsory process, to secure the attendance of his witnesses. I do not know of any privilege to exempt members of congress from the service, or the obligations, of a subpoena, in such cases. (25 Fed.Cas. at 626).
 Thus, Justice Chase seemed to be establishing a different standard for members of Congress than for the President. For an interpretation of the Cooper case favorable to the President, see Power of the President, supra note 75, at 36-37.
 
 
 [162]
 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)
 
 
 [163]
 That the President has taken personal custody of the tapes and is himself a party to the action is, in my view as well as the majority's, immaterial. "There is not the slightest hint in any of the Youngstown opinions that the case would have been viewed differently if President Truman rather than Secretary Sawyer had been the named party," as Justice Black made clear. The authorities relied on by my colleagues here are simply not applicable because no Constitutional privilege of the Executive regarding documents was involved
 It is arguable that judicial process may issue ordering the President to perform a purely ministerial act. The basis for such an argument is language contained in Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 18 L.Ed. 437 (1867):
 A ministerial duty, the performance of which may, in proper cases, be required of the head of a department, by judicial process, is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law.
 71 U.S. (4 Wall.) at 498. Johnson held that a court could not order the President to cease enforcement of the Reconstruction Acts on the ground that enforcement of Congressional enactments is purely discretionary with the President and thus not subject to judicial process. Therefore, even if a court could order the President to perform a "ministerial" act, the issue is whether the Presidential action sought is ministerial or discretionary.
 In the case at bar, that issue turns on whether the privilege asserted by the President is a mere evidentiary one, as the Per Curiam contends, or is grounded on the Constitutional doctrine of separation of powers, as I believe. If the privilege were a qualified, evidentiary one, the President arguably would have a ministerial duty to turn over evidence in his possession when ordered to do so by a judicial subpoena. However, I have endeavored to show that the President has an unqualified, Constitutional privilege to decide whether it is in the public interest to disclose records in his possession to a co-equal Branch of Government. The decision whether to disclose or not to disclose the evidence sought in this case is thus a discretionary one for the President and not subject to judicial process under Mississippi v. Johnson. As with many of the other subsidiary issues in the case at bar, resolution of the ministerial versus discretionary question rests on the basic Constitutional issue, Who Decides?
 
 
 [164]
 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)
 
 
 [165]
 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1828)
 
 
 [166]
 479 F.2d 1099 (8th Cir., 1973)
 
 
 [167]
 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973)
 
 
 [168]
 157 U.S.App.D.C. -, 484 F.2d 820 (1973)
 
 
 [169]
 157 U.S.App.D.C. -, 484 F.2d 1086 (1973)
 
 
 [170]
 5 U.S.C. Sec. 552 (1970)
 
 
 [171]
 Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 40 F.R.D. 318 (D.C.D.C.1966), aff'd on opinion below, 128 U.S.App.D.C. 10, 384 F.2d 979, cert. dismissed, 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967)
 
 
 [172]
 145 U.S.App.D.C. 144, 448 F.2d 1067 (1971)
 
 
 [173]
 Vaughn v. Rosen, 157 U.S.App.D.C. -, 484 F.2d 820 (1973)
 
 
 [174]
 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953)
 
 
 [175]
 Citing id., at 6 & n. 9, 73 S.Ct. 528
 
 
 [176]
 Indeed, the interest in and impact of the court's decision in this case already extend well beyond the parties and legal rights directly involved. Several third parties have sought to assert their interests and views by moving to file briefs as amici curiae:
 
 
 [1]
 The Senate Select Committee on Presidential Campaign Activities. The Committee is seeking to enforce its own subpoena duces tecum against the President in the District Court for the District of Columbia. Select Committee on Presidential Campaign Activities, et al. v. Nixon, 366 F.Supp. 51. In its brief, the Committee takes the position that its case "like the one at bar, presents important constitutional issues relating to the refusal of Richard M. Nixon, President of the United States, to comply with lawfully issued subpenas for vital evidence relating to possible criminal conduct by high executive officials. In both cases, the President's noncompliance with the subpenas is grounded on the claim that material requested is protected by the doctrine of executive privilege." (Brief of Amicus Curiae at 3.)
 
 
 [2]
 American Civil Liberties Union. The ACLU sought leave to file as amicus curiae in order to vindicate "the public's right to know how the government is discharging its duties." The ACLU also raised doubts about whether the Special Prosecutor should have access to the tapes for use against persons who did not consent to the recording of their conversations with the President
 
 
 [3]
 Louis Schroeder, et al. These movants are plaintiffs-appellants in Schroeder, et al. v. Richardson, No. 73-1265, currently pending in this court. The plaintiffs-appellants allege that they have an interest in this case because one of the issues raised by the briefs is to what extent officials of the Executive Branch can control the investigative functions of federal grand juries
 4-5. Two other amicus motions were made that might be characterized as frivolous, charitably speaking.
 
 
 [6]
 In addition to these amicus curiae motions, the appellees in Nader v. Butz, No. 73-1935 (D.C.Cir.), moved to schedule the oral arguments on their motion for summary affirmance at the same time as the oral arguments in this case (11 Sept. 1973). In Nader v. Butz, District Judge Jones ordered in camera inspection of White House records in the face of a claim of Executive privilege similar to the claim made here. Thus, appellees in Nader asserted that the decision in this case would be dispositive of Nader
 
 
 [177]
 This was their concern, but the Framers were not confident they had completely achieved it: ". . . a mere demarcation on parchment of the constitutional limits of the several departments is not a sufficient guard against those encroachments which led to a tyrannical concentration of all the powers of government in the same hands." The Federalist No. 47 (J. Madison). Cf. Mr. Justice Frankfurter: "[T]he doctrine of separation of powers was not mere theory; it was a felt necessity." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 593, 72 S.Ct. 863, 889, 96 L.Ed. 1153 (1952) (concurring opinion)
 
 
 [178]
 "The same rule which teaches the propriety of a partition between the various branches of power, teaches us likewise that this partition ought to be so contrived as to render the one independent of the other." The Federalist No. 70 (A. Hamilton)
 
 
 [179]
 From Queen Anne's reign in the early 1700's, the time of Marlborough and Godolphin, the English had enjoyed the most efficient government in the western world, with the possible exception of France for a time under Louis XIV or Prussia under Frederick the Great
 
 
 [180]
 Compare the devices enumerated by Hamilton in The Federalist No. 50, "On Maintaining a Just Partition of Power Among the Necessary Departments."
 
 
 [181]
 The reason for the separation of powers was well put by Mr. Justice Brandeis:
 The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of governmental powers among three departments, to save the people from autocracy.
 Myers v. United States, 272 U.S. 53, 293, 47 S.Ct. 21, 85, 71 L.Ed. 160 (1926) (dissenting opinion).
 
 
 [182]
 See notes 40-45 supra and accompanying text
 
 
 [183]
 See notes 75-85 supra and accompanying text
 
 
 [184]
 Hamilton began his essay "On Maintaining a Just Partition of Power Among the Necessary Departments" by posing the question:
 To what expedient, then, shall we finally resort, for maintaining in practice the necessary partition of power among the several departments, as laid down in the Constitution? The only answer that can be given is that as all these exterior provisions are found to be inadequate, the defect must be supplied, by so contriving the interior structure of the government as that its several constituent parts may, by their mutual relations, be the means of keeping each other in their proper places.
 He then first referred to that
 due foundation for that separate and distinct exercise of the different powers of government which to a certain extent is admitted on all hands to be essential to the preservation of liberty, . . .
 The Federalist No. 50.